# EXHIBIT C

**IN THE MATTER OF AN ARBITRATION IN GENEVA, SWITZERLAND AND UNDER THE TREATY BETWEEN THE FEDERAL REPUBLIC OF GERMANY AND THE KINGDOM OF THAILAND MADE ON 24 JUNE 2002 CONCERNING THE ENCOURAGEMENT AND RECIPROCAL TREATMENT OF INVESTMENTS AND UNDER THE UNCITRAL ARBITRATION RULES 1976**

**BETWEEN**

**WALTER BAU AG (IN LIQUIDATION)**
<u>**CLAIMANT**</u>

**AND**

**THE KINGDOM OF THAILAND**
<u>**RESPONDENT**</u>

---

**AWARD**

**DATED 1 JULY 2009**

---

| | |
|---|---|
| Tribunal: | The Hon. Sir Ian Barker, Q.C. (Chair) (New Zealand)<br>The Hon. Marc Lalonde, P.C., O.C., Q.C. (Canada)<br>Mr. Jayavadh Bunnag (Thailand) |
| Secretary to the Tribunal: | Ms. Anja Borchardt (New Zealand) |
| Counsel: | Mr. Robert Hunter, Dr. Mariel Dimsey, Prof. James Crawford SC for Claimant<br>Mr. Michael Polkinghorne, Ms. Elizabeth Lefebvre-Gross, Mr. Paul Brumpton for Respondent |
| Lawyers: | Lovells LLP (Frankfurt) for Claimant<br>White & Case LLP (Paris) for Respondent |

## TABLE OF CONTENTS

1. INTRODUCTION AND PROCEDURAL HISTORY ..............................1
2. EVENTS 1984 TO CONCESSION AGREEMENT ............................23
3. EVENTS POST-CONCESSION AGREEMENT.................................33
4. EVENTS PRECEDING MOA2.................................................................38
5. EVENTS POST-MOA2..............................................................................48
6. THE EVENTS OF DECEMBER 2004 AND BEYOND........................67
7. THE EFFECT OF CLAUSE 25 OF CONCESSION AGREEMENT .......73
8. THE EFFECT OF MOA2..........................................................................79
9. JURISDICTION RATIONE TEMPORIS .........................................87
10. "CREEPING EXPROPRIATION"..................................................117
11. FAIR AND EQUITABLE TREATMENT STANDARD ("FET") ........121
12. CLAIMANT'S LEGITIMATE EXPECTATIONS............................126
13. DAMAGES - GENERAL .......................................................................141
14. DAMAGES - ASSESSMENT ......................................................145
15. COSTS ................................................................................................161
16. INTEREST..........................................................................................162
17. FORMAL AWARD..............................................................................163

1. **INTRODUCTION AND PROCEDURAL HISTORY**

   1.1  On 13 December 1961, a Treaty was signed between the Respondent, the Kingdom of Thailand and the Federal Republic of Germany. That Treaty came into force on 10 April 1965. One principal aim of the Treaty was: *"The promotion and reciprocal protection of investments"*. The Claimant, as a German national with an "investment" in Thailand, alleges that it is entitled to seek relief from the Respondent by virtue of provisions in a similar Treaty between the same parties, signed on 24 June 2002 and which came into force on 20 October 2004. The first Treaty will be referred to as "the **1961 Treaty**" and the second Treaty as "the **2002 Treaty**".

   1.2  By notice dated 21 September 2005, requesting submission of a dispute to arbitration, the Claimant asserted that the 2002 Treaty, under which it brought its claim for arbitration, applied to "approved investments" made in Thailand prior to the entry into force of that Treaty and that it had an investment approved in terms of the 1961 Treaty.

   1.3  The Claimant alleges that its "approved investment" was as a shareholder in the company which became the Concessionaire under a tollway concession granted by the Respondent in its territory and that the Respondent had breached its obligations to it as a shareholder of the concessionaire. It made its claim for relief in terms of the 2002 Treaty as an "investor", as defined in the 2002 Treaty.

   1.4  The provision in the 2002 Treaty under which the Claimant brought its claim for arbitration is Article 10 which reads as follows:

1

> **"Settlement of Disputes between a Contracting Party and an Investor**
>
> (1) Disputes concerning investments between a Contracting Party and an investor of the other Contracting Party should as far as possible be settled amicably between the parties in dispute.
>
> (2) If the dispute cannot be settled within six months from the date on which it has been raised by one of the parties to the dispute, it shall, at the request of either party to the dispute be submitted for arbitration. Unless the parties to the dispute have agreed otherwise, the provisions of Article 9(3) to (5) shall be applied mutatis mutandis on condition that the appointment of the members of the arbitral tribunal in accordance with Article 9(3) is effected by the parties to the dispute and that, insofar as the period specified in Article 9(3) are (sic) not observed, either party to the dispute may, in the absence of other arrangements, invite the President of the Court of International Arbitration of the International Chamber of Commerce in Paris to make the required appointments. The award shall be enforced in accordance with domestic law.
>
> (3) During arbitration proceedings or the enforcement of an award, the Contracting Party involved in the dispute shall not raise the objection that the investor of the other Contracting Party has received compensation under an insurance contract in respect of all or part of the damage.
>
> (4) In the event of both Contracting Parties having become Contracting States of the Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States, disputes under this Article between the parties to dispute shall be submitted for arbitration under the aforementioned Convention, unless the parties in dispute agree otherwise; each Contracting Party herewith declares its acceptance of such procedure."

1.5   The provisions in Article 9(3) to (5) of the 2002 Treaty, referred to in Article 10 above, in summary require each party to appoint a member of an arbitral Tribunal. The two members so appointed should nominate a national of a third state to be Chair of the arbitral tribunal within three months from the date when the Claimant gave notice that it intended to submit the dispute to an arbitral Tribunal (i.e. 21 September 2005). In default of the co-arbitrators

2

agreeing on a Chairman, the nomination of a Chairman is to be made by the President of the Court of International Arbitration of the International Chamber of Commerce, Paris (the "**ICC Court**"). Article 9 of the 2002 Treaty deals with state-state arbitration in the event of a dispute concerning interpretation or application of the Treaty.

***Procedural Background***

1.6  The Claimant is Walter Bau AG (In Liquidation) ("**Claimant**" or "**Walter Bau**"), a company incorporated under the laws of the Federal Republic of Germany which is acting through its insolvency administrator, Herrn Werner Schneider.

1.7  The Claimant is represented by Mr. Robert Hunter of Lovells LLP, Frankfurt, Germany.

1.8  The Respondent is the Kingdom of Thailand ("**Respondent**"). Like all governments, the Respondent operates through a variety of agencies. Many of these will appear in the narrative, notably the Department of Highways ("**DoH**").

1.9  The Respondent is represented by Mr. Michael Polkinghorne of White & Case LLP, Paris, France.

1.10  The Claimant, through its insolvency administrator served its Request for Arbitration on 21 September 2005 pursuant to Article 10(2) of the Treaty. In this document, the Claimant appointed the Honourable Marc Lalonde, P.C., O.C., Q.C. of Montréal, Québec, Canada as a co-arbitrator.

1.11  The Respondent did not immediately respond to the Request for Arbitration. However, on 30 November 2005, the Respondent appointed Dr. Suvarn Valaisathien of Bangkok, Thailand as a co-arbitrator.

3

1.12   The co-arbitrators were unable to agree on the appointment of a Chairman as envisaged by Articles 9(3) and 10(2) of the 2002 Treaty. By letter dated 25 January 2006, the Claimant submitted a Request for Appointment of Chair to the President of the ICC Court pursuant to Articles 9(4) and 10(2) of the 2002 Treaty.

1.13   In the interim, the Claimant wrote to the ICC Court on 10 February 2006 expressing concerns regarding Dr. Suvarn's impartiality.

1.14   The Claimant noted in that letter to the ICC Court that, although the Treaty did not provide a mechanism for the resolution of concerns of lack of impartiality against an arbitrator, the Claimant nevertheless wished to reserve its position on this point. However, the Claimant never took any formal step to challenge Dr. Suvarn's appointment.

1.15   On 27 February 2006, the President of the ICC Court confirmed the appointment of the Honourable Sir Ian Barker QC of Auckland, New Zealand as the Chairman of the Arbitral Tribunal ("the **Tribunal**").

1.16   A preliminary telephone conference was convened by the Chairman on 15 March 2006 between Counsel for the parties and the full Tribunal. The participants discussed various administrative matters, including a potential venue and date for a procedural conference to settle Terms of Reference and Terms of Appointment of the Arbitral Tribunal.

1.17   In accordance with arrangements reached at the telephone conference, a procedural conference was held on 8 June 2006 in Montréal, Québec, Canada. The Tribunal, counsel for the parties and representatives of the parties attended. At this conference, there emerged general agreement on the Terms of Reference for the arbitration and on the

4

Terms of Appointment of the Tribunal (collectively called "**Terms of Reference**"). A draft Procedural Timetable was also discussed.

1.18  The Respondent indicated at the procedural conference that it wished to contest the Tribunal's jurisdiction to consider the Claimant's claim for Treaty protection and that it would seek bifurcation of the proceedings in order to have jurisdictional objections disposed of at an early stage. The parties agreed that the language of the arbitration was to be English.

1.19  On 20 July 2006, the Chairman, on behalf of the Tribunal, settled the form of a final agreed version of the Terms of Reference and a Procedural Timetable and sent them to the parties for signature. Pursuant to paragraph 13 of the Terms of Reference, the parties were each required to deposit their share of the advance on costs. An expense account and a fees account were established. Funds were to be held and supervised by the London Court of International Arbitration ("**LCIA**") as the stakeholder approved by the parties. The LCIA was to disburse funds in accordance with directions from the Chairman given in accordance with the Terms of Reference.

1.20  On 24 July 2006, the Claimant confirmed to the Tribunal that it would sign the Terms of Reference and that it was arranging to make the necessary payments to the LCIA. On 28 July 2006, the Respondent advised that it was also arranging payment of its share. It still had a few minor reservations about the Terms of Reference which had yet to receive the Thai Cabinet's approval which was expected on 16 August 2006.

1.21  In light of the Respondent's letter, the Chairman extended the time period for obtaining the Thai Cabinet's approval to

the Terms of Reference until 16 August 2006 and emphasised that the extension should not be interpreted as permitting either party to veto the Terms of Reference. The Chairman reminded the parties that the Tribunal had the authority to issue the Terms of Reference without the parties' approval and asked that the parties proceed on the basis that the Terms of Reference were fixed.

1.22   The Claimant signed the Terms of Reference and sent its signed copy to the members of the Tribunal on 10 August 2006. On 11 August 2006, it forwarded a signed copy of the Procedural Timetable to the Chairman and advised that the Claimant's share of the advance on costs had been paid to the LCIA.

1.23   On 18 August 2006 the Respondent indicated that it had been unable to meet the 16 August 2006 deadline referred to in para 1.21 above. The Chairman granted the Respondent until 4 September 2006 as a final deadline for obtaining the Thai Cabinet's approval to the Terms of Reference.

1.24   On 1 September 2006, the Respondent deposited its share of the advance on costs with the LCIA. On 4 September 2006, it forwarded a signed copy of the Terms of Reference and the Procedural Timetable to the Tribunal.

1.25   Under the Terms of Reference, the juridical seat of the arbitration is Geneva, Switzerland. The applicable law for the arbitration is :

> "public international law. Subject to this, where discrete issues of national law arise, the law to be applied or considered shall ordinarily be the law of the Kingdom of Thailand although German law issues may also arise. The Tribunal shall determine the appropriate law or laws to be applied."

6

1.26 Under the Terms of Reference, the UNCITRAL Arbitration Rules ("the **UNCITRAL Rules**") (except as excluded, supplemented or varied by agreement of the parties), the relevant provisions (if any) of the Treaty and/or such specific orders or instructions of the Tribunal are to be the applicable procedural rules.

1.27 Under the Terms of Reference, the Tribunal is not to be bound by strict rules of evidence. However, as appropriate, the Tribunal may have regard to the 1999 Rules on the Taking of Evidence in International Commercial Arbitration adopted by the International Bar Association ("the **IBA Rules**").

1.28 Under the Terms of Reference, the Chairman was empowered to make procedural rulings alone, subject to the provisions of Clause 14(c) which states:

> "The Tribunal and the Parties agree that the Presiding Arbitrator may make procedural rulings alone provided that:
>
> (i) all correspondence is copied to the co-arbitrators;
>
> (ii) the Presiding Arbitrator shall be free to consult, in his discretion, with the other arbitrators or to refer significant or difficult matters to the full Tribunal for decisions; and
>
> (iii) the full Tribunal shall hear and determine any procedural matter if requested by either Party."

1.29 After the signing of the Terms of Reference, the Tribunal appointed Ms. Lauren Lindsay, Barrister, of Auckland, New Zealand as Administrative Secretary to the Tribunal. Ms. Lindsay resigned and was replaced in this role by Ms. Anja Borchardt, Barrister, of Auckland, New Zealand on 1 July 2008. Appointment of an Administrative Secretary was authorised by the Terms of Reference.

1.30 On 2 October 2006, the Respondent submitted a Memorial on Jurisdiction and a Request for Bifurcation. It also sought an order for security for costs against the Claimant. Both parties made various applications for discovery. A further telephone conference was held on 21 December 2006 (Auckland time) to discuss these applications and the timing of a jurisdictional hearing, should the decision be made to bifurcate the proceedings. The telephone conference was attended by all members of the Tribunal and counsel for the parties.

1.31 After consideration by members of the Tribunal of the discussion at the telephone conference, the Chairman, on behalf of the Tribunal, issued an order on 21 December 2006 which granted the Respondent's application to bifurcate the proceedings. He ordered that discrete jurisdictional questions in a form to be agreed between the parties would be considered by the Tribunal at a jurisdictional hearing which was fixed for 20-21 March 2007 in Kuala Lumpur, Malaysia, a venue acceptable to the parties.

1.32 Whilst certain discovery orders were made, the Tribunal refused to make an order for security for costs in respect of the jurisdictional hearing. It made no decision in the meantime on the Respondent's application that the Claimant give security for the Respondent's costs of the substantive arbitration. The Tribunal sought the following information from the Claimant:

> "(a) the insolvency administrator's current estimate of the amount that would be available after payment of secured creditors and the costs of the insolvency;
>
> (b) whether, out of this sum, it is possible to 'ring-fence' a discrete amount which would earn interest for the insolvency but which could be available for security for costs. Such sum

8

                could only be disbursed on the order of the Tribunal."

1.33  The Tribunal considered that, if the Respondent's jurisdictional challenge were successful, there would be no need to consider any application for security for the costs of a substantive hearing. The parties could not agree on discovery issues and were in dispute over the scope the Tribunal's 21 December 2006 Discovery Order.

1.34  The Claimant objected to the reception as evidence of a letter from Dr. Reinhard Zimmer attached to the Respondent's rejoinder on jurisdiction. The Claimant argued that the letter, as a witness statement (expert or otherwise) was incomplete and that Dr. Zimmer should appear at the hearing in Kuala Lumpur for cross-examination if reliance were to be placed on his statement.

1.35  The Chairman, on behalf of the Tribunal, issued Procedural Order No. 1 on 6 March 2007 to dispose of the issues relating to Dr. Zimmer's evidence. He ruled that, should the Respondent wish to rely on Dr. Zimmer's evidence at the hearing, it would have to submit a witness statement from him that complied with the IBA Rules and to arrange for Dr. Zimmer to attend the hearing. The disclosure issue was to be argued at the hearing. (In the event, Dr. Zimmer did not attend either the substantial or jurisdictional hearings in Hong Kong).

1.36  On 16 March 2007, when M. Lalonde was already on his way from Montréal to Kuala Lumpur for the hearing and the Chairman was about to leave New Zealand for the hearing, the Respondent emailed the Tribunal challenging the continued service on the Tribunal of its own party-appointed arbitrator, Dr. Suvarn Valaisathien. This letter was seemingly in response to an earlier letter from the

9

Claimant to the Respondent dated 4 March 2007 where it advised that:

> "It [had] come to [its] attention during the course of preparing for the March hearing that, many years ago, Dr. Suvarn Valaisathien provided some advice and temporarily held a nominal shareholding in a company connected with this project. The circumstances [were] as follows. In 1984, Dyckerhoff & Widmann AG (Dywidag") and a local Thai engineering company Delta Engineering Construction Company Limited ("Delta") established a Thai company named Dywithai Company Limited ("Dywithai"). For compliance reasons, Dr. Valaisathien held a 2% interest in Dywithai. Under its new name of Dywidag (Thailand) Company Limited ("Dywidag Thailand"), this company was part of the consortium which contracted with DMT for the design and construction of the Don Muang Tollway. Dywidag ceased to have an interest in the company in 1997. Dr. Valaisathien also provided legal advice to Dywidag and Delta on Thai corporate and tax law in connection with Dywidag's and Delta's establishment and incorporation of DMT in 1988 and 1989."

1.37    In their email to the Tribunal, the Respondent's lawyers noted that Dr. Suvarn's appointment had been made by the previous Thai government and before the engagement of their firm, White & Case. Following receipt of the Claimant's 4 March 2007 letter, they had obtained lists of shareholders from Thailand's Ministry of Commerce which confirmed that between 1984 and 2001, Dr. Suvarn had had an equity interest in Dywidag.

1.38    The Respondent therefore challenged Dr. Suvarn pursuant to Article 10 of the UNCITRAL Rules, which permits an arbitrator to be challenged by the party appointing him, if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence, as long as the challenging party becomes aware of those circumstances following the appointment. In the Respondent's submission, the circumstances did give rise to justifiable

doubts as to Dr. Suvarn's impartiality and independence in that:

> "Dr. Suvarn has a close relationship not only with Claimant but also with an entity closely connected with Claimant by virtue of the facts that: (i) he provided legal advice to Claimant's predecessor, Dyckerhoff & Widmann; and (ii) Dr. Suvarn held a long-term interest in a company that partnered with Claimant's predecessor to construct the very project that is at issue in this arbitration.
>
> The matter is all the more sensitive given the nature and importance of this dispute to the Kingdom of Thailand and the need for all parties, and the Thai people, to have the utmost confidence in the decisions of this Tribunal."

1.39   The Respondent submitted that the challenge was timely under Article 11 of the UNCITRAL Rules since it was made within 15 days of the 4 March 2007 letter notifying if of the relevant circumstances. The Respondent invited Dr. Suvarn to withdraw as an arbitrator and, in the event that he did not willingly do so, the Respondent intimated that it would pursue its challenge with the President of the ICC Court. The Respondent requested that the hearing on jurisdiction be adjourned.

1.40   In an email of 16 March 2007 to the Tribunal, the Claimant categorised Dr. Suvarn's involvement with the project as tangential. It submitted that the fact that he had given certain advice a considerable time ago was not a ground for impugning his impartiality. In addition, the Respondent had, at the time it signed the Terms of Reference, knowledge of Dr. Suvarn's questioned involvement. Accordingly, the challenge was excluded under paragraph 3(e) of the Terms of Reference under which the parties waived any possible objections to the appointment of the arbitrators on the grounds of potential conflict of interest and/or lack of independence or impartiality in respect of

11

matters known to them at the date of signature of the Terms of Reference.

1.41   In the interests of efficiency, the Claimant suggested that:

> "the hearing should go ahead ... and the evidence be taken, with a direction by the tribunal – preferably with the consent of the parties – that there shall be no rehearing if the challenge is upheld. The challenge could then follow that with a minimum impact on procedure. ... Should the challenge succeed, the new arbitrator could be appointed and the tribunal could then determine the issue upon the basis of the transcript and written submissions."

1.42   Following this exchange of emails, Dr. Suvarn immediately resigned as a co-arbitrator without protest. The Respondent refused to agree to proceeding with the hearing without a third member of the Arbitral Tribunal on the basis suggested by the Claimant. The Chairman therefore felt obliged to adjourn the hearing. The hearing was, accordingly, adjourned, at great inconvenience to the remaining members of the Tribunal, the parties, counsel and witnesses.

1.43   The Chairman held a telephone conference with Counsel for the parties on 20 March 2007 to discuss a timetable for the appointment of a new co-arbitrator. Following the conference, the Chairman on behalf of the Tribunal issued Procedural Order No. 2 on 22 March 2007 stipulating as follows:

> "1.   The Respondent is to have a new arbitrator appointed and his/her appointment advised to the Tribunal and the Claimant by 6 pm 20 April 2007 (French time).
>
> 2.   The new arbitrator should make a declaration of impartiality and independence and accept the existing Terms of Reference and Terms of Appointment, subject to any necessary adjustment to the terms relating to the remuneration of the Tribunal.