> 3. The new arbitrator must be available to consider the jurisdictional challenge in late July/early August 2007 and conduct the substantive hearing (if any) in March/April 2008. Any consequential amendments to the TOR should be considered at the [next] telephone conference ..."

1.44 On 11 May 2007, the Respondent advised the Claimant and the Tribunal of the appointment of its replacement co-arbitrator, Mr. Jayavadh Bunnag of International Legal Counsellors Thailand Ltd, Bangkok. However, although his appointment had been made, Mr. Bunnag did not receive an official letter of confirmation for a further few days after this date.

1.45 Mr. Bunnag signed and forwarded a Statement of Independence and Impartiality to the administrative secretary of the arbitration on 18 May 2007. Mr. Bunnag signified his acceptance to the Terms of Reference on 25 May 2007. After discussions between Counsel and the Tribunal, a jurisdictional hearing was directed to take place in Hong Kong on 31 July – 1 August 2007. The Respondent wished the venue for the hearing to be in Asia. The Claimant preferred a venue in London or Paris but ultimately agreed to Hong Kong.

1.46 On 19 June 2007, the Respondent revived the issues of Dr. Zimmer and document production. The Respondent advised that because the German Government did not consent to Dr. Zimmer's participation at the hearing, Dr. Zimmer would not be attending as a witness. The Respondent also objected to the Claimant's assertions of privilege in relation to the disclosure of those documents that fell within paragraph 8(b) of the Tribunal's Order for Directions No. 1. The Claimant provided its response on 13 July 2007.

13

1.47 The Tribunal issued Procedural Order No. 3 on Document Disclosure on 18 July 2007 and reiterated its views on Dr. Zimmer. It ruled that the Claimant had already complied with the Respondent's request for broader disclosure by stating that it had no documents in its possession or power falling within the scope of the request.

1.48 The hearing on the challenge to jurisdiction *ratione materiae* and *ratione personae* took place at the Hong Kong International Arbitration Centre on 31 July and 1 August 2007. The Claimant was represented by Mr. Robert Hunter and Dr. Mariel Dimsey of Counsel and the Respondent by Mr. Michael Polkinghorne and Ms. Sarah Cohen of Counsel. Representatives of both parties attended the hearing.

1.49 Prepared briefs of the evidence-in-chief of the Expert witnesses – one for each side - had been provided in advance. Each witness was cross-examined and re-examined. A verbatim transcript was taken of the whole hearing and made available to the Tribunal and the parties. The parties had already filed extensive memorials on the jurisdictional issues before the order for bifurcation had been made.

1.50 Written submissions were forwarded by both counsel to the Tribunal on or about 10 August 2007.

1.51 An Award on Jurisdiction was issued on 5 October 2007. The Tribunal determined that the claim should proceed to a hearing on the merits and on some other jurisdictional objections which the Respondent proposed to raise at the substantive hearing.

1.52 Until the Respondent's initial jurisdictional objections had been determined, there had been no need for the Tribunal to have considered the Respondent's application for

        security for costs in respect of the substantive hearing of the arbitration.

1.53    On 15 January 2008, the Tribunal made a Ruling on Security for Costs, deciding that no amount for security for the costs of the arbitration be paid by the Claimant to the Respondent.

1.54    A Variation of Terms of Reference to Arbitration and Terms of Appointment of Arbitral Tribunal ("Amended Terms of Reference") were agreed to by the parties to accommodate the changes, *inter alia*, resulting from the increase in the size of the claim and the amended constitution of the Tribunal. Those Amended Terms of Reference were signed by the Claimant on 25 February 2008 and by the Respondent on or about 16 September 2008.

1.55    On 11 March 2008, a procedural conference was held via telephone between the Chairman and counsel and the Tribunal subsequently issued a timetable order.

1.56    A number of interlocutory steps were taken and a further procedural conference via telephone was held on 19 August 2008 between the Chairman and counsel in preparation for the substantive hearing in Hong Kong.

1.57    The hearing on the merits and on the Tribunal's jurisdiction *ratione temporis* took place from 6 October to 17 October 2008 over 11 sitting days. It was held at the Hong Kong International Arbitration Centre.

1.58    The Claimant was represented by Mr. Robert Hunter, Dr. Mariel Dimsey and Professor James Crawford S.C. of counsel. The Respondent was represented by Mr. Michael Polkinghorne, Ms. Elizabeth Lefebvre-Gross and Mr. Paul Brumpton of counsel. Various representatives of the parties and support staff from the lawyers attended the

hearing, as well as the Administrative Secretary to the Tribunal, Ms. Anja Borchardt.

1.59 Briefs of Evidence of the evidence-in-chief of the witnesses of fact and of the expert witnesses had been provided to the Tribunal in accordance with the procedural timetable. Statements in reply had been filed in advance. Witnesses were cross-examined by opposing counsel and questioned by members of the Tribunal. A verbatim transcript was taken of the whole hearing and was made available to the Tribunal and the parties.

1.60 The parties had already filed extensive memorials as follows: the Claimant's Principal Memorial on or about 30 November 2007; the Respondent's Defence Memorial on or about 1 April 2008; the Claimant's Reply Memorial on or about 27 May 2008 and the Respondent's Reply Memorial on or about 21 July 2008.

1.61 Written legal submissions were forwarded by both counsel to the Tribunal on or about 15 September 2008. Each party had provided a Skeleton Argument to the Tribunal on or about 29 August 2008.

1.62 On 6 October 2008, the Tribunal heard the opening submissions by the Claimant, followed by those of the Respondent.

1.63 The following factual witnesses were called by the Claimant on 7 October 2008, Mr. Albert Hacker, former head of the Finance Department of Dywidag and later Walter Bau, Mr. Franz-Josef Brinkschulte, former Claim Manager for Dywidag and Mr. Rainer Trapp, former Chief Financial Officer of Dywidag. Mr. Trapp's evidence was continued on the following day.

1.64   On 8 and 9 October 2008 the Respondent called its factual witnesses, i.e. Dr. Vongchai Jarernswan, former principal adviser at the Ministry of Transport and Communications of Thailand and Mr. Prasit Siripakorn, a member of the Selection Committee of the DoH which had negotiated various agreements between the parties.

1.65   On 9 October 2008, Mr. Philip Bates of Steer Davis Gleave, London, was called as the Claimant's expert witness on traffic issues.

1.66   On 10 October 2008, Mr. James Bamford formerly of Halcrow, London and Bangkok (now an independent consultant), was called as the traffic expert for the Respondent. To accommodate the witnesses' travel plans, the Tribunal sat on Saturday, 11 October 2008, and Mr. Bamford's evidence was concluded on that day. Both experts jointly considered questions from the Tribunal at the conclusion of Mr. Bamford's evidence.

1.67   On 13 October 2008 the Tribunal heard the evidence of Mr. Robert Boulton of LECG Limited, London, United Kingdom, as valuation expert for the Claimant. He was followed by Mr. Brent Kaczmarek of Navigant Consulting, Washington DC, United States of America, valuation expert for the Respondent.

1.68   On 14 October 2008, after the evidence of Mr. Kaczmarek had concluded, Mr. Boulton and Mr. Kaczmarek answered questions from the Tribunal in a "hot tub" situation.

1.69   On 15 October 2008, the experts on Thai law, Prof. Sompong Sucharitkul for the Claimant and Dr. Bhokin Bhalakula for the Respondent gave evidence.

1.70 On 16 and 17 October 2008, the Tribunal heard the closing submissions and legal argument from counsel for both parties.

1.71 On 17 October 2008, the Tribunal heard from counsel for the Claimant in reply to the Respondent's submissions. Afterwards the Tribunal held a dialogue with all counsel. The hearing adjourned at 11:51am on 17 October 2008.

1.72 Written post-hearing submissions were forwarded to the Tribunal on or about 14 November 2008. The Tribunal is grateful to all counsel for their assistance before and during the hearing and for the high quality of their submissions.

1.73 On 24 April 2009, the Chairman of the Tribunal received a letter from Weerawong, Chinnavat & Peangpanor Limited ("**W C & P**") a firm of lawyers in Bangkok who purported to write on behalf of the Respondent. W C & P had been a part of White & Case LLP until separation from that firm on 1 January 2009 and establishment as a separate legal firm under the W C & P name.

1.74 The letter advised that Mr. Sombath Phanichewa ("**Sombath**") and his son, Mr. Tarnin Phanichewa ("**Tarnin**") had commenced an ICC arbitration against the insolvency administrator of the Claimant on 15 October 2008. Their claim in this arbitration was based on alleged breaches of the agreement dated 3 December 2006 for the sale by the administrator to Sombath & Tarnin of the Claimant's shareholding in DMT.

1.75 A copy of this agreement was attached to the letter from W C & P who alleged that the Claimant had not disclosed the document to the Tribunal, even when requested to do so by the Respondent.

18

1.76 The letter stated that the Respondent believed that the Claimant had proceeded with the arbitration hearing in bad faith, had violated its obligations under the said agreement and had increased its claim after the date of the agreement, also in violation of the agreement. The claimants in the ICC arbitration were seeking an order from the ICC Tribunal to instruct the administrator to withdraw from the present arbitration. The W C & P letter concluded: *"Accordingly, the Kingdom of Thailand would like to formally notify the Tribunal of this information and the fact that the SP and TP arbitration is being considered by another tribunal. The Kingdom of Thailand strongly believes that it would be fair and equitable that the Tribunal take into consideration the above information, including the outcome of the SP and TP arbitration."*

1.77 The Chairman, by email on 25 April 2009, acknowledged receipt of W C & P's letter but pointed out that the Tribunal had received no advice from White & Case LLP and its leading counsel, Mr. M. Polkinghorne, that White & Case LLP was no longer acting for the Respondent in this arbitration. The Chairman went on to advise that the Tribunal was due to confer in London on 4 and 5 May 2009 and that the time for receiving further evidence had long since passed. The Chairman opined that W C & P's letter came nowhere close to a proper application to admit further evidence. He invited counsel on the record for both parties to file submissions.

1.78 On 25 April 2009, W C & P advised the Chairman that they would send a copy of their earlier letter to M. Lalonde and Mr. Bunnag. For some unexplained reason, they had not done so originally. They stated, *inter alia*:

> "(a) After 1 January 2009 White & Case LLP continue to represent the Respondent with W C & P acting as local counsel; and

19

      (b)    W C & P has no involvement in the ICC arbitration."

1.79    Sombath and Tarnin are represented in the ICC arbitration by a firm of Swiss lawyers. An arbitral tribunal has been appointed by the ICC. Under the relevant agreement, Swiss law applies to the arbitration and the seat of the arbitration is Singapore.

1.80    On 28 April 2009, the Claimant provided detailed comment of W C & P's letter and advised *inter alia* :

    (a)    Contrary to W C & P's letter, the relevant agreement had been before the Tribunal at the principal hearing. It bore the reference number R139 and was included the agreed volumes of documents.

    (b)    The Respondent had a copy of this document some five days before it applied to the Tribunal during the jurisdictional hearing on 1 August 2007 for the production of this document. This fact could be deduced from the facsimile identification notification.

    (c)    The Respondent produced the document R139 with its defence on 1 April 2008.

1.81    The Claimant offered argument as to the merits of the Respondent's bad faith claim against the Claimant's insolvency administrator. The Tribunal does not consider it necessary to explore these allegations in view of its clear conclusion that the W C & P letter should be ignored by the Tribunal.

1.82    The Claimant refuted the suggestion in W C & P's letter that the administrator had increased the Claimant's claim in violation of the agreement. The Claimant pointed out that it had indicated at the procedural conference in Montreal in June 2006 that once detailed reports on

damages had been received, the amount stated in the original claim could well be increased. On 31 July 2007, at the jurisdictional hearing in Hong Kong, the Claimant advised that the claim was to be in the region of €120 million. That figure was used as a basis for calculating the Tribunal's remuneration.

1.83   On 30 April 2009, the Respondent, through White & Case LLP, advised that there would be no comment on W C & P's letter. White & Case said that it had not been possible to set up a meeting of the Respondent's relevant Executive Committee.

1.84   On 1 May 2009, W C & P again communicated with the Tribunal essentially repeating the claims made in the first letter. They stated that the Respondent's Emergency Committee had met to consider the Claimant's letter of 27 April 2009. They stated that the Respondent believed that the information regarding the ICC arbitration *"is important and relevant to the BIT arbitration and that the Tribunal should take such information into consideration"*.

1.85   The Tribunal does not propose to take any action on W C & P's letters and will ignore them when considering its Award. Its reasons can be summarised as follows:

(a)   The letters have not come from the lawyers on the record as representing the Respondent. In all correspondence and appearances, the Tribunal has had no indication that the mandate of those lawyers has been terminated.

(b)   Contrary to W C & P's assertion, the document which W C & P claimed should affect the Tribunal's determination was one of the many documents before the Tribunal at the substantive hearing. No reference was made to the document during the

hearing. The Tribunal was not asked to examine its terms and no submissions were made about those terms which are now said to be material. There were literally thousands of documents placed before the Tribunal. If any one document had been of significance then the Tribunal considers that counsel would have referred to it either at the hearing or in post-hearing submissions.

(c) The ICC arbitration is *res inter alios acta*. This Tribunal is not in any position to comment on the issues that will fall to be considered by the ICC arbitrators.

(d) Mr. Sombath, as the leading shareholder in DMT, must have known of this present arbitration. Indeed, the Respondent requested at the jurisdictional hearing, that Mr. Sombath give evidence about the share purchase transaction. Clearly, if his evidence had been considered material for the substantive hearing, the Respondent should have tried to call him.

(e) The hearing of evidence in the arbitration closed on 17 October 2008, save for the Tribunal receiving written submissions and some agreed further information from the traffic experts. Very strong grounds would be needed for the Tribunal even to consider, let alone grant, an application to call further evidence at a stage when the issue of an award is imminent. This is especially so when the evidence sought to be addressed was before the Tribunal at the time of the substantive hearing. Moreover, when the allegedly crucial document, which was before the Tribunal, had not been made the subject of any comment or submission.

22

1.86   Accordingly, the Tribunal proceeds to consider the claim on the merits untrammelled by the letter from W C & P.

1.87   The members of the Tribunal met to confer over preparation of this Award in London, United Kingdom on 4 May 2009. As a result of these deliberations, they issued a request for further information and calculations to be supplied by the accounting experts for each party. The experts supplied an agreed report to the Tribunal on 13 May 2009.

1.88   The Tribunal will now give a summary of relevant facts. Of necessity, this summary does not set out many matters in huge detail but endeavours to note everything of significance to the issues which the Tribunal has to address. The volume of evidence, submissions and exhibits was such that would make detailed canvassing of every nuance of factual material impracticable in any award of tolerable length.

## 2. EVENTS 1984 TO CONCESSION AGREEMENT

2.1   In 1984, Dyckerhoff & Widmann AG ("**Dywidag**"), a German construction company with international experience, incorporated under the laws of Germany, commenced construction activities in Thailand.

2.2   In 2000, Dywidag's International Operations Division was transferred to a separate legal entity, Dywidag International GmbH ("Dywidag International") which was fully owned by Dywidag.

2.3   On 16 August 2001, Dywidag was merged with Walter Bau AG ("**Walter Bau**"), a public limited company incorporated under the laws of Germany.

23

2.4 On 1 April 2005, Walter Bau became insolvent. Its remaining business has continued to be operated by Dywidag International in co-ordination with Walter Bau's insolvency administrator, Herrn Werner Schneider. As noted earlier, this present claim is being brought by the insolvency administrator.

2.5 It will be convenient in this Award to refer to the Claimant in all its various guises as "the **Claimant**".

2.6 During the late 1980s, the Kingdom of Thailand was experiencing rapid population growth which involved a consequential need to develop public infrastructure. In particular, there had been a rapid growth of traffic flowing between Bangkok to the north of the country which had led to a level of congestion on the existing road to the north which was also the route to Don Muang International Airport, some 20 kms from the centre of Bangkok. This road to the north was known as the Vibhavadi-Rangsit Highway (the "**VRR**").

2.7 In a study made in 1986 by DoH (the "**1986 Report**") it was noted that:

(a) upgrading the VRR would require a large investment and there would be difficulty in obtaining the necessary funds from government sources;

(b) the private sector should be allowed to participate in investment on this highway or any other highway in the form of tolls.

2.8 The 1986 Report pointed out that, in order to attract private investment, it would be necessary to create benefits and incentives for private investors. It further stated:

> "Based on the principle that it should bring benefits to all the parties concerned, the private party would be granted concession right to construct and operate

> a toll road along the existing route..". "This alternative would ease the burden on the budget fund, eliminate the difficulties of the users, as well as create additional jobs in the construction industry."

2.9 The DoH followed up this Report with a further document in 1987 called "Guidelines for Proposals for a Concession Highway" ("the **1987 Guidelines**"). This document recorded that "*Concessionaire has the right to collect toll fees for elevated road users at justifiable rates to recover investment*".

2.10 Having heard at an early stage about the 1986 Report, the Claimant saw a profitable investment in the Tollway project suggested in the Report. It combined forces with a joint venture partner, a Thai company, Delta Engineering Construction Co. Limited ("**Delta**").

2.11 The Joint Venture submitted a bid to DoH on 20 January 1988 seeking to be considered as the constructor and operator of the proposed Tollway. This original bid proposed a general toll of THB 10 for the first 10 years of operation. The bid was the result of an invitation from DoH to the Joint Venture to apply to tender for the Tollway Concession. The concession required the Concessionaire to construct the Tollway and to operate it once it had been built for the period of the concession. At the end of the concession period, the Tollway would be handed over to the Respondent without compensation. The Concessionaire was to recover the costs of construction and operation, plus a return on its investment from the tolls payable by motorists using the Tollway over the life of the concession.

2.12 On 9 March 1988, the Claimant and Delta were informed by the DoH that the Joint Venture's proposal had been selected for negotiation.

25

2.13 The Tollway was to be what was described at the hearing by the Claimant's traffic expert as a "congestion-buster" tollway, as distinct from a tollway which either provided a road where none had existed before or which provided an alternative to an otherwise lengthy or inconvenient journey.

2.14 The Joint Venture's bid was based on the 1986 Report and the 1987 Guidelines plus a one-page sketch of the average daily traffic volumes on the VRR recorded in January 1988. The basic assumption was that through-traffic and higher-speed traffic would travel on the elevated triple-carriageway express lanes of the Tollway whilst the ten lanes of the VRR would cater for local and lower-speed traffic.

2.15 As part of the bid, the Claimant considered that four existing longitudinal flyovers on the VRR would have to be demolished. The benefit in doing this was that the bulk of north-south traffic would be induced to use the Tollway and that east-west through-traffic would use newly-constructed east-west flyovers.

2.16 On 9 May 1988, the Thai Council of Economic Ministers rejected the Joint Venture's technical proposals. The Council decided to maintain the status quo of the VRR rather than accept the turning of four flyovers. Despite this rejection, the Respondent maintained the status of the Joint Venture as preferred bidder for the Tollway.

2.17 In mid June 1988, the Claimant was informed by Delta that the Respondent might accept the technical concept with two flyovers being turned and two flyovers staying as they were. Consequently, a supplementary proposal from the Joint Venture (which by now had become an incorporated company, Don Muang Tollway Co. Limited ("**DMT**")) was submitted on 5 August 1988 to DoH and to the Chairman of

26

   the *"Committee of Highways Construction Project by Concession Highway No. 31"*. The shareholding in DMT at this stage was 51% for Delta and 49% for the Claimant.

2.18 DMT's supplementary proposal offered two alternatives. The first was that all the existing flyovers stay as they were, with an increase in tolls of THB 5 and an extension of the Tollway concession period from 24 to 30 years.

2.19 The second alternative involved:

  (a) the turning of two of the four flyovers;

  (b) maintaining the original proposed toll for 4-wheeled vehicles (20 THB for the whole journey) but with 5 THB toll increases in the 9th and 14th year respectively;

  (c) an extension of the concession period from 24 to 30 years;

  (d) equal treatment with already-agreed Concession Agreements concerning other private toll roads; and

  (e) the award of Board of Investment ("**BoI**") privileges to DMT.

2.20 According to the evidence of Mr. Trapp (who was Dywidag's Commercial Project Manager at the time and effectively driving the bid), the Claimant's investment strategy at the time of submission of DMT's supplementary offer was for the Claimant to invest a minimum of DM 17 million which corresponded to a 20% shareholding in DMT's total equity of DM 85 million, which in turn corresponded to 20% of the total necessary capital investment for the Tollway of DM 425 million (a debt-equity ratio of 1:4).