**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                    :

In the Matter of the Arbitration Between:     :

                                    :

WERNER SCHNEIDER, acting in his capacity   :
as insolvency administrator of WALTER BAU AG  :
(IN LIQUIDATION)                        :              1:10-cv-2729-RJH

                                    :

                    Petitioner,      :

                                    :

              v.                      :

                                    :

THE KINGDOM OF THAILAND          :

                                    :

                   Respondent.     :

                                    :

-----------------------------------------------------------X


**THAILAND'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION TO DISMISS PETITION FOR CONFIRMATION OF A FOREIGN ARBITRAL AWARD**


                                         Claudia T. Salomon
                                         David S. Christy, Jr.
                                         David S. Wenger
                                         DLA Piper LLP (US)
                                         1251 Avenue of the Americas
                                         New York, NY 10020-1104

                                         *Counsel for The Kingdom of Thailand*

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .............................................................................................................2

    I.      Context of the Dispute.......................................................................2

    II.     The Relevant Treaties .......................................................................3

    III.    WB's Arbitration Claim Against Thailand....................................3

    IV.   Thailand's Objection To The Arbitrators' Jurisdiction ...............4

    V.    Common Ground Between The Parties On Approval Requirements.....................4

    VI.   Thailand's Position That WB's Investment Did Not Receive The Required Approval ...........................................................................5

    VII.  The Arbitrators' Award On Jurisdiction.......................................6

    VIII. Further Procedural Background........................................................7

ARGUMENT ...................................................................................................................8

    I.      The Court Should Not Confirm The Award Because Thailand Did Not Agree To Arbitrate With WB .............................................8

         A.    The Court Should Make An Independent Determination Of Whether Thailand Agreed to Arbitrate Because The Issue of Arbitrability Is Reserved For The Court. ...........................9

              1.    The Court Has A Mandate To Review Whether The Parties Agreed To Arbitrate The Dispute.....................9

              2.    The Arbitrators' Decision On Arbitrability Does Not Bind The Court.........................................................10

              3.    Thailand Has Not Waived Its Right To Challenge Arbitrability ................................................................12

         B.    The Arbitrators Incorrectly Decided That Thailand Approved WB's Investment, Entitling WB's Investment To BIT Protection And Giving WB The Right To Arbitrate With Thailand. ....................13

              1.    The arbitrators incorrectly equated the term "permit" in Part 1(a) with a "certificate of admission" classifying an investment as an "approved project" in Part 1(b)..........................14

              2.    The arbitrators incorrectly reasoned that Thailand's issuance of eight CAs prior to the 2003 Announcement had no bearing on whether the 1961 Treaty required a CA. ................16

         C.    The Evidence Upon Which The Arbitrators Relied Was Insufficient To Support A Finding That Thailand Agreed to Arbitrate ..........................18

# TABLE OF CONTENTS

**Page**

II.     The Court Should Dismiss The Case Because New York Is An Improper
        Forum To Confirm The Award. ..................................................................................19

     A.     The Doctrine Of Forum Non Conveniens Applies To Actions
        Seeking To Confirm A New York Convention Award ...............................19

     B.     WB's Choice Of New York Is Not Entitled To Any Deference; An
        Alternative Forum Is Adequate; The Public And Private Interest
        Factors Favor Dismissal Because Thailand Has No Executable
        Assets In the United States, And The Action Has No Other
        Connection To The United States....................................................................20

          1.     WB's Choice Of Forum Should Not Be Entitled To Any
        Deference Because The New York Convention Is The Only
        Basis For Bringing This Action In New York.................................20

          2.     Thailand Is An Adequate Alternative Forum Because
        Thailand Is Amenable To Service Of Process, Thailand Is
        A Signatory To The Convention, And Thailand's Assets
        Are Located In Thailand.................................................................22

          3.     The Private And Public Interest Factors Strongly Favor
        Dismissal Because A Judgment Will Be Unenforceable In
        The United States And There Is No Local Interest In
        Resolving This Non-Local Dispute .................................................22

CONCLUSION ...................................................................................................................24

# TABLE OF AUTHORITIES

CASES                                      **Page**

*Allstate Life Ins. Co. v. Linter Group, Ltd.*
994 F.2d 996 (2d Cir. 1993) ............................................................. 22, 23

*Blimpie Int'l v. ICA Menyforetagen AB*
1997 U.S. Dist. LEXIS 3950 (S.D.N.Y. Mar. 21, 1997) ......................... 23

*China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*
334 F.3d 274 (3d Cir. 2003) .................................................................. 11

*Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda v. Republic of Peru*
655 F. Supp. 2d 361 (S.D.N.Y. 2009) ............................................. 19, 22

*First Options v. Kaplan*
514 U.S. 938 (1995) .................................................................. 9, 10, 11

*Great Northern Ins. Co. v. Constab Polymer-Chemie GmbH & Co.*
2007 WL 2891981 (N.D.N.Y 2007)......................................................... 23

*Gulf Oil Corp. v. Gilbert*
330 U.S. 501 (1947) ......................................................................... 22, 23

*Management & Technical Consultants S.A. v. Parsons-Jurden International Corp.*
820 F.2d 1531 (9th Cir. 1987) ............................................................... 12

*Melton v. Oy Nautor Ab*
1998 U.S. App. LEXIS 22100 (9th Cir. Sept. 4, 1998)........................... 19

*Mobil Oil Corp. v. Oil, Chemical & Atomic Workers International Union*
600 F.2d 322 (1st Cir. 1979)................................................................. 12

*Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*
("*Monde Re*"), 311 F.3d 488 (2d Cir. 2002)................................ 19, 20, 21

*Norex Petroleum Ltd. v. Access Industries, Inc.*
416 F.3d 146 (2d Cir. 2005) ........................................................... 20, 21

*Olympic Corp. v. Societe Generale*
462 F.2d 376 (2d Cir. 1974) .................................................................. 23

*Penrod Mngmt. Group v. Stewart's Mobile Concepts*
2008 U.S. Dist. LEXIS 11793 (S.D.N.Y. Feb. 16, 2008) ....................... 11

*Permatex, Inc. v. Loctite Corp.*
2003 U.S. Dist. LEXIS 20363 (S.D.N.Y. Nov. 14, 2003)....................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Sarhank Group v. Oracle*
  2002 U.S. Dist. Lexis 19229 (S.D.N.Y Oct. 8, 2002) ...................................................... 10, 11

*Sarhank Group v. Oracle Corp.*
  404 F.3d 657 (2d Cir. 2005) .................................................................................... 10, 11

*Solvay Pharmaceuticals, Inc. v. Duramed Pharmeceuticals, Inc.*
  442 F.3d 477 (6th Cir. 2006) ............................................................................................ 12

*Telenor Mobile Communs. v. Storm LLC*
  524 F. Supp. 2d 332 (S.D.N.Y. 2007) ........................................................................... passim

*Turedi v. Coca Cola Co.*
  460 F. Supp. 2d 507 (S.D.N.Y. 2006) ................................................................................ 20

*Wright v. Universal Mar. Serv. Corp.*
  525 U.S. 70 (1998) ............................................................................................................. 15

**STATUTES**

9 U.S.C. § 207 ......................................................................................................................... 1

28 U.S.C. §§ 1609-1611 ........................................................................................................ 21

**Introduction**

Respondent, The Kingdom of the Thailand ("Thailand"), moves to dismiss the Petition of Werner Schneider, acting as insolvency administrator of Walter Bau AG ("WB"), a German company.  The Petition seeks confirmation of a foreign arbitral award dated July 1, 2009 in favor of WB against Thailand (the "Award").

**Preliminary Statement**

The Court should not confirm the Award because Thailand did not agree to arbitrate with WB.  Thailand and WB have not signed an agreement giving WB the right to arbitrate with Thailand.  WB convinced an arbitration tribunal that a 2002 bilateral investment treaty between Thailand and Germany, signed after WB invested in Thailand, extended protection to WB's investment—including granting WB the right to arbitrate with Thailand.  But the arbitrators erred.  The treaty required WB's investment to receive specific approval for protection.  Because Thailand never approved WB's investment in the manner required by the treaty, the treaty did not protect WB's investment and give WB the right to arbitrate with Thailand.  The arbitrators asserted jurisdiction over a dispute that Thailand never agreed to arbitrate.  Pursuant to 9 U.S.C. § 207, the Court should deny confirmation of the Award and dismiss the Petition.

The Petition should also be dismissed on *forum non conveniens* grounds.  This Court is an improper forum for this action seeking a judgment against Thailand because Thailand has no assets in this District or anywhere in the United States that are subject to execution.  WB's choice of forum should not be entitled to any deference.  This Court need not serve as a clearing house to confirm a foreign arbitral award and issue a judgment that cannot be enforced in the United States and, thus, will be taken to another country for enforcement.

## Background

**I.      Context of the Dispute**

This dispute arose in the context of Thailand's efforts to develop its infrastructure.  In the 1980s, Thailand emerged as an "Asian Tiger," one of the economic drivers of the region.  To ensure continued economic growth, the Thai government strengthened its infrastructure in a variety of ways, including by improving the highways and roads in and around Bangkok.  As part of this effort, in 1989, Thailand's Department of Highways entered into a Concession Agreement ("Concession") with Don Muang Tollway Co. ("DMT"), a Thai company.  The Concession granted DMT the right to build, operate and collect tolls from a highway extending from central Bangkok to past the Don Muang International Airport.  (Jurisdiction Award ("Juris. Award") ¶ 1.49, Wenger Decl. Ex. 1.)

Dyckerhoff & Widhamm AG ("D&W"), a German company, invested in DMT; following a restructuring of DMT, D&W owned just under 10 percent of DMT's shares.  (Juris. Award ¶ 1.52, Wenger Decl. Ex. 1.)  On August 16, 2001, D&W was merged into WB.  Through the merger, WB acquired all of D&W's assets, including its shares in DMT.  (*Id.* ¶ 1.53.)

DMT built the highway over a period of five years, but, unfortunately, the highway was negatively affected by the Asian economic crisis, as was Thailand (and all of Asia).  Businesses in Thailand suffered, and traffic decreased, both generally and on the Don Muang Tollway.  Thailand and investors in the highway including WB disagreed about increasing toll rates and constructing alternative roads to the highway.  In 2007, after multiple attempts to resolve its disagreements with Thailand, WB sold its shares in DMT.

Attempting to earn further revenue from its highway project investment, WB turned to arbitration against Thailand and obtained an Award.  The Court should not confirm that Award.

## II.    The Relevant Treaties

Two treaties between Thailand and Germany are at the crux of this case.

The first treaty is the December 13, 1961 Treaty between the Federal Republic of Germany and the Kingdom of Thailand concerning the Promotion and Reciprocal Protection of Investments (the "**1961 Treaty**").  (Wenger Decl. Ex. 2.)

The second treaty is the June 24, 2002 Treaty between the Kingdom of Thailand and the Federal Republic of Germany for the Encouragement and Reciprocal Protection of Investments, which entered into force on October 20, 2004 (the "**2002 Treaty**").  (Wenger Decl. Ex. 3.)

The critical difference between the two treaties is that the 1961 Treaty does not provide investors with a right to arbitrate disputes against Thailand, while the 2002 Treaty grants investors whose investments receive official approval from Thailand the right to arbitrate investment-related disputes with Thailand.  (1961 Treaty, Article 11; 2002 Treaty, Articles 2(2), 10.)

## III.   WB's Arbitration Claim Against Thailand

On September 21, 2005, WB submitted a Request for Arbitration against Thailand ("Request").  (Juris. Award ¶ 1.2, Wenger Decl. Ex. 1.)  WB alleged that Thailand breached its obligations to WB under the 2002 Treaty by not properly fixing or increasing the levels of tolls for the highway built by DMT, depriving WB of its return on its investment.  (*Id.* ¶ 1.59.)

Although WB's alleged investment in DMT preceded the 2002 Treaty's entry into force, WB claimed that the 2002 Treaty protected its investment—and gave WB the right to arbitrate with Thailand.  (Juris. Award ¶ 1.2, Wenger Decl. Ex. 1.)  WB relied upon Article 8 of the 2002 Treaty, which provides:

> This Treaty shall also apply to approved investments made prior to its entry into force by investors of either Contracting Party in the territory of the other Contracting Party consistent with the latter's laws and regulations.

WB claimed that Thailand approved its investment under the 1961 Treaty which was in force at the time of its investment.  Thus, according to WB, Article 8 of the 2002 Treaty, which extends treaty protection to investments approved before the 2002 Treaty entered into force, incorporated and protected WB's investment—and granted it the right to arbitrate with Thailand. (Juris. Award ¶¶ 3.20, 4.1, Wenger Decl. Ex. 1.)

## IV.   Thailand's Objection To The Arbitrators' Jurisdiction

The parties agreed on a panel of three arbitrators.  On October 6, 2006, Thailand submitted a Memorial on Jurisdiction ("Thailand's Juris. Memorial") objecting to the arbitrators' jurisdiction over WB's claims.  Thailand asked the arbitrators to bifurcate the proceedings and determine whether they had jurisdiction before hearing the merits of the case.  (Juris. Award ¶ 1.27, Wenger Decl. Ex. 1.)

On December 8, 2006, WB replied to Thailand's jurisdiction objection.  The arbitrators granted Thailand's request for bifurcation and agreed to consider issues of jurisdiction at the outset.  (Juris. Award ¶ 1.28, Wenger Decl. Ex. 1.)  The parties submitted multiple filings and participated in a hearing on Thailand's objections to the arbitrators' jurisdiction.[1]

## V.   Common Ground Between The Parties On Approval Requirements

During the arbitration, Thailand and WB agreed on several aspects of the requirements for the approval of investments under the 1961 Treaty and the 2002 Treaty:

---

[1]      On February 27, 2007, Thailand submitted its Rejoinder on Jurisdiction.  On March 14, 2007, WB submitted its Rebuttal to Thailand's Rejoinder.  On July 31 and August 1, 2007, the arbitrators held a hearing on jurisdiction.  (Juris. Award ¶¶ 1.45-1.46, Wenger Decl. Ex. 1.)  On August 10, 2007, WB and Thailand submitted post-hearing submissions ("WB's Post-Hearing Submission" and "Thailand's Post-Hearing Submission").  (*Id.* ¶ 1.47.)

- For pre-2002 Treaty investments such as WB's investment, Article 8 of the 2002 Treaty only protects "approved investments" (Thailand's Post-Hearing Submission ¶ 15, Wenger Decl. Ex. 4);

- An investment approved under the 1961 Treaty was an "approved investment" under Article 8 of the 2002 Treaty (Thailand's Post-Hearing Submission ¶ 4, Wenger Decl. Ex. 4); and

- In the 1961 Treaty, the Protocol to Article 1 (the "**Protocol**") sets forth the requirements for approval, and hence the requirements for protection under the 2002 Treaty (Thailand's Post-Hearing Submission ¶ 16, Wenger Decl. Ex. 4; WB's Post-Hearing Submission ¶¶ 10.2-10.7, Wenger Decl. Ex. 5).

## VI. Thailand's Position That WB's Investment Did Not Receive The Required Approval

The parties' dispute centered on the approval requirements of the Protocol to Article 1 of the 1961 Treaty and whether the approvals received by WB qualified.  Thailand argued that, for WB's investment to have been approved under the 1961 Treaty and be entitled to protection under the 2002 Treaty, the Protocol required WB to obtain a Certificate of Admission (also referred to as a Certificate of Approval) ("**CA**") classifying its investment as an "approved project."  (Thailand's Post-Hearing Submission ¶¶ 25, 29, Wenger Decl. Ex. 4.)[2]

Thailand cited Part 1(b) of the Protocol, which states:

> [I]n respect of investments in the territory of the Kingdom of Thailand, the term 'investment', wherever it is used in this Treaty, shall refer to all investments made in projects <u>classified in the certificate of admission by the appropriate authority</u> of the Kingdom of Thailand in accordance with its legislation and administrative practice <u>as an 'approved project'</u>.

*Emphasis added*.

---

[2]    Certificates of Admission issued by Thailand to eight other German investors in Thailand are at Wenger Decl. Ex. 8.

Thailand argued that it had insisted on limiting treaty protection to certain approved investments, and that Part 1(b) of the Protocol requires a specific CA approval of the investment for treaty protection.  (Juris. Award ¶ 4.7, Wenger Decl. Ex. 1.)  Moreover, Thailand's Ministry of Foreign Affairs ("**MFA**") was the only Thai government entity with authority to issue a CA. (Thailand's Post-Hearing Submission, ¶¶ 27-28, 33, Wenger Decl. Ex. 4.)

Thailand contended that WB's investment, which indisputably did not receive a CA from Thailand's MFA (Thailand's Post-Hearing Submission ¶ 5, Wenger Decl. Ex. 4), was not considered an "approved investment" under the 1961 Treaty and was therefore not entitled to protection under the 2002 Treaty.  (Juris. Award ¶ 4.2., Wenger Decl. Ex. 1.)  Although Thailand's Board of Investment ("**BOI**") issued certain approvals for the overall Concession granted to DMT and a 2003 diplomatic announcement by Thailand ("2003 Announcement") equated BOI approval with a CA, the 2003 Announcement applied only to prospective investments.  (*Id.* ¶¶ 3.34-3.35.)  BOI approval provides tax benefits and other incentives. (Thailand's Post-Hearing Submission ¶ 30, Wenger Decl. Ex. 4.)  However, BOI approval of the Concession (for tax and other advantages), which predated the 2003 Announcement and which did not mention treaty approval or protection, did not take the place of the required CA or otherwise suffice for approval of WB's investment.  (*Id.* ¶ 4.2.)  Thailand submitted that WB failed to obtain a CA although eight other German investors had sought and received CAs from Thailand's MFA.  (*Id., see* Wenger Decl. Ex. 8.)

## VII.   The Arbitrators' Award On Jurisdiction

On October 5, 2007, the arbitrators issued their Award on Jurisdiction.  The arbitrators concluded that WB was a protected investor under Article 8 of the 2002 Treaty because WB had made an "approved investment" under the 1961 Treaty—and therefore Thailand had agreed to

6

arbitrate with WB.  (Juris. Award ¶ 5.13, Wenger Decl. Ex. 1.)  The arbitrators denied Thailand's objections to their jurisdiction over WB's claims.

The arbitrators rejected Thailand's position that it was unequivocally necessary, under Part 1(b) of the Protocol, for WB to have obtained a CA from Thailand's MFA for its investment to be approved under the 1961 Treaty.  (Juris. Award ¶ 4.24, Wenger Decl. Ex. 1.)  The arbitrators found that, given Thailand's "uncertain and equivocal" administrative practice, BOI approval of the Concession fell "within the parameters" of Part 1(b), and therefore, WB's investment was an approved investment under the 1961 Treaty.  (*Id.*)  The arbitrators did not agree that Part 1(b) of the Protocol established a two-step approval process requiring an investment to obtain a CA if such investment received BOI approval.  (*Id.* ¶ 4.25.)

## VIII.   Further Procedural Background

On July 1, 2009, after further submissions and hearings on the substantive merits of WB's claims, the arbitrators issued the final Award, assessing damages against Thailand in the amount of 29.21 million euros, plus costs in the amount of 1,806,560 euros, plus interest.  On March 26, 2010, WB's liquidator, Werner Schneider (acting on behalf of now-insolvent WB), filed a Petition with this Court seeking confirmation of the Award even though, as representatives of Thailand's Attorney General's Office confirm, Thailand does not have any assets in the United States used for commercial activity.   (*See* Declaration of the Representatives of the Office of the Attorney General of Thailand, dated August 16, 2010, at ¶¶ 1-10.)

## Argument

Thailand does not ask the Court to examine the merits of the arbitrators' Award.

Rather, Thailand requests, first, that the Court review whether the arbitrators correctly decided that the 2002 Treaty granted WB the right to arbitrate with Thailand, and thus whether the arbitrators properly had jurisdiction over the case. Protection under the 2002 Treaty was necessary for WB to assert a claim in arbitration against Thailand because the parties agree that WB and Thailand have not signed an agreement to arbitrate. Without treaty protection, WB had no right to arbitrate against Thailand, and the arbitrators improperly asserted jurisdiction.

Second, Thailand asks the Court to dismiss this action on the grounds of *forum non conveniens*. This Court is an improper forum for this action seeking to confirm an award against Thailand, especially given that Thailand has no executable assets in the United States.

## I. The Court Should Not Confirm The Award Because Thailand Did Not Agree To Arbitrate With WB.

An agreement to arbitrate is a prerequisite to submitting a dispute to arbitration. "A dispute is arbitrable only if the parties contractually agree to arbitrate it." *Telenor*, 584 F. 3d 396, 405. Article V(1)(c) of the New York Convention[3] recognizes this fundamental principle and allows a court to refuse to confirm an award if the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration."[4] The Award

---

[3]     The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T. 53 (the "New York Convention"), as implemented by 9 U.S.C. § 201 *et. seq.*

[4]     9 U.S.C. § 207 allows a court to refuse to confirm an award if "it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." In this case, the ground for refusal to recognize the award is Article V(1)(c) of the Convention.

here resulted from a dispute that does not fall within the "terms of the submission to arbitration" (here, the 2002 Treaty and the right to arbitrate that it extends to protected investors).

>**A.      The Court Should Make An Independent Determination Of Whether Thailand Agreed to Arbitrate Because The Issue of Arbitrability Is Reserved For The Court.**

Thailand asks the Court to take a fresh look at whether Thailand and WB agreed to arbitrate the dispute resulting in the Award.  The parties' submittal of the jurisdiction issue to the arbitrators does not affect the Court's mandate to determine whether the dispute was in fact arbitrable.  The Court is not constrained by the arbitrators' decision on arbitrability.

>**1.      The Court Has A Mandate To Review Whether The Parties Agreed To Arbitrate The Dispute.**

The Supreme Court has held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so."  *First Options v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted).  "[M]erely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point."  *Id.* at 946.

In *Telenor Mobile*, the district court refused to "'merely defer to' the Tribunal's finding on the issue of arbitrability."  *Telenor Mobile Communs. v. Storm LLC*, 524 F. Supp. 2d 332, 352 (S.D.N.Y. 2007) (Lynch, J.) (citation omitted).  A party that argued its agent lacked authority to sign the agreement giving rise to the dispute—and the right to arbitrate—was "entitled to an independent determination on that issue."  *Id.*  The court was "not persuaded to defer to the Tribunal's findings on the arbitrability of the dispute by [the party's] prior concessions that the Tribunal had jurisdiction to determine its own jurisdiction."  *Id.* at 351.  The court found that, although the parties had conceded that the arbitrators had jurisdiction to decide the jurisdictional

9

questions, they had not conceded the merits of the arbitrators' determination that it was an arbitrable claim.  *Id.* at 351-52.

That the arbitration had concluded was irrelevant.  "[T]he arbitrators' jurisdictional decision is subject to judicial review at any time before, after, or during arbitration proceedings." *Id.* at 351, *quoting China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003) ("Such review no more constitutes permitting [a party] to take more than 'one bite at the apple' than any other broad-based appellate review.").

The Second Circuit affirmed Judge Lynch's decision to independently determine whether the parties agreed to arbitrate, rejecting the contention that "the district court erred, in making its own determination, *de novo*" that a party was required to arbitrate.  *Telenor*, 584 F.3d 396, 411 (2d Cir. 2009).  The Court noted that the assertion "that an arbitral award should not be enforced because there was no effective agreement to arbitrate the dispute" raises "a question of arbitrability".  *Id.* at 406.  As *First Options* requires, "arbitrability questions are presumptively to be decided by the courts, not the arbitrators themselves."  *Id.*, *citing Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003).

### 2.   The Arbitrators' Decision On Arbitrability Does Not Bind The Court.

The Court should not give undue deference to the arbitrators' decision on arbitrability.  In *Sarhank Group v. Oracle*, 2002 U.S. Dist. Lexis 19229 (S.D.N.Y Oct. 8, 2002), Oracle argued that an arbitration award against it should not be confirmed under the New York Convention because Oracle had not signed the arbitration agreement upon which the arbitrators relied for jurisdiction.  Judge Batts concluded that the court "did not need to determine whether Oracle consented to arbitrate because it was simply being asked to enforce a foreign arbitration award in which arbitrability was previously determined."  *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005).  The Second Circuit vacated Judge Batts's decision:  "The district court was

not, as a matter of law, bound by the arbitrators' determination of arbitrability . . . [T]here is no

'clear and unmistakable evidence' that Oracle submitted the issue of arbitrability to the

arbitrators." *Id.* at 662.  Citing *First Options*, the Court held that "[m]erely arguing non-

arbitrability to the arbitrators . . . does not amount to consent by Oracle to having the arbitrators

decide the issue." *Id.*  "The case law in this Circuit is clear that to the extent that a party

participates in the arbitration hearings in order to resolve the question of arbitrability itself, such

participation does not constitute waiver." *Penrod Mngmt. Group v. Stewart's Mobile Concepts*,

2008 U.S. Dist. LEXIS 11793, at *6-7 (S.D.N.Y.  Feb. 16, 2008) (*quoting Opals on Ice Lingerie

v. Body Lines Inc.*, 320 F.3d 262, 369 (2d Cir. 2003).

Other circuit courts have agreed with the Second Circuit's application of the *First

Options* rule – in *Telenor* to approve, and in *Sarhank* to require – a district court's independent

determination of arbitrability.

Nothing about the international context of an arbitral award precludes a fresh look at

arbitrability.  In *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d

274, 289-290 (3d Cir. N.J. 2003), the Third Circuit considered "whether the international context

of the arbitration at issue affects the principle that the district court should decide whether there

was an agreement to arbitrate." *Id.* at 286-87 (citing the principle of competence-competence,

*i.e.,* the power of arbitrators to decide their own jurisdiction).  The court noted that "every

country adhering to the competence-competence principle allows some form of judicial review

of the arbitrator's jurisdictional decision where the party seeking to avoid enforcement argued

that no valid arbitration agreement ever existed." *Id.* at 288.

Like the Second and Third Circuits, the Ninth, Sixth, D.C., and First Circuits have all

expressly approved the mandate of district courts to independently determine arbitrability.  *See*

11

*Management & Technical Consultants S.A. v. Parsons-Jurden International Corp.*, 820 F.2d 1531, 1534 (9th Cir. 1987) ("We review de novo a contention that the subject matter of the arbitration lies outside the scope of a contract."); *Solvay Pharmaceuticals, Inc. v. Duramed Pharmeceuticals, Inc.*, 442 F.3d 477 (6th Cir. 2006) (The threshold question of arbitrability is one of law, and even after an arbitrator has issued an award, a reviewing court is obligated to make its own determination of arbitrability), *quoting Davis v. Chevy Chase Fin., Ltd.*, 215 U.S. App. D.C. 117, 667 F.2d 160, 167 (D.C. Cir. 1981), which cites *Mobil Oil Corp. v. Oil, Chemical & Atomic Workers International Union*, 600 F.2d 322, 324 (1st Cir. 1979) ("[T]he court, in reviewing an arbitrator's award, has an obligation to make its own determination of the arbitrability of the dispute presented.  Arbitrability is a question which the district court must pass on in the first instance.") (Internal quotation omitted).

### 3.     Thailand Has Not Waived Its Right To Challenge Arbitrability.

Thailand did not "clearly and unmistakably" waive the well-recognized right to challenge the arbitrators' decision on whether it agreed to arbitrate.

Thailand (and WB) never asserted during the arbitration that the arbitrators should have the final say on arbitrability.  On the contrary, in the Terms of Reference for the arbitration, the parties agreed that the arbitrators could consider jurisdictional issues, but Thailand "reserved its right to contest Claimant's reliance on the 1961 Treaty."  (Terms of Reference ¶ 4, Wenger Decl. Ex. 6.)  From the outset of the case, Thailand specifically reserved the right to raise issues of jurisdiction.  (Thailand's Juris. Memorial ¶ 38, Wenger Decl. Ex. 7.)  Moreover, the parties incorporated the UNCITRAL rules of procedure for the arbitration—further evidence that they did not intend for the arbitrators to have the final say on arbitrability.  *See Telenor*, 524 F. Supp. 2d at 351 ("While incorporation of the ICC and AAA rules may be 'clear and unmistakable evidence' that the parties intended for the arbitrators to have sole jurisdiction over the

arbitrability of the dispute, the UNCITRAL language, standing alone, is insufficient to strip

Storm of its ability to 'present evidence of [the agreement's] . . . invalidity' to this Court.").[5]

Because the issue of arbitrability is reserved for the Court, the Court should take a fresh

look at whether Thailand agreed to arbitrate the dispute with WB.  The evidence shows that the

arbitrators incorrectly decided that Thailand agreed to arbitrate.

> **B.     The Arbitrators Incorrectly Decided That Thailand Approved WB's Investment, Entitling WB's Investment To BIT Protection And Giving WB The Right To Arbitrate With Thailand.**

The arbitrators erred in deciding that Thailand approved WB's investment and that the

arbitrators therefore had jurisdiction over the dispute.

The parties' disagreement turned on whether Part 1 of the Protocol to the 1961 Treaty

required an investment to receive a CA approving it for protection under the treaty, or whether

alternative approval would suffice.  WB argued that, for approval purposes under the 1961

Treaty, the relevant portion of the Protocol is **Part 1(a)**, which states:

> Each Contracting Party is free to decide, in accordance with its legislation and rules and regulations issued thereunder and with due regard to its policies and published plans, whether it will grant a permit required. When a permit is issued the respective investment enjoys full protection of the Treaty.

> (Juris. Award ¶ 4.21, Wenger Decl. Ex. 1.)

Thailand relied on the more specific provisions of **Part 1(b)** of the Protocol:

> [I]n respect of investments in the territory of the Kingdom of Thailand, the term "investment", wherever it is used in this Treaty, shall refer to all investments made in projects classified in the certificate of admission by the appropriate authority of the Kingdom of Thailand in accordance with its legislation and administrative practice as an "approved project".

---

[5] UNCITRAL Rule 21 provides narrowly that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction", as compared to the broad wording of ICC Rule 6.2 which provides that "any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself" and AAA Rule R-7(a) which provides arbitrators with general, unrestricted authority to "rule on [their] jurisdiction."  *See Telenor*, 524 F. Supp. 2d at 351.

(*Id.*)

Despite the express requirement in Part 1(b) that an investment receive a CA classifying it as an "approved project" (in quotes in the Protocol), the arbitrators concluded that Part 1(b) did not require an investment to receive a CA for treaty protection if the investment received BOI approval.  (*Id.* ¶ 4.24.)  According to the arbitrators, the BOI approval process came "within the parameters" of Part 1(b) of the Protocol and qualified as a CA by an appropriate authority.  (*Id.*)

The arbitrators' reasoning was deeply flawed.

> **1.     The arbitrators incorrectly equated the term "permit" in Part 1(a) with a "certificate of admission" classifying an investment as an "approved project" in Part 1(b).**

The arbitrators concluded that Part 1(b) of the Protocol did not require an investment to receive a CA to qualify for treaty protection.  They decided that both sections of Part 1 of the Protocol—the requirement of a "permit" in Part 1(a) and the requirement of a "certificate of admission" classifying an investment as an "approved project" in Part 1(b)—"refer to the same thing, namely the various approvals obtained by DMT for the tollway concession."  (Juris. Award ¶ 4.26, Wenger Decl. Ex. 1.)  In effect, the arbitrators read Part 1(b) right out of the Protocol.

The arbitrators relied on Article 1(1) of the Protocol to support their flawed interpretation.  Article 1(1) requires Thailand to provide "sympathetic consideration to the granting of any relevant permits required."  The arbitrators thought that "it is hard to see a two-step approval process as being 'sympathetic consideration'." (Juris. Award ¶ 4.26, Wenger Decl. Ex. 1.)  A two-step approval process, however, that gives an investor the right to arbitrate a claim with Thailand is not inconsistent with "sympathetic consideration."  Certainly, a maze of restrictions and necessary approvals may amount to a process too complex to allow "sympathetic

14

consideration".  However, that was not the case here.  Thailand had a two-step process for investors wishing to enjoy the distinct benefits of BOI approval and the CA.  Thailand had a one-step process for those investors wishing to enjoy the treaty protection flowing from a CA—they must obtain the CA.  Requiring investors to obtain a CA to enjoy treaty protection is not depriving them of a right to "sympathetic consideration."

The arbitrators' conjecture that Article 1(1)'s "sympathetic consideration" wording justified ignoring the explicit CA requirement in Part 1(b) of the 1961 Treaty also was erroneous because it read Part 1(b) out of the Protocol.  Under the controlling language of the 1961 Treaty, English, there is a plain distinction between a general reference to a "permit" in Part 1(a), and the specific requirement of a CA classifying an investment as an "approved project" in Part 1(b).  The arbitrators failed to justify why they ignored Part 1(b) of the Protocol contrary to the principle of effectiveness in treaty interpretation (*ut res magis valeat quam pereat*), the principle that an interpreter should give meaning and effect to all terms of a treaty.  *See Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 81 (1998).

Finally, the interpretation offered by the arbitrators ignores other critical wording in the 1961 Treaty.  One of the main differences between Part 1(a) and Part 1(b) of the Protocol is that Part 1(a) applies to "Each Contracting Party" (Germany and Thailand) while Part 1(b) applies only to Thailand.  Thus, Part 1(b) is a more specific clause than Part 1(a).  It is a specification that applies only to Thailand, providing Thailand greater control over the investments in Thailand to which Treaty protections are extended by requiring—for investments in Thailand—a CA for treaty protection.  The arbitrators ran afoul of the general rule of interpretation that more specific provisions have precedence over provisions of broader application.  *See Permatex, Inc. v. Loctite Corp.*, 2003 U.S. Dist. LEXIS 20363, at *27 (S.D.N.Y. Nov. 14, 2003).  Thailand

negotiated this clause and insisted on including it in the 1961 Treaty so that only certain

investors in Thailand would have treaty protections and the right to arbitrate with Thailand.

Unlike Germany, Thailand insisted on the specific requirement of a CA for treaty protection.

     The arbitrators' flawed interpretation of Part 1 of the Protocol cannot serve as a

foundation for their conclusion that WB's investment did not need a CA to qualify for treaty

protection because it had received BOI approval.  Part 1(b) of the Protocol explicitly requires a

CA for treaty protection.  WB does not dispute that its investment did not receive that required

CA.  Therefore, the dispute was not subject to arbitration.

> **2.    The arbitrators incorrectly reasoned that Thailand's issuance of eight
> CAs prior to the 2003 Announcement had no bearing on whether the
> 1961 Treaty required a CA.**

     The arbitrators incorrectly rejected Thailand's argument that its granting of eight CAs to

other German investments in Thailand demonstrated that a CA was required under the 1961

Treaty.  Instead, the arbitrators found persuasive the notion that a 2003 Announcement, which

equated BOI approval with a CA, confirmed Thailand's past practices.  In essence, the arbitrators

erroneously concluded that a 2003 Announcement that prospectively set forth a formal change of

policy, was simply reiterating then-existing Thai government policy.

     The arbitrators stated that the eight CAs granted to German investors prior to the 2003

Announcement were irrelevant to whether a CA was actually required for treaty protection

because, in each of those cases, BOI approval was neither obtained nor required.  (Juris. Award ¶

4.33, Wenger Decl. Ex. 1.)  The arbitrators, however, failed to explain how the lack of BOI

approval of the investments that had obtained CAs supports their finding that investments with

16

BOI approval did not also need a CA for treaty protection.[6]  Nor did the arbitrators adequately account for the fact that BOI approval confers benefits (tax and other advantages) that are distinct from the treaty protections conferred by a CA.  (*See* Thailand's Post-Hearing Submission ¶ 30, Wenger Decl. Ex. 4.)  Thus, at the time of WB's investment, BOI approval and a CA had distinct roles.  Different entities might seek BOI approval or a CA to obtain different benefits for different types of projects, but BOI approval could not take the place of the CA explicitly required by Part 1(b) of the Protocol.

Thailand's allegedly "uncertain and equivocal" administrative practice (Juris. Award, ¶ 4.24, Wenger Decl. Ex. 1) and alleged failure to explain to WB's predecessor the distinction between BOI approval and a CA (*Id.* ¶ 4.41) cannot justify ignoring a treaty requirement.

### 3. The arbitrators erred in lending any significance to advice WB's predecessor allegedly received from its consultant.

The arbitrators improperly ascribed significance to advice allegedly given to WB's predecessor, D&W, by its consultant, Treuarbeit.  Prior to D&W's investment in the tollway project, Treuarbeit apparently advised D&W that a CA was unnecessary because BOI approval sufficed for treaty protection.  (Juris. Award ¶ 4.35, Wenger Decl. Ex. 1.)  Advice that WB's predecessor may have received from its German consultants on Thailand's legal requirements for the qualification of investments for treaty protection has no bearing on the actual requirements. Moreover, it is completely irrelevant to whether Thailand approved WB's investment.

### 4. The arbitrators erred in reasoning that, because the 1961 Treaty incorporated pre-existing investments before the CA requirement went into effect, obtaining a CA could not be a requirement for protection under the 1961 Treaty.

---

[6]     Although not presented to the arbitrators, a correct English translation of the Thai version of the 2003 Announcement (¶ 5) confirms that a CA was required for an investment made prior to the announcement to receive protection under the 2002 Treaty.

The arbitrators noted that the 1961 Treaty incorporated investments made after the treaty was signed but before it entered into force in April 1965.  The arbitrators mistakenly concluded that this meant that a pre-1965 investment could be approved through BOI approval because the Protocol (and its CA requirement) was not yet in force when a pre-1965 investment was made.  Therefore, according to the arbitrators, investments after the treaty entered into force also needed nothing more than BOI approval.   (Juris. Award ¶ 4.27, Wenger Decl. Ex. 1.)

The arbitrators' reasoning here is also mistaken.  Nothing prevented an investment predating the 1961 Treaty's entry into force from applying for and receiving a CA, and thus treaty protection, in accordance with Part 1(b) of the Protocol as soon as the investment owner was aware of the Protocol.  No party ever applied for a CA before 1972, and there is no evidence that Thailand would not have granted a CA to a proper investment predating the 1961 Treaty.  In any event, analysis of the 1961 Treaty's application to pre-1965 investments is irrelevant to WB's investment many years after the CA requirement was in effect.

### C.   The Evidence Upon Which The Arbitrators Relied Was Insufficient To Support A Finding That Thailand Agreed to Arbitrate.

The arbitrators' finding that Thailand approved WB's investment for treaty protection equates to a finding that Thailand agreed to arbitrate with WB.  The arbitrators' conclusion is based on flawed reasoning and inadequate evidence.  Nothing in the extensive submissions and witness testimony made in the arbitration showed that Thailand approved WB's investment for treaty protection.  The arbitrators ignored the specific wording of Part 1(b) of the Protocol requiring a "certificate of admission" to classify a project as "approved."  The arbitrators found that extraneous circumstances justified reading an entire clause out of the 1961 Treaty.  The Court should not confirm an award where the arbitrators so obviously lacked jurisdiction.

**II.**     **The Court Should Dismiss The Case Because New York Is An Improper Forum To Confirm The Award.**

   **A.**     **The Doctrine Of *Forum Non Conveniens* Applies To Actions Seeking To Confirm A New York Convention Award.**

The Second Circuit and the Ninth Circuit have both affirmed decisions to dismiss proceedings to confirm arbitration awards under the New York Convention on *forum non conveniens* grounds.

The Second Circuit agreed with Judge Marrero that the New York Convention does not preclude application of the doctrine of *forum non conveniens*.  *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine* ("*Monde Re*"), 311 F.3d 488, 495 (2d Cir. 2002).  The Second Circuit noted that Article III of the Convention requires courts to recognize arbitral awards and enforce the award "in accordance with the *rules of procedure* of the territory where the award is relied upon."  *Id.,* stating that "The Supreme Court has classified the doctrine of forum non conveniens as procedural rather than substantive[.]" (internal citation and quotation omitted).

The Second Circuit quoted with approval Judge Marrero's rationale that forcing the recognition and enforcement of an award in a forum "where the parties, the underlying proceeding, and the award" have no connection to the forum "may be highly inconvenient overall and might chill international trade if the parties had no recourse but to litigate, at any cost, enforcement of arbitral awards in a petitioner's chosen forum."  *Id.* at 497-98, quoting *Monde Re*, 158 F. Supp. 2d at 383.  The Second Circuit concluded that "[a]lthough the Convention establishes jurisdiction in the United States as a signatory state . . . there remains the authority to reject that jurisdiction for reasons of convenience, judicial economy and justice."  *Id.* at 497; *Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda v. Republic of Peru*, 655 F. Supp. 2d 361, 375 (S.D.N.Y. 2009) (same); *see also Melton v. Oy Nautor Ab*, 1998 U.S. App.

LEXIS 22100 (9th Cir. Sept. 4, 1998) (affirming district court's decision to dismiss an action to confirm a New York Convention award on *forum non conveniens* grounds).

      **B.**    **WB's Choice Of New York Is Not Entitled To Any Deference; An Alternative Forum Is Adequate; The Public And Private Interest Factors Favor Dismissal Because Thailand Has No Executable Assets In the United States, And The Action Has No Other Connection To The United States.**

The Court's analysis of *forum non conveniens* focuses on three inquires:  (1) the degree of deference accorded the plaintiff's choice of forum; (2) the adequacy of an alternate forum; and (3) a balancing of private and public interest factors.  *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 521 (S.D.N.Y. 2006).  A district court has broad discretion to determine *forum non conveniens* issues.  *Norex Petroleum Ltd. v. Access Industries, Inc*., 416 F.3d 146, 153 (2d Cir. 2005).

      **1.**    **WB's Choice Of Forum Should Not Be Entitled To Any Deference Because The New York Convention Is The Only Basis For Bringing This Action In New York.**

The first *forum non conveniens* inquiry examines the degree of deference owed to the Petitioner's choice of forum.  *Monegasque*, 311 F.3d 488, 498, *citing Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (*en banc*).  A foreign petitioner's choice of a United States forum receives less deference than that of a domestic petitioner.  *Id.*  The degree of deference is measured on a "sliding scale."  *Id.*  "[T]he more it appears that the petitioner's choice of a U.S. forum was motivated by forum-shopping reasons -- such as . . . the inconvenience and expense to the respondent resulting from litigation in that forum -- the less deference the petitioner's choice commands, and, consequently, the easier it becomes for the respondent to succeed on a forum non convenience motion by showing that convenience would better be served by litigating in another country's courts."  *Id.*  When a plaintiff is not a U.S. citizen, "it is much less reasonable

to presume that the choice was made for convenience." *Norex*, 416 F.3d at 154 (internal citations omitted).

Neither WB nor Schneider is located in the United States.  No relevant evidence is located in the United States.  The facts leading to the Award have no connection whatsoever to the United States.  Moreover, as representatives of Thailand's Attorney General's Office explain, Thailand does not have assets in the United States that are used for commercial activity.  (*See* Declaration of the Representatives of the Office of the Attorney General of Thailand, at ¶ 1.) Thailand does not:

- Conduct any commercial activity in the United States through its Embassy, Consulate and Mission offices or their bank accounts (*Id.* ¶¶ 2-3);

- Have funds on deposit in United States Federal Reserve banks used for commercial activity (*Id.* ¶ 4);

- Own any real property in the United States used for commercial activity (*Id.* ¶ 5);

- Collect or pay any taxes in the United States (*Id.* ¶ 6);

- Own any investments in the United States (*Id.* ¶ 7);

- Issue bond offerings in the United States (nor has it ever done so) (*Id.* ¶ 8);

- Own cultural artifacts or artwork in the United States (*Id.* ¶ 9); or

- Make payments to or receive payments from any company or private individual in the United States (*Id.* ¶ 10).

Because Thailand has no assets in the United States used for commercial activity, Thailand has no assets subject to execution in the United States.  (*See* 28 U.S.C. § 1609-1611.) Thus, a judgment confirming the Award will be unenforceable in the United States.

This action has no relationship to the United States.  As in *Monegasque*, "the jurisdiction provided by the Convention is the only link between the parties and the United States." *Monegasque*, 311 F.3d at 499.  WB's motive in bringing this action in New York is aptly

described by Lord Denning:  "Just as a moth is draw to the light, so is a litigant drawn to the

United States."  *French Labs v. Bloch* [1983] 2 ALL ER 72, 74 (CA).  The Court should not give

any deference to WB's decision to litigate in the United States.

> **2.      Thailand Is An Adequate Alternative Forum Because Thailand Is
> Amenable To Service Of Process, Thailand Is A Signatory To The
> Convention, And Thailand's Assets Are Located In Thailand.**

The second *forum non conveniens* inquiry is whether there is an adequate alternative

forum.  A forum is an adequate alternative if the defendant is amenable to service of process and

the forum permits litigation of the subject matter in dispute.  *Figueiredo*, 655 F.Supp.2d at 375.

In determining whether there is an adequate alternative forum, a court may also take into

consideration where the plaintiff can access the defendant's assets.  *Id*.

Thailand is amenable to service of process in Thailand.  Moreover, because Thailand is a

signatory to the New York Convention, WB can enforce the Award in Thailand.  The Court

would not be restricting WB's access to Thailand's assets in any way by dismissing this case in

favor of the alternate forum of Thailand where most of Thailand's assets are located.

> **3.      The Private And Public Interest Factors Strongly Favor Dismissal
> Because A Judgment Will Be Unenforceable In The United States And
> There Is No Local Interest In Resolving This Non-Local Dispute.**

The third *forum non conveniens* inquiry is a balancing of the private and public interest

factors.  The private and public interest factors recognized by the Supreme Court in *Gilbert*

include:  "(1) the ease of access to sources of proof; (2) the availability of compulsory process

for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses;

(4) practical problems involving the efficiency and expense of a trial; (5) enforceability of

judgments; (6) administrative difficulties flowing from court congestion; (7) imposing jury duty

on citizens of the forum; (8) the local interest in having controversies decided at home; and

(9) the avoidance of unnecessary problems in the application of foreign law."  *Allstate Life Ins.*

*Co. v. Linter Group, Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993), *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947).

The *Gilbert* factors relating to the conduct of a trial (numbers 1, 2, 3, 4, 6, and 7) and the application of foreign law (number 9) are not relevant in this case.  The only relevant factors are the "enforceability of judgments" (number 5) and "the local interest in resolving local disputes" (number 8).  These two factors strongly favor dismissal on *forum non conveniens* grounds.

Thailand's lack of executable assets in the United States would make a judgment by this court unenforceable in the United States.  Many courts have recognized the absence of executable assets in the forum as a basis for *forum non conveniens* dismissal.  *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (affirming dismissal on *forum non conveniens* grounds, noting that the district court "properly recognized that any judgment . . . will have to be enforced in Australia where all of the Banks' assets are located"); *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1974) (affirming dismissal on *forum non conveniens* grounds, noting that "any judgment entered by a United States court would quite likely be worthless, as it does not appear that Protex has assets subject to attachment in the United States… on all accounts, this is exactly the type of case for which the *forum non conveniens* doctrine was designed."); *Great Northern Ins. Co. v. Constab Polymer-Chemie GmbH & Co.*, 2007 WL 2891981, 13 (N.D.N.Y 2007) (dismissing action on *forum non conveniens* grounds because "[a]ny judgment entered by a United States court would likely be worthless as the record does not contain any evidence to suggest that Constab has assets subject to attachment in the United States." ); *Blimpie Int'l v. ICA Menyforetagen AB*, 1997 U.S. Dist. LEXIS 3950 (S.D.N.Y. Mar. 21, 1997) (dismissing action on *forum non conveniens* grounds where party claimed it had no assets subject to enforcement in the United States).

There is no local interest in resolving this *non-local* dispute, aside from the general policy to enforce arbitration awards.  Neither the plaintiff nor the defendant resides in the United States. None of the facts underlying the Award has any connection with the United States, and Thailand has no assets in the United States that are subject to execution.

WB's motives for bringing the Award to New York for recognition are thinly veiled. Because Thailand has no assets in the United States subject to execution, should the Court issue a judgment confirming the Award, WB will simply take the Court's judgment to another country for recognition and attempt to execute the Award against assets not protected by foreign sovereign immunity afforded to Thailand in the United States.  The Court should not serve as a clearing house for the Award, and issue a judgment that cannot be enforced in the United States.

## Conclusion

Because Thailand did not agree to arbitrate with WB, and New York is an improper forum to confirm the Award, Thailand respectfully moves the Court to dismiss the Petition.

Respectfully submitted,

Dated: New York, New York            /s/ Claudia T. Salomon
      August 17, 2010            Claudia T. Salomon
                                  David S. Christy, Jr.
                                  David S. Wenger
                                  DLA Piper LLP (US)
                                  1251 Avenue of the Americas
                                  New York, NY 10020-1104
                                  (212) 335-4848
                                  claudia.salomon@dlapiper.com

*Counsel for The Kingdom of Thailand*

## <u>CERTIFICATE OF SERVICE</u>

I, Claudia T. Salomon, hereby certify that on this 17th day of August 2010, I caused an electronic copy of the foregoing Cross-Motion to be served via the Court's ECF system to counsel for Petitioner.


/s/ Claudia T. Salomon
Claudia T. Salomon
David S. Christy, Jr.
David S. Wenger
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4848
claudia.salomon@dlapiper.com

*Counsel for The Kingdom of Thailand*