IN THE MATTER OF AN ARBITRATION IN GENEVA, SWITZERLAND AND
UNDER THE TREATY BETWEEN THE FEDERAL REPUBLIC OF GERMANY AND
THE KINGDOM OF THAILAND MADE ON 24 JUNE 2002 CONCERNING THE
ENCOURAGEMENT AND RECIPROCAL TREATMENT OF INVESTMENTS AND
UNDER THE UNCITRAL ARBITRATION RULES 1976

BETWEEN

## WALTER BAU AG (IN LIQUIDATION)
### CLAIMANT

AND

## THE KINGDOM OF THAILAND
### RESPONDENT

---

### PARTIAL AWARD ON JURISDICTION

### DATED: 5th OCTOBER 2007

---

1   INTRODUCTION ........................................................................... 1

Procedural Background ............................................................. 2

Summary of factual background .............................................. 10

2   QUESTIONS FOR THE TRIBUNAL............................................ 13

3   THE TREATIES – PROVISIONS, PREPARATORY DOCUMENTS AND APPROVALS............................................................................... 14

1961 Treaty ............................................................................ 14

The provisions......................................................................... 14

Preparatory documents........................................................... 16

Approvals under the 1961 Treaty............................................ 17

The 2002 Treaty..................................................................... 19

The provisions......................................................................... 19

Preliminary documents............................................................ 21

Proceedings of the Committee of Investment Approval............... 22

4   DOES THE CLAIMANT HAVE AN APPROVED INVESTMENT FOR THE PURPOSES OF ARTICLE 8 OF THE 2002 TREATY?............................. 25

Expert testimony .................................................................... 25

The Tribunal's view ................................................................. 28

5   OBJECT OF INVESTMENT APPROVAL.................................... 35

6   IS THE CLAIMANT AN INVESTOR FOR THE PURPOSES OF THE 2002 TREATY – ABSORPTION OF DYWIDAG................................... 39

7   ESTOPPEL / PRECLUSION...................................................... 40

8   ANSWERS TO QUESTIONS .................................................... 40

9   AWARD.................................................................................... 43

## 1     INTRODUCTION

1.1     On 13 December 1961, a Treaty came into force between the Respondent, the Kingdom of Thailand and the Federal Republic of Germany.  The aim of the Treaty was: "*The promotion and reciprocal protection of investments*".  The Claimant, as a German national with an "investment" in Thailand, alleges that it is entitled to seek relief from the Respondent by virtue of provisions in a similar treaty between the same parties, signed on 24 June 2002 and which came into force on 20 October 2004.  The first Treaty will be referred to as "the 1961 Treaty" and the second Treaty as "the 2002 Treaty".

1.2     By notice dated 21 September 2005 requesting submission of a dispute to arbitration, Claimant asserted that the 2002 Treaty, under which it brought its claim for arbitration, applied to "approved investments" made in Thailand prior to the entry into force of that Treaty because it had an investment approved under the terms of the 1961 Treaty.

1.3     The Claimant alleges that its "approved investment" is in a tollway concession granted by the Respondent in its territory and that the Respondent breached its obligations to it as a shareholder of the concessionaire.  It makes its claim for protection under the 2002 Treaty as an "investor", as defined in the 2002 Treaty.

1.4     The provision in the 2002 Treaty under which the Claimant seeks to bring its claim for arbitration is Article 10 which reads as follows:

> **"Settlement of Disputes between a Contracting Party and an Investor**
>
> (1) Disputes concerning investments between a Contracting Party and an investor of the other Contracting Party should as far as possible be settled amicably between the parties in dispute.
>
> (2) If the dispute cannot be settled within six months from the date on which it has been raised by one of the parties to the dispute, it shall, at the request of either party to the dispute be submitted for arbitration.  Unless the parties to the dispute have agreed otherwise, the provisions of Article 9(3) to (5) shall be applied mutatis mutandis on condition that the appointment of the members of the arbitral tribunal in accordance with Article 9(3) is effected by the parties to the dispute and that, insofar as the period specified in Article 9(3) are (sic) not observed, either party to the dispute may, in the absence of other arrangements, invite the President of the Court of International Arbitration of the International Chamber of Commerce in Paris to make the required appointments.  The award shall be enforced in accordance with domestic law.

1

(3) During arbitration proceedings or the enforcement of an award, the Contracting Party involved in the dispute shall not raise the objection that the investor of the other Contracting Party has received compensation under an insurance contract in respect of all or part of the damage.

(4) In the event of both Contracting Parties having become Contracting States of the Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States, disputes under this Article between the parties to dispute shall be submitted for arbitration under the aforementioned Convention, unless the parties in dispute agree otherwise; each Contracting Party herewith declares its acceptance of such procedure."

1.5     The provisions in Article 9(3) to (5) of the 2002 Treaty referred to in Article 10 above, in summary require each party to appoint a member of an arbitral Tribunal and that the two members so appointed should nominate a national of a third state to be Chair of the arbitral tribunal within three months from the date when the Claimant gave notice that it intended to submit the dispute to an arbitral Tribunal (i.e. 21 September 2005).   In default of the co-arbitrators agreeing on a Chairman, the nomination of a Chairman could be made by the President of the Court of International Arbitration of the International Chamber of Commerce, Paris (the "ICC Court").

**Procedural Background**

1.6     The Claimant is Walter Bau AG (In Liquidation) ("Claimant" or "Walter Bau"), a company incorporated under the laws of the Federal Republic of Germany. The Respondent is the Kingdom of Thailand ("Respondent").

1.7     The Claimant is represented by Mr Robert Hunter of Lovells LLP, Frankfurt, Germany and the Respondent is represented by Mr Michael Polkinghorne of White & Case LLP, Paris, France.

1.8     The Claimant, which is in liquidation, through its insolvency administrator served its Request for Arbitration on 21 September 2005 pursuant to Article 10(2) of the Treaty.   In this document, the Claimant appointed the Honourable Marc Lalonde, P.C., O.C., Q.C. of Montréal, Québec, Canada as a co-arbitrator.

1.9     The Respondent did not immediately respond to the Request for Arbitration. However, on 30 November 2005, the Respondent appointed Dr Survan Valaisathien of Bangkok, Thailand as a co-arbitrator.

2

1.10   The co-arbitrators were unable to agree on the appointment of a Chairman as envisaged by Articles 9(3) and 10(2) of the 2002 Treaty.  By letter dated 25 January 2006, the Claimant submitted a Request for Appointment of Chair to the President of the ICC Court pursuant to Articles 9(4) and 10(2) of the 2002 Treaty.

1.11   In the interim, the Claimant wrote to the ICC Court on 10 February 2006 expressing concerns regarding Dr Suvarn's impartiality.

1.12   The Claimant noted that although the Treaty did not provide a mechanism for the resolution of concerns of lack of impartiality against an arbitrator, the Claimant nevertheless wished to reserve its position on this point.  However, the Claimant never took any formal step to challenge Dr Suvarn's appointment.

1.13   On 27 February 2006, the ICC Court confirmed Hon. Sir Ian Barker QC of Auckland, New Zealand as the Chairman of the arbitral tribunal.

1.14   A preliminary telephone conference was convened by the Chairman on 15 March 2006 between Counsel for the parties and the full Tribunal.  The participants discussed various administrative matters, including a potential venue and date for a procedural conference to settle Terms of Reference and Terms of Appointment of the Arbitral Tribunal.

1.15   In accordance with arrangements reached at the telephone conference, a procedural conference was held on 8 June 2006 in Montréal, Québec, Canada.  The Tribunal, counsel for the parties and representatives of the parties attended.  At this conference, there emerged general agreement as to the Terms of Reference for the arbitration and the Terms of Appointment of the Tribunal (collectively called 'Terms of Reference').  A draft Procedural Timetable was also discussed.

1.16   The Respondent indicated at the procedural conference that it wished to contest the Tribunal's jurisdiction to consider the Claimant's claim for treaty protection and that it would seek bifurcation of the proceedings in order to have jurisdictional objections disposed of at an early stage.

1.17   On 20 July 2006, the Chairman, on behalf of the Tribunal, settled the form of a final agreed version of the Terms of Reference and a Procedural

Timetable and sent them to the parties for signature. Pursuant to paragraph 13 of the Terms of Reference, the parties were each required to deposit US$350,000 as their share of the advance on costs. US$100,000 of the total amount was to establish an expense account and US$600,000 was to establish a fees account. These funds were to be held and supervised by the London Court of International Arbitration ("LCIA") as the stakeholder approved by the parties. The LCIA was to disburse funds in accordance with directions from the Chairman given in accordance with the Terms of Reference.

1.18    On 24 July 2006, the Claimant confirmed to the Tribunal that it would sign the Terms of Reference and that it was arranging to make the necessary payments to the LCIA. On 28 July 2006, the Respondent advised that it was also arranging payment of its share of the advance on costs. However, regarding the Terms of Reference, it noted that it still had a few minor reservations and that, in any event, the Thai Cabinet's approval could not be obtained until 16 August 2006.

1.19    In light of the Respondent's letter, the Chairman extended the time period for obtaining the Thai Cabinet's approval to the Terms of Reference until 16 August 2006 and emphasised that the extension should not in any way be interpreted as permitting either party to veto the Terms of Reference. The Chairman reminded the parties that the Tribunal had the authority to issue the Terms of Reference without the parties' approval and asked that the parties proceed on the basis that the Terms of Reference as finally settled were fixed.

1.20    The Claimant signed the Terms of Reference and sent its signed copy to the members of the Tribunal on 10 August 2006. On 11 August 2006, it forwarded a signed copy of the Procedural Timetable to the Chairman and advised that the Claimant's share of the advance on costs had been paid to the LCIA.

1.21    On 18 August 2006 the Respondent indicated that it had been unable to meet the 16 August 2006 deadline referred to in para 1.19 above. The Chairman granted the Respondent until 4 September 2006 as a final deadline for obtaining the Thai Cabinet's approval to the Terms of Reference.

1.22   On 1 September 2006, the Respondent deposited its share of the advance on costs with the LCIA.  On 4 September 2006, it forwarded a signed copy of the Terms of Reference and the Procedural Timetable to the Tribunal.

1.23   Under the Terms of Reference, the juridical seat of the arbitration is Geneva, Switzerland. The applicable law of arbitration is :

> "public international law.  Subject to this, where discrete issues of national law arise, the law to be applied or considered shall ordinarily be the law of the Kingdom of Thailand although German law issues may also arise.  The Tribunal shall determine the appropriate law or laws to be applied."

1.24   Under the Terms of Reference, the UNCITRAL Arbitration Rules (except as excluded, supplemented or varied by agreement of the parties), the relevant provisions (if any) of the Treaty and/or such specific orders or instructions of the Tribunal were to be the applicable procedural rules.

1.25   Under the Terms of Reference, the Tribunal was not to be bound by strict rules of evidence.  However, as appropriate, the Tribunal may have regard to the 1999 Rules on the Taking of Evidence in International Commercial Arbitration adopted by the International Bar Association ("The IBA Rules").

1.26   Under the Terms of Reference, the Chairman was empowered to make procedural rulings alone, subject to the provisions of Clause 14(c).

1.27   On 2 October 2006, the Respondent submitted a Memorial on Jurisdiction and a Request for Bifurcation.  It also sought an order for security for costs against the Claimant.  Both parties made various applications for discovery. A further telephone conference was held on 21 December 2006 (Auckland time) to discuss these applications and the timing of a jurisdictional hearing, should the decision be made to bifurcate the proceedings.  The telephone conference was attended by all members of the Tribunal and counsel for the parties.

1.28   After consideration by members of the Tribunal of the discussion at the telephone conference, the Chairman, on behalf of the Tribunal, issued an order on 21 December 2006 which granted the Respondent's application to bifurcate the proceedings.  He ordered that discrete jurisdictional questions in a form to be agreed between the parties would be considered by the

Tribunal at a jurisdictional hearing which was fixed for 20-21 March 2007 in Kuala Lumpur, Malaysia. This venue was one acceptable to the parties.

1.29    With respect to discovery, the following provisions were made by the Chairman on behalf of the Tribunal in the 21 December 2006 order:

> "8.   (a)   The Claimant is to confirm in writing that it has no documents in its possession or power requesting the approval of the Thai Government in terms of Article 8 of the BIT.
>
>       (b)   The Claimant is to confirm in writing that it has no documents in its possession or power from the German Government or any organ thereof relating to the negotiation of either the 1961 or the 2002 Investment Treaties other than documents (if any) already disclosed."

1.30    The Tribunal refused to make an order for security for costs for the jurisdictional hearing in favour of the Respondent. It made no decision in the meantime on the Respondent's application that the Claimant give security for the Respondent's costs of the arbitration. The Tribunal sought the following information from the Claimant:

> "(a)   the insolvency administrator's current estimate of the amount that would be available after payment of secured creditors and the costs of the insolvency;
>
>  (b)   whether, out of this sum, it is possible to 'ring-fence' a discrete amount which would earn interest for the insolvency but which could be available for security for costs. Such sum could only be disbursed on the order of the Tribunal."

1.31    The Tribunal considered that, if the Respondent's jurisdictional challenge were successful, there would be no need to consider any application for security for costs of a substantive hearing. The parties could not agree on discovery issues and were in dispute over the scope of paragraph 8(b) of the Tribunal's 21 December 2006 Order referred to above at para 1.24. The Claimant also objected to the reception as evidence of a letter from Dr Reinhard Zimmer attached to the Respondent's rejoinder on jurisdiction. The Claimant argued that the letter, as a witness statement (expert or otherwise) was incomplete and that Dr Zimmer should appear at the hearing in Kuala Lumpur for cross-examination if reliance were to be placed on his statement.

6

1.32    The Chairman on behalf of the Tribunal issued Procedural Order No. 1 on 6 March 2007 to dispose of the issues relating to Dr Zimmer's evidence. He ruled that, should the Respondent wish to rely on Dr Zimmer's evidence at the hearing, it would have to submit a witness statement that complied with the IBA Rules and arrange for Dr Zimmer to attend the hearing. The disclosure issue was to be argued at the hearing. (In the event, Dr Zimmer was not available to attend the hearing in Hong Kong).

1.33    On 16 March 2007, when M. Lalonde was already on his way from Montréal to Kuala Lumpur for the hearing and the Chairman was about to leave New Zealand for the hearing, the Respondent emailed the Tribunal challenging the continued service on the Tribunal of its own party-appointed arbitrator, Dr. Suvarn Valaisathien. This letter was seemingly in response to an earlier letter from the Claimant to the Respondent dated 4 March 2007 where it advised that:

> "It [had] come to [its] attention during the course of preparing for the March hearing that, many years ago, Dr Suvarn Valaisathien provided some advice and temporarily held a nominal shareholding in a company connected with this project. The circumstances [were] as follows. In 1984, Dyckerhoff & Widmann AG (Dywidag") and a local Thai engineering company Delta Engineering Construction Company Limited ("Delta") established a Thai company named Dywithai Company Limited ("Dywithai"). For compliance reasons, Dr Valaisathien held a 2% interest in Dywithai. Under its new name of Dywidag (Thailand) Company Limited ("Dywidag Thailand"), this company was part of the consortium which contracted with DMT for the design and construction of the Don Muang Tollway. Dywidag ceased to have an interest in the company in 1997. Dr Valaisathien also provided legal advice to Dywidag and Delta on Thai corporate and tax law in connection with Dywidag's and Delta's establishment and incorporation of DMT in 1988 and 1989."

1.34    In their email to the Tribunal, the Respondent's lawyers noted that Dr Suvarn's appointment had been made by the previous Thai government and before the engagement of their firm, White & Case. Following receipt of the Claimant's 4 March 2007 letter, they had obtained lists of shareholders from Thailand's Ministry of Commerce which confirmed that between 1984 and 2001, Dr Suvarn had had an equity interest in Dywithai.

1.35    The Respondent therefore challenged Dr Suvarn pursuant to Article 10 of the UNCITRAL Rules, which permits an arbitrator to be challenged by the party appointing him, if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence, as long as the challenging

7

party becomes aware of those circumstances following the appointment. In the Respondent's submission, the circumstances did give rise to justifiable doubts as to Dr Suvarn's impartiality and independence in that:

> "Dr Suvarn has a close relationship not only with Claimant but also with an entity closely connected with Claimant by virtue of the facts that: (i) he provided legal advice to Claimant's predecessor, Dyckerhoff & Widmann; and (ii) Dr. Suvarn held a long-term interest in a company that partnered with Claimant's predecessor to construct the very project that is at issue in this arbitration.
>
> The matter is all the more sensitive given the nature and importance of this dispute to the Kingdom of Thailand and the need for all parties, and the Thai people, to have the utmost confidence in the decisions of this Tribunal."

1.36    The Respondent submitted that the challenge was timely under Article 11 of the UNCITRAL Rules since it was made within 15 days of the 4 March 2007 letter notifying if of the relevant circumstances. The Respondent invited Dr Suvarn to withdraw as an arbitrator and, in the event that he did not willingly do so, the Respondent intimated that it would pursue its challenge with the President of the ICC Court. The Respondent requested that the hearing on jurisdiction be adjourned.

1.37    In an email of the same date, the Claimant categorised Dr Suvarn's involvement with the project as tangential. It submitted that the fact that he gave advice a considerable time ago was not a ground for impugning his impartiality. In addition, the Respondent had, in its possession at the time it signed the Terms of Reference, knowledge of Dr Suvarn's questioned involvement. Accordingly, the challenge was excluded under paragraph 3(e) of the Terms of Reference in which the parties waived any possible objections to the appointment of the arbitrators on the grounds of potential conflict of interest and/or lack of independence or impartiality in respect of matters known to them at the date of signature of the Terms of Reference.

1.38    In the interests of efficiency, the Claimant suggested that:

> "the hearing should go ahead ... and the evidence be taken, with a direction by the tribunal – preferably with the consent of the parties – that there shall be no rehearing if the challenge is upheld. The challenge could then follow that with a minimum impact on procedure. ... Should the challenge succeed, the new arbitrator could be appointed and the tribunal could then determine the issue upon the basis of the transcript and written submissions."

1.39   Following this exchange of emails, Dr Suvarn immediately resigned as a co-arbitrator without protest.  The Respondent refused to agree to proceeding with the hearing without a third member of the Arbitral Tribunal on the basis suggested by the Claimant.  The remaining members of the Tribunal therefore felt obliged to adjourn the hearing.  The hearing was, accordingly, adjourned, at great inconvenience to the remaining members of the Tribunal, the parties, counsel and witnesses.

1.40   The Chairman held a telephone conference with Counsel for the parties on 20 March 2007 to discuss a timetable for the appointment of a new co-arbitrator.  Following the conference, the Chairman on behalf of the Tribunal issued Procedural Order No. 2 on 22 March 2007 stipulating the following procedure:

> "1.   The Respondent is to have a new arbitrator appointed and his/her appointment advised to the Tribunal and the Claimant by 6 pm 20 April 2007 (French time).
>
> 2.   The new arbitrator should make a declaration of impartiality and independence and accept the existing Terms of Reference and Terms of Appointment, subject to any necessary adjustment to the terms relating to the remuneration of the Tribunal.
>
> 3.   The new arbitrator must be available to consider the jurisdictional challenge in late July/early August 2007 and conduct the substantive hearing (if any) in March/April 2008. Any consequential amendments to the TOR should be considered at the [next] telephone conference ..."

1.41   On 11 May 2007, the Respondent advised the Claimant and the Tribunal of the appointment of its replacement co-arbitrator, Mr Jayavadh Bunnag of International Legal Counsellors Thailand Ltd, Bangkok.  However, although his appointment had been made, Mr Bunnag did not receive an official letter of confirmation for a further few days after this date.

1.42   Mr Bunnag signed and forwarded a Statement of Independence and Impartiality to the administrative secretary of the arbitration on 18 May 2007. Mr Bunnag signified his acceptance to the Terms of Reference on 25 May 2007.  After discussions between Counsel and the Tribunal, a jurisdictional hearing was directed to take place in Hong Kong on 31 July – 1 August 2007.  The Respondent wished the venue for the hearing to be in Asia.  The Claimant preferred a venue in London or Paris but ultimately agreed to Hong Kong.

1.43    On 19 June 2007, the Respondent revived the issues of Dr Zimmer and document production. The Respondent advised that because the German Government did not consent to Dr Zimmer's participation at the hearing, Dr Zimmer would not be attending as a witness. The Respondent also objected to the Claimant's assertions of privilege in relation to the disclosure of those documents that fell within paragraph 8(b) of the Tribunal's Order for Directions No. 1. The Claimant provided its response on 13 July 2007.

1.44    The Tribunal issued Procedural Order No. 3 on Document Disclosure on 18 July 2007, reiterating its views on Dr Zimmer. It ruled that the Claimant had already complied with the Respondent's request for broader disclosure by stating that it had no documents in its possession or power falling within the scope of the request.

1.45    The hearing on the jurisdictional issues took place at the Hong Kong International Arbitration Centre on 31 July and 1 August 2007. The Claimant was represented by Mr Robert Hunter and Dr. Mariel Dimsey of Counsel and the Respondent by Mr Michael Polkinghorne and Ms Sarah Cohen of Counsel. Representatives of both parties attended the hearing.

1.46    Prepared briefs of the evidence-in-chief of the Expert witnesses – one for each side - had been provided in advance. Each witness was cross-examined and re-examined. A verbatim transcript was taken of the whole hearing and made available to the Tribunal and the parties. The parties had already filed extensive memorials on the jurisdictional issues before the order for bifurcation had been made.

1.47    Written submissions were forwarded by both counsel to the Tribunal on or about 10 August 2007. The Tribunal is grateful to all counsel for their assistance and for the high quality of the submissions.

**Summary of factual background**

1.48    Between August 1989 and July 1997, a German corporation called Dyckerhoff & Widmann AG ("Dywidag") invested about 750 million Thai baht (approx. Euro 17.5 million at today's value) in the Don Muang Tollway through the purchase of shares in a company known as Don Muang Tollway Co. Ltd ("DMT").

1.49   Dywidag made its investment as a shareholder in DMT as a result of an invitation by the Department of Highways ("DoH"), a department of the government of the Respondent, dated 18 September 1987, seeking applications to tender for the tollway concession. The Respondent was unwilling or unable to commit public funds to pay for the project. The project was an urgently-needed infrastructural improvement to the most important road transport route in Thailand. Dywidag and another investor ("Delta") jointly submitted a proposal to the Thai government. DMT was formed for the purpose of entering into a contract with DoH. DMT was to finance, design, construct, operate and maintain the tollway for DoH under a concession agreement to be entered into between DMT and DoH. The concession was awarded to DMT by DoH on 9 March 1988. The formal "Tollway Concession Agreement" was entered into by DoH and DMT on 21 August 1989.

1.50   The tollway is now a 21 kilometre stretch of six-lane elevated expressway near Bangkok, constructed over and forming part of Highway 31, the Viphavadis-Rangsit Road. It provides access to the Don Muang International Airport and forms part of the most important road in the Kingdom.

1.51   In return for the right to collect tolls at levels agreed to and set in advance with DoH, DMT bore the entire capital cost of designing and constructing the tollway plus the operating costs of running and maintaining it for a concession period of 25 years. At the end of that period, the tollway is to be handed back to the Respondent in good condition and at no cost to the Respondent. The value of the concession for the investors lies solely in the return to be made from the excess of toll income over investment and operating costs. Dywidag was noted in the concession agreement as one of DMT's two and only foreign founding joint-venture partners. The document itself recites "*D & W [and Delta co-founder] have caused the registration of DMT pursuant to the laws of the Kingdom of Thailand for the purpose of holding and exercising such a toll highway concession*".

1.52   Initially, the shareholding in DMT was 49% to Dywidag and 51% to Delta. Further investors participated as shareholders in DMT over the years. Some restructuring of DMT took place in 1996-7. The Respondent itself then subscribed to shares and the Claimant provided further share capital.

11

However, because of the large amount of capital in DMT, the Claimant's share stood at 9.87% from the time of the restructuring down until the date of the request for arbitration. Its percentage of the shareholding had varied over the years from the 49% initial high.

1.53    Dywidag was merged into the Claimant by absorption pursuant to s 20 of the German Transformation Act on 16 August 2001. The Claimant asserts that, under German law, it has succeeded to all the rights of Dywidag, including its shares in DMT. The Claimant's holding of 9.87% of the shares in DMT as at 8 December 2004, had been approved by the Thai Ministry of Finance. Although there has been an increase in the Claimant's percentage shareholding in DMT since the Request for Arbitration, counsel were agreed that the Tribunal should decide the jurisdictional arguments on the basis of the Claimant's 9.87% shareholding as at the date of the filing of the Request for Arbitration.

1.54    The Ministry of Finance of the Respondent had entered into a share sale and purchase agreement with Dywidag, Delta and DMT whereby the Respondent, Delta and Dywidag each invested capital in DMT and agreed to regulate matters of share sale and management between themselves. On 26 June 1989, Dywidag and Delta committed themselves to hold together not less than 30% of the registered capital of DMT throughout the construction period. This arrangement was superseded after the 1996/7 restructuring referred to in paragraph 1.52.

1.55    The invitation to tender had been issued by DoH pursuant to a policy adopted and approved by the Council of Ministers ('Full Cabinet') of the Respondent. On 20 September 1988, the Full Cabinet approved the project and granted DMT the concession on the basis of its proposal. The Office of the Supreme Attorney-General approved the form of the concession. The DoH granted the concession pursuant to its statutory power under the Concession Highways Act.

1.56    On 11 June 1990, the Full Cabinet approved the concession project as being eligible for investment promotion privileges such as tax benefits which were duly granted. On 16 May 1991, another arm of the Respondent called the Board of Investment ("BoI") issued a "certificate of investment" to DMT

for the implementation and construction of the project. This certificate was issued under the Investment Promotion Act ("IPA").

1.57    On 11 June 1996, the Full Cabinet approved in principle an amendment to the concession. On 29 November 1996, DoH granted an amendment to the concession which extended the tollway a further six kilometres to connect it with the then Bangkok International Airport. On 6 March 1998, the BoI issued a certificate of investment to DMT for the construction and operation of the northern extension.

1.58    The tollway and its extension were duly built by DMT over a five year period and are fully functional.

1.59    The essential theme of the Claimant's claim for damages is that the Respondent failed to keep its part of the bargain with DMT (in which the Claimant, as legal successor to Dywidag, was a shareholder) by not properly fixing or increasing the level of tolls for the freeway. The Claimant says it was thus deprived of its rightful return on its investment over and above the cost of constructing the tollway.

## 2    QUESTIONS FOR THE TRIBUNAL

2.1    As noted in the Procedural History, the Tribunal agreed to bifurcate the arbitral hearing and to consider the questions set out below at a preliminary hearing. Determination of the questions in favour of the Respondent would mean the end to the arbitral proceedings.

2.2    The agreed questions with which this Partial Award is concerned, are set out as follows:

"(a)    Do the treaties require that a German investment into Thailand be approved as a precondition for treaty protection?

(b)    If so, and without limiting the scope of this question:

(i)    What form must that approval take?

(ii)    What is the object of the approval?

(iii)    Are there different approval requirements under the treaties?

(iv)    Has the Claimant satisfied the approval requirement(s) under the treaties?

13

(c)     If the answer to Issue b(iv) is no, is the Respondent estopped or precluded from arguing (within the meaning of ¶ 60 of Professor Sucharitkul's Witness Statement) that the Claimant has not?

(d)     Is the Claimant entitled to bring this claim in arbitration in light of the "*merger by absorption*" of Dyckerhoff & Widmann Aktiengesellschaft into Walter Bau effective 16 August 2001?"

2.3     The parties agreed on the above formulation of questions for consideration by the Tribunal at this jurisdictional stage of the proceedings before any hearing on the merits.  The Respondent sought answers to the questions which, if answered in the manner contended for by the Respondent, would have the effect of depriving the Tribunal of jurisdiction to entertain the substantive claim.  The Respondent advises that, even if the Tribunal were to rule in favour of the Claimant in respect of the above questions, canvassed at the hearing in Hong Kong on 31 July/1 August 2007, it still has other arguments to the effect that the Tribunal has no jurisdiction to consider the claim.  These arguments would be made at any substantive hearing of the claim on the merits.

## 3     THE TREATIES – PROVISIONS, PREPARATORY DOCUMENTS AND APPROVALS

3.1     It is now necessary to record relevant provisions in both Treaties as a preliminary to considering the arguments on the questions posed.

**1961 Treaty**

*The provisions*

3.2     The Preamble to this Treaty states the desire "*...to intensify economic co-operation between both States*". and the intention: "*...to create favourable conditions for investments by nationals or companies of each State in the territory of the other State*".  Then follows the declaration: "*Recognising that a contractual protection of investments is apt to stimulate private business initiatives and to increase the prosperity of both nations*".

3.3     Article 1 of the 1961 Treaty provides:

"(1)     Each Contracting Party will endeavour to admit in its territory, in accordance with its legislation, the investment of capital by nationals or companies of the other Contracting Party, to promote such investments as far as possible, and to give sympathetic consideration to the granting of any relevant permits required."

14

    (2)    Investments owned by, or under the management or effective control of, nationals or companies of each Contracting Party shall in the territory of the other Contracting Party not be treated less favourably by that Party than it treats investments of its own nationals or companies or investments of nationals or companies of any third State."

3.4      The Protocol to Article 1, which is declared an integral part of the Treaty, provides:

    "(a)    Each Contracting Party is free to decide, in accordance with its legislation and rules and regulations issued thereunder and with due regard to its policies and published plans, whether it will grant a permit required. When a permit is issued the respective investment enjoys full protection of the Treaty.

    (b)    in respect of investments in the territory of the Kingdom of Thailand, the term "investment", wherever it is used in this Treaty, shall refer to all investments made in projects classified in the certificate of admission by the appropriate authority of the Kingdom of Thailand in accordance with its legislation and administrative practice as an "approved project".

3.5      The term "investment" is defined by Article 8 thus:

    "(1)    For the purpose of this Treaty, the term "investment" shall comprise every kind of asset, and more particularly, though not exclusively:

        (a)    movable and immovable property as well as any other rights in rem, such as mortgages, liens, pledges, usufructs and similar rights.

        (b)    shares or other kinds of interest in companies,

        (c)    rights of action for money or for any performance having an economic value,

        (d)    copyrights, patents, trade-marks, trade-names and good will,

        (e)    business concessions under public law.

        Any alteration of the form in which assets are invested shall not affect their classification as investment.

    (2)    The term "returns" shall mean the amounts yielded by an investment or profit or interest for a specific period.

    (3)    The term "nationals" shall mean:

        (a)    in respect of the Federal Republic of Germany:  Germans within the meaning of the Basic Law for the Federal Republic of Germany,

(b)   in respect of the Kingdom of Thailand:   Thai within the meaning of Thai law.

(4)   The term "companies" shall mean any juristic person as well as any commercial or other company or association with or without legal personality, having its seat in the territory of either Contracting Party and lawfully existing consistent with legal provisions, irrespective of whether the liability of its partners, associates or members is limited or unlimited and whether or not its activities are directed at profit."

The term "investors" was not defined.

3.6     The 1961 Treaty did not provide for claims being made by an investor directly against a State Contracting Party.   The only dispute resolution mechanism was, ultimately, state-versus-state arbitration should negotiation fail.

*Preparatory documents*

3.7     Under Article 32 of the Vienna Convention on the Law of Treaties 1969 ("Vienna Convention"), recourse may be had to supplementary means of interpretation, including *travaux préparatoires* for the Treaty and other relevant circumstances.   Such recourse provides a useful check to confirm the 'plain meaning' which Article 31 of the Vienna Convention on the Law of Treaties directs one to consider.   It can also determine meaning when the plain meaning interpretation under Article 31 either (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable.  The Respondent is not a signatory to the Vienna Convention. Nevertheless, it is considered as being part of customary international law since it simply codified existing customary law on the subject: see *Namibia Case – Advisory Opinion* [1971] ICJ Reports 16; *Hungary v Slovakia* ICJ Reports 1997.

3.8     Counsel made submissions on a host of preparatory documents, all of which have been examined carefully by the Tribunal.   It appears that the 1961 Treaty had been negotiated in the context of the Investment Promotion Act of 1954 and an Amendment to that Act made in 1960.

3.9     Article 9 of the 1961 Treaty provided:

> "The present Treaty shall also apply to approved investments made prior to its entity into force by not earlier than the 26th October 1960 by nationals or companies of either Contracting Party in the territory of the other Contracting Party in the performance of the latter's legislation." The date mentioned is the date when the 1960 Amendment to the IPA came into force."

3.10    Minutes of a formal meeting, held on 2 August 1960 during the Treaty negotiations, record a Thai official stating that the date of the coming into effect of the IPA (26 October 1960) should be the 'cut-off' date for the commencement of the application of the 1961 Treaty.  This suggestion was approved by the negotiating team and found expression in Article 9 above.

3.11    The process for obtaining approval under the IPA had been communicated by the Thai delegation to the German delegation for Treaty negotiations in the context of a remark by a German delegate at a meeting on 16 October 1961 about the need for clarification of confusion surrounding the different authorities dealing with private investments.  The Thai delegation explained the BoI's screening processes and suggested that potential investors might consider consulting the BoI.  Professor Sompong Sucharitkul (the Claimant's expert witness) was present at this meeting.  This appears to have been the only recorded discussion during the preparatory talks and negotiations for the 1961 Treaty on the criteria for approval of approved investments.

*Approvals under the 1961 Treaty*

3.12    Certificates of Approval ("CAs") were issued by the Thai Ministry of Foreign Affairs to German investors under the 1961 Treaty, the first in 1972 to Schering Chemicals Limited ("Schering").  This company was not a holder of a certificate of promotion from the BoI.  In the minutes recording the meeting of officials considering Schering's application for approval, can be found the following statement from a representative of the Department of Treaties & Legal Affairs in the Ministry of Foreign Affairs at a meeting on 19 October 1972:

> "...in order to clarify any confusion on this matter, all relevant officials shall authenticate their understanding to be on a common ground such that as a result of the Thai-German Treaty and the Investment Promotion Act investments by German companies and individuals could be divided into 3 of the following categories:
>
> (a)    For investments entitled to a BoI Certificate under the Investment Promotion Act shall be protected by both the Treaty and the Act

as agreed.   The BoI Certificate would also constitute the Certificate of Admission.

(b)   For investments not being promoted but had been issued the Certificate of Admission by the Ministry of Foreign Affairs shall be protected under the Treaty only.

(c)   For investments not granted with the BoI Certificate or the Certificate of Admission – not constituting as those under point (a) or point (b), were entitled to no benefits aside from the benefits granted by the general laws of the country.  Such laws were freely subjected to any changes and amendments."

3.13   This meeting was attended by representatives of many Thai government departments and agencies.   The Committee Minutes stated that it was a meeting of "*the Committee in charge of the approval of the CA Applications of Schering Chemicals Ltd*".   It seems to have been an *ad hoc* Committee rather than one which met regularly.

3.14   Other applications for CAs by German companies were granted by the Ministry of Foreign Affairs ("MFA") in 1982 to B. Grimm & Co. (a manufacturer) and to DEG (an German equity financier of industrial and agricultural enterprises) for an investment in The Industrial Finance Corporation of Thailand.  DEG was issued another CA on 6 December 1984 in relation to its investment in Thai Factory Development Co Ltd.

3.15   DEG is owned indirectly by the Federal Republic of Germany.   DEG is mandated to invest only in projects which meet certain development, environmental and social standards.   In 1987, it made enquiries of the Department of Economic Affairs at the MFA about CA approval for investments in Bangkok Ranch Limited, a duck-breeding and slaughtering enterprise and another in respect of Thai Agri Business Venture Capital Company.

3.16   DEG set out in its letter of 21 August 1987 to the Department of Economic Affairs at the MFA its understanding that, because the Bangkok Ranch Ltd financing proposal was not a "BoI approved project", that was why a CA in accordance with Part 1(b) of the Protocol to Article 1 to the 1961 Treaty was being sought.   It wrote a similar letter in respect of financing for Thai Agri Business Venture Co Ltd on 29 October 1987.  Neither letter received any recorded reply, let alone any challenge to the understanding recorded about the issuance of CAs.   In both cases, DEG was seeking to finance ventures

by acquiring an equity participation in the ventures.  Both CAs were duly granted.

3.17    The Bangkok Ranch investment was approximately 21.8 million Baht in value.   The total figure for German investment in Thailand in 1987 was 2682.4 million Baht.

3.18    Treuarbiet, an accounting and tax consultant firm appointed by the German Government to administer the German foreign investment guarantee programme, had the same understanding as DEG.  In a letter to Dywidag, on 10 May 1988, after mentioning the 1961 Treaty, it stated, *inter alia*:

> "The application of the Investment Promotion Treaty presupposes that the Board of Investment grants a permit under the Thai Investment Promotion Act 1977 in which the entity in which the investment is made is designated as "Promoted Person".  This permit is in the opinion of the Inter Ministerial Committee for Capital Investment, guarantees an indispensable prerequisite for legal protection".

> "In those cases in which the afore-mentioned permit cannot be obtained it is possible to ensure the application of the investment promotion treaty by the issuance of a certificate of admission by the Thai Foreign Ministry in accordance with the protocol to the treaty."

3.19    Treuarbiet's letter to Dywidag was followed by DMT's application for approval by the Cabinet of the Tollway project.  Specific confirmation that the concession should be entitled to promotional privileges and BoI approval followed in due course.

**The 2002 Treaty**

*The provisions*

3.20    This Treaty reflected many of the provisions of the 1961 Treaty, with some variations, additions and re-arrangement of Articles.  The Preamble is identical.  The relevant portions of this Treaty to record here are as follows:

> "Article 1
>
> Definitions
>
> For the purpose of this Treaty
>
> 1.    the term "investments" comprises every kind of asset, in particular, though not exclusively,

(a) movable and immovable property as well as any other rights in rem, such as mortgages, liens and pledges;

(b) shares of companies and other kinds of interest in companies;

(c) claims to money which has been used to create an economic value or claims to any performance having an economic value;

(d) intellectual property rights, in particular copyrights, patents, utility-model patents, industrial designs, trade-marks, trade-names, trade and business secrets, technical processes, know-how, and good will;

(e) business concessions under public law, including concessions to explore, extract and exploit natural resources.

Any alteration of the form in which assets are invested shall not affect their classification as investment, provided such altered investment is approved by the relevant Contracting Party if so required by its laws and regulations.

2. the term "returns" means the amounts yielded by an investment for a definite period, such as profit, dividends, interest, royalties or fees.

3. the term "investors" with regard to either Contracting Party refers to:

(a) natural persons who

- in respect of the Kingdom of Thailand, are considered to be nationals within the meaning of its applicable laws; and

- in respect of the Federal Republic of Germany are Germans within the meaning of its Basic Law;

(b) legal entities, including companies, corporations, business associations and other organisations, with or without legal personality, which are constituted or otherwise duly organized under the law of that Contracting Party and have their seat in the territory of that Contracting Party."

<u>"Article 2(1) to (4)</u>

Admission, Protection and Treatment of Investments

1. Each Contracting Party shall in its territory promote as far as possible investments by investors of the other Contracting Party and admit such investments in accordance with its laws and regulations.

2. The Treaty shall apply only to investments that have been specifically approved in writing by the competent authority, if so required by the laws and regulations of that Contracting Party.

3. Each Contracting Party shall in its territory in any case accord such investments by investors of the other Contracting Party and their returns fair and equitable treatment and full protection.

4. Neither Contracting Party shall in any way impair by arbitrary or discriminatory measures the management, maintenance, use, enjoyment or disposal of investments in its territory of investors of the other Contracting Party."

<u>Article 4</u>

1. Investments by investors of either Contracting Party shall enjoy full protection and security in the territory of the Contracting Party.

2. Investments by investors of either Contracting Party shall not be expropriated, nationalized or subjected directly or indirectly to any other measure the effects of which would be tantamount to expropriation or nationalization in the territory of the other Contracting Party except for the public benefit and against compensation. Such compensation shall be equivalent to the value of the expropriated investment immediately before the date on which the actual or threatened expropriation, nationalization or comparable measure has become publicly known. The compensation shall be paid without delay and shall carry interest at the market lending rate from the date the payment is due until the date of actual payment; it shall be effectively realizable and freely transferable. Appropriate provision shall be made at or prior to the time of expropriation, nationalization or comparable measure for the determination and payment of such compensation. The legality of any expropriation, nationalization or comparable measure, as well as the compensation thereof, shall, at the request of the affected investors, be subject to review by due process of law.

Article 8

Scope of Application

This Treaty shall also apply to approved investments made prior to its entry into force by investors of either Contracting Party in the territory of the other Contracting Party consistent with the latter's laws."

3.21   Article 10 of the 2002 Treaty gives the right to arbitrate for "*disputes concerning investments between a Contracting Party*" (in this the Respondent) and "*an investor of the other Contracting Party*" (as the Claimant claims to be). The Article defines the procedure for appointing the Arbitral Tribunal. The provisions of Article 9(3)-(5) apply which deal with disputes between the parties to the Treaty. Article 10(1) states that such disputes should as far as possible be settled amicably between the parties in dispute.

*Preliminary documents*

3.22   A *note verbale* dated 2 October 1997 from the German Embassy in Bangkok proposed to the MFA that negotiations be entered into to update the 1961 Treaty. A draft of a new Treaty was attached for the purposes of discussion. Negotiations commenced in due course and continued over the next year or so.

3.23   The German delegation was unhappy about any Treaty requirement for approval of investments. The MFA, in a memorandum dated 18 September 2000, stated:

"We feel therefore it is essential to maintain this prior approval principle in order to ensure that the FDI flowing into Thailand will be channelled into the most needed sectors and will assist in our efforts to achieve early economic recovery."

3.24   The German Embassy maintained its unhappiness with this position in a memorandum of 23 March 2001.   The Thai side maintained the position stated in the preceding paragraph.

3.25   Agreement on a common text for a new Treaty was reached on 16 May 2002 and the Treaty was signed on 24 June 2002.   Included in its provisions was Article 2(2) quoted earlier.

*Proceedings of the Committee of Investment Approval*

3.26   Despite the apparently *ad hoc* issuing of a few CAs since 1982, on 9 June 1991, the Thai Cabinet, on the proposal of the MFA, set up a permanent committee for approving treaty investments.   It included representatives of no fewer than 13 agencies of the Thai Government.   The Committee went through some internal restructuring but was affirmed by the Office of the Secretary to the Cabinet on 18 February 1997.   The Committee's mandate was stated  to determine the criteria for the grant of CAs under Treaties with foreign countries and to "*take into consideration the approval of CA as applied by investors whose countries have investment protection Treaties with Thailand*".

3.27   At the Committee's meeting of 15 August 2002, the following was noted in the Minutes:

"4.2 <u>Agencies responsible for admission, promotion and protection</u>

<u>Facts</u>:  Agencies responsible for admission, promotion and protection of investments are MOC, BoI and MFA.  Besides, there are other agencies in charge of foreign investments such as Ministry of Industry taking care of concession, Ministry of Transport taking care of infrastructure in a field of telecommunication, or other Ministries or Departments that are involved in the engagement of work.

<u>Consideration</u>:  The authority in charge of the issuance of the license and the approval for protection should be the same agency.  At this stage, it may be proposed that BoI, as the agency that looks after the promotion and protection of investments that have received promotion, be also the agency to issue CA in accordance with resolutions of the CA committee, so as to become a one-stop service facility.  As for investments under the responsibility of other official agencies, most of which were projects of investment in government's infrastructure, it may be considered that licences received for the investments grant automatic

22

> protection.  Matters of publicity for investors' information should also be considered."

3.28    The minutes of this 15 August 2002 meeting record that this Committee had met three times – in 1972, 1994 and 1990.  This cannot be strictly correct – certainly in respect of meetings in 1972 and 1990.  The Committee was not set up until 1991.

3.29    Reaching agreement on the correct translation of part of the Minutes of this meeting occupied some time at the hearing before the Tribunal.  After Professor Sompong, Dr Varachai and Mr Bunnag had conferred, the following was the agreed translation of a further important part of these minutes:

> "At the first CA Committee meeting in 1972, criteria were set for the granting of a CA to the effect that it must be an industrial enterprise that has been given a BoI Certificate of Promotion under the Investment Protection Act.  Those that have not been given such Certificates of Promotion, or which have previously been given the licence documents for their investment from relevant authorities could be given a CA.  The criteria for granting of CA were set as earlier proposed by the Ministry as follows."

3.30    The minutes note that Thailand had 34 investment, promotion and protection treaties, all of which contained a requirement for CA approval.  A later minute from the same meeting, which was also the subject of an agreed translation, stated:

> "It should be provided that the agency that issues licences and that which issues Certificates of Admission for protection in accordance with the Treaty are at the same place.  At this stage, it may be proposed that BoI is the agency that looks after the promotion and protection of investments that have received promotion, be also at the agency to issue CA in accordance with the resolutions of the CA Committee, so as to become a one-stop service facility.  As for investments under the responsibility of other official agencies, most of which were projects of investments in government's infrastructure, it may be considered that licences received for the investments grant automatic protection in accordance with the Treaty.  Matters of publicity for investors information should also be considered."

3.31    A later meeting of the same Committee on 28 August 2002, again attended by representatives of numerous government agencies, saw the Chairman informing the meeting that, in the past, investment protection had been given to foreign direct investments which were high-end value and long-term but not to portfolios on the Stock Exchange.

3.32    On 28 August 2002, the minutes of the same Committee record: *"The BoI's view on investment having been granted, the BoI certificate should be an approved investment"*.

3.33    A further meeting of the Committee on 7 February 2003, recorded that 18 applicants for CAs had come from Germany, 3 from the Netherlands and 1 from Taiwan. The meeting concluded with the secretary being asked to draft criteria for the granting of CAs for the next meeting as a proposal to the Cabinet. In the meantime, on 15 May 2003, CAs had been issued to two subsidiaries of Daimler Chrysler AG. Their relevant applications had been discussed at various meetings of this Committee.

3.34    Eventually, on 22 October 2003, there was an official announcement by the Thai Government recording Cabinet approval of future policy for the issue of CAs under Treaties. This announcement provided, in effect, that:

(a)    investments that had been granted licences by the Minister of Commerce or the Director-General of the Department of Business Development, or

(b)    investments that had received a Certificate of Promotion from the oI, or

(c)    investments under a government concession

would all be entitled to protection under all investment treaties, (not just the Treaty with Germany). A Certificate of Promotion from the BoI and a contract for a government concession were to be construed as a Certificate of Approval ("CAP") for the investment. Such investment was to be granted protection under the agreement on the promotion and protection of investments between the Government of the Kingdom of Thailand and the government of the country of the foreign investor.

3.35    This announcement was intended to give guidelines for future investors. Several agencies of the Thai Government clearly were of the view at the meeting that enterprises with a BoI did not need an extra document of approval before the investor became entitled to Treaty protection.

**4      DOES THE CLAIMANT HAVE AN APPROVED INVESTMENT FOR THE PURPOSES OF ARTICLE 8 OF THE 2002 TREATY?**

4.1      The Tribunal must first decide whether the Claimant is covered by Article 8 of the 2002 Treaty which applies provisions of that Treaty to "*approved investments*" made prior to its entry into force by investors of either Contracting Party in the territory of the other Contracting Party consistent with the latter's laws. Specifically, was it necessary for the Claimant to have obtained a special CA, in addition to the various approvals DMT obtained from various departments of the Thai Government to build the tollway and the very concession it received from the Thai Government to build and operate the tollway? Unless the Claimant is covered by Article 8, it cannot maintain its claim for relief in this arbitration.

4.2      Essentially, the contention of the Respondent is that neither the various approvals nor the concession itself constituted sufficient compliance with the requirements of Article 1 of the 1961 Treaty and its Protocol for specific approval of its investment and that a further CA was required. In addition, the Respondent submitted that the Claimant's shareholding did not amount to an investment within the meaning of Article 8 of the 1961 Treaty. This argument will be dealt with separately below. The contention of the Claimant is that there was no CA required and that the various grants of approvals and the grant of the concession for the tollway itself were adequate compliance with those requirements of the 1961 Treaty for the obtaining of approval for the investment. The Respondent's further contention - that the Claimant was not an 'investor' under the 2002 Treaty - will be considered later.

**Expert testimony**

4.3      Each side called an Expert to discuss the meaning of the various terms in the Treaties and to comment on the *travaux préparatoires* and the bureaucratic processes. The Claimant called Professor Sompong Sucharitkul who has enjoyed a distinguished academic, legal, diplomatic and arbitral career extending over 50 years. He has served on various ICSID and ASEAN arbitral tribunals and annulment committees and also as the United Nations Compensation Commission to consider claims arising from the occupation of Kuwait. He occupies a distinguished Chair of International

25

Comparative Law at the Golden Gate University School of Law, San Francisco. In the course of his duties, he had been present at some of the meetings discussed when reviewing the bureaucratic background. He had many years' service in the MFA.

4.4   Professor Sompong's written briefs (and his reply to the Respondent's Expert) drew widely and extensively from his many fields of experience and expertise. His essential opinion was that:

(a)   the shares held by the Claimant in the DMT came within the meaning of 'investment' under the 1961 Treaty;

(b)   this 'investment' had been approved by the Respondent to the extent required by the 1961 Treaty;

(c)   because of this being an 'approved investment' under the 1961 Treaty, Article 8 of the 2002 Treaty applied to the Claimant's investment in the DMT

(d)   the Claimant is, accordingly, entitled to claim directly against the Respondent under the 2002 Treaty and is an 'investor' within the meaning of that Treaty.

(e)   Alternatively, the Respondent is estopped by the international doctrine of preclusion (or estoppel) from deviating from the approvals given to the Claimant by its various agencies and asserting that the Claimant does not have the approval of its investment required by the Treaties.

(f)   The fact that the Claimant's investment is a 9.87% shareholding in DMT does not exclude treaty protection of that investment.

(g)   The Claimant as the legal successor to the rights of Dywidag, can maintain the claim in its own name.

4.5   The Respondent called Dr Virachai Plasai, presently the Director-General of the Department of International Economic Affairs, Ministry of Foreign Affairs, Thailand. He has been employed by the FA for 20 years, during which time he has worked mostly at the Department of Treaties & Legal Affairs. He transferred to the Department of International Economic Affairs within the MFA three years ago. Since then, he has been in charge of Investment

Treaty negotiations.  He has served as a panelist in WTO disputes but not any involving Thailand.

4.6    Dr Virachai opined that, based on his knowledge of international investment law and Thai approval regimes, the Claimant was not entitled to make any claim under the 1961 Treaty.   That Treaty did not provide for any investor/state dispute settlement mechanism.   In any case, the Claimant's "investment" was not an "approved investment" under that Treaty and, therefore the Claimant was unable to benefit from Article 8 of the 2002 Treaty.

4.7    He claimed that a "two-step" approach to investment protection was required by the 1961 Treaty: namely, the acquiring and operating the tollway concession, which needed both the granting of a concession and approvals from various agencies along the way plus a separate and specific approval of the investment for treaty protection purposes from the Ministry of Foreign Affairs.  He referred to the various CAs issued since 1972 canvassed at the hearing, which have been summarised earlier.  He was not able to say whether there had been any more than eight CAs issued to German investors, despite a huge amount of German investment in Thailand over the period.  The Tribunal notes the reference to 18 CAs granted to German applicants referred to in paragraph 3.33 above.  There was no evidence given of any more than 8 CAs having been issued.

4.8    Each Expert was cross-examined for the better part of a day.  The Tribunal found some of the evidence of these experts of limited value.  Some of what they had to say on the subject of interpretation of treaty terms was really a matter for submission since they were opining on the very points of interpretation on which the Tribunal has to make a ruling.  However, much of their evidence has been helpful to the Tribunal.

4.9    The Tribunal generally preferred the evidence of Professor Sompong where it took issue with that of Dr Virachai.  One difficulty that the Tribunal found in Dr Virachai's evidence was his reluctance to accept that the concept of a separate CA could have existed before the 1961 Treaty came into force.

4.10    The Tribunal is guided in its consideration of interpretation issues by the broad proposition of Professor Sompong that the approval requirement

should be seen as an incentive, not an obstacle, to foreign investment. This view follows naturally from the expressions in the identical Preambles to both Treaties quoted earlier. The purpose of both Treaties was to create favourable conditions for investors in order to stimulate business initiative and increase prosperity.

4.11    Professor Sompong also made the commonsense point that it would be absurd for any Government to solicit investment and participation by foreigners in a government project – particularly one like the tollway – and then subsequently to deny treaty protection to the foreign investors. Such behaviour, in his view, would cause the country to lose credibility in the money market and would discourage foreign investment. He particularly espoused this view for a project as vast and as important to the Thai nation as the Don Muang tollway.

4.12    The Tribunal considers that the above general statements set the background for consideration of the interpretation issues.

**The Tribunal's view**

4.13    The wording of Article 8 of the 1961 Treaty is very wide. The term "investment" shall comprise *"every kind of asset and more particularly, though not exclusively... (b) shares or other kinds of interest in companies, and (e) business concessions under public law"*.

4.14    The primary mode for the interpretation of treaties, as indeed of any other form of documentation, is a consideration of the plain wording. It is not necessary to revert to secondary evidence if the primary interpretation produces a clear result. One can have resort to secondary modes of interpretation as a 'back-up' to the primary interpretation.

4.15    Professor Sompong's view was that the Dywidag shareholding in DMT came within both Article 8(1)(b) and (e) of the 1961 Treaty. The Tribunal agrees. Shares held by Dywidag in the DMT company clearly come within the term "investment". The shares are owned by a national of the Federal Republic of Germany in respect of a particular project (see Article 8(3)(a)). Article 8(1)(b) refers to shares in companies. The Claimant has also an indirect interest as a shareholder in the concessionaire in a "business concession under public law" (see Article 8(1)(e)).

4.16    The object of the various approvals received by DMT, and through DMT its shareholders, was the tollway project. That fact that the approval was given for the project does not prevent a shareholding in the company responsible for the approved project from being covered by the broad definition of 'investment'. It is difficult to see how else a foreign investor might obtain an interest in a concession other than as a shareholder in the concessionaire company.

4.17    In interpreting this and other Articles in the 1961 Treaty, the Tribunal reverts to its Preamble which emphasises the desire to create a favourable condition for investment by nationals of Germany and Thailand and a recognition that a contractual protection of such interests is apt to stimulate private business initiative and to increase the prosperity of both nations. This is exactly what happened. Clearly, designing, financing, building and operating a tollway on such a grand scale was a private business initiative vastly beneficial for the Kingdom of Thailand which must have contributed to the Kingdom's prosperity. These general statements in the Preamble flavour the interpretation of the Treaty, which the Tribunal has reached on this point.

4.18    The Tribunal now considers the meaning of the word "*approved*" in Article 8 of the 2002 Treaty which relates to approvals under the 1961 Treaty.

4.19    The Tribunal considers that this question also can be resolved from an interpretation of the plain wording of the Treaty itself, bearing in mind the remedial considerations encouraged by the broad statements in the Preamble already mentioned. Article 1(1) of the 1961 Treaty requires each Contracting Party to endeavour to admit in its territory *in accordance with its legislation*, the investment of capital by nationals of companies of the other Contracting Party to promote such investments as far as possible and to give sympathetic consideration to the granting of any relevant permits required. The Tribunal notes that the granting of the concession and the permits and approvals given were all in accordance with various pieces of Thai legislation.

4.20    The Protocols to Article 1 are to be regarded as an integral part of the Treaty but, nevertheless, cannot undermine the broad effect of Article 1(1) which underlines the "*sympathetic consideration*" to be given to the granting of

29

permits and the promotion of investment. The Protocols must be read in the light of Thailand wanting to stimulate investment in the knowledge that foreign investors will the more readily invest if they know they will have Investment Treaty protection.

4.21   The Claimant relied on Part 1(a) of the Protocol to Article 1 of the 1961 Treaty and the Respondent on Part 1(b). These parts of the Protocol must be construed together and cannot be isolated from the context of their relationship with Article 1.

4.22   There can be little doubt that the concession for and construction of the tollway was made in accordance with Thai legislation and regulations and with due regard to Thai policies and published plans as mandated by Part 1(a) of the Protocol. This was a project which the Thai Government needed urgently to relieve congestion on the nation's busiest highway and to facilitate access to the then international airport for Bangkok. The Tribunal notes as crucial to the interpretation point, the second sentence of Part 1(a) of the Protocol, viz: *"When a permit is issued, the respective investment enjoys full protection of the Treaty"*. Such words militate against an investor having to undergo another exercise seeking a separate approval.

4.23   The argument of the Respondent is that Part 1(b) of the Protocol requires a separate "certificate of admission" by the appropriate authority of the Kingdom "in accordance with legislation and administrative practice as an "approved project"". Under this argument, the "permit" under Part 1(a) when issued does not confer "full protection of the Treaty", despite the wording of Part 1(a) noted in the preceding paragraph.

4.24   This insistence on a separate certificate of admission is at variance with the proper interpretation of Part 1(a) of the Protocol, in the Tribunal's view. No legislation existed about any specific certificate of admission. There was legislation, both about granting a concession and approving the investment by the BoI. The Thai administrative practice was, at best, for the Respondent, uncertain and equivocal, certainly until the 2003 announcement. The BoI approval process comes within the parameters of Article 1(b) of the Protocol as a "certificate of admission" by the "appropriate authority in accordance with its legislation and administrative practice".

4.25    Dr Virachai relied exclusively on Part 1(b) in support of the two-step approval process.  The Tribunal considers that the expression "Certificate of Admission" in Part 1(b) could just as easily cover the approvals received by DMT from both the Cabinet and the DoH as could a separate CA.  The expression in Part 1(b) must refer to the same thing as that in Part 1(a).  The Thai word used for "permit" in Part 1(a) is the same word as is used in Part 1(b) for "certificate".  The English language text is the authoritative one.  The English version uses different words to describe what is essentially the same concept.

4.26    The two parts of the Protocol to Article 1 cannot be read as setting up inconsistent regimes.  It is quite appropriate, on a proper reading of both parts of the Protocol and Article 1 as a whole to find, as the Tribunal does, that they refer to the same thing, namely the various approvals obtained by DMT for the tollway concession.   Article 1(1) requires "sympathetic consideration to the granting of any relevant permits required".  It is hard to see a two-step approval process as being "sympathetic consideration" – particularly when the investor concerned has gone through an elaborate process of tendering for and receiving a concession and then receiving approvals for the work which was going to bestow great benefit on the nation.

4.27    Article 9 of the 1961 Treaty, which applies that Treaty to "approved investments" made prior to its entry into force, but not earlier than 26 October 1960, is another indication that the concept of approval can be tied to something other than a certificate of approval specifically given for the purposes of protection under the Treaty.   The 1961 Treaty was the Respondent's first-ever Bilateral Investment Treaty.  It came into force in April 1965.  There could have been no investments approved under some kind of "second step" process for the purpose of treaty protection prior to its coming into force.  Yet the Treaty expressly contemplates investments being approved between October 1960 and April 1965.  How else could they have been approved other than through the BoI certificate process?

4.28    The Tribunal notes that Dr Virachai's admitted, in cross-examination, that he did not know, nor had he been able to find, when a system of approval of Treaty protection began.  There was no permanent body for considering CA

applications until 1991, although there had been an *ad hoc* Committee to consider the Schering application in 1972.

4.29    For the foregoing reasons, the Tribunal cannot accept the argument of the Respondent that Part 1(b) of the Protocol to Article 1 "carves out" an exception to the general rule set forth in Part 1(a).  It also follows, from the temporal limitation of the Treaty's application to pre-existing investments, that the concept of approval must have existed before the Treaty's entry into force.  On this point, Dr Virachai in cross-examination stated that there was no obligation for an investor to apply for protection at the time of investment. Yet to have done otherwise would defy common sense.  One contemplates that an investor would want to have the assurance of Investment Treaty protection before expending large amounts of money on a development project.  The Tribunal notes that in the instant case Dywidag was advised by an authoritative source (Treuebeit) that a separate CA was not required if there was a BoI approval.

4.30    Because the point was thoroughly argued and, in case the Tribunal is wrong in its assessment of the plain meaning of the words of the Treaty, the Tribunal goes on to have recourse to secondary means of interpretation, including preparatory works and the circumstances of the Treaty's conclusion.

4.31    On deciding what form "approval" under the 1961 Treaty might take, one notes that there was no legislation designating the Ministry of Foreign Affairs as the appropriate body, although it issued CAs from 1972, when the first was issued to Schering.  The documentation also shows that only eight CAs had been issued to German investors until 2003 despite the reference to 18 referred to in paragraph 3.33.   No others were found and none was ever issued to a German investor holding a BoI certificate.  The correspondence from important quasi-governmental German organisations indicates their view that a specific CA was not necessary for those cases when a BoI approval had been granted.  There was no letter from the Ministry of Foreign Affairs rejecting this view as might have been expected, had the German organisations been incorrect in their assumptions.

4.32    Dr Virachai, acknowledged in cross-examination that approval under the IPA rather raised an expectation of protection under the Treaty.  The German

32

delegation concerned with negotiating the 1961 Treaty had explained to it, by the Thai delegation, the screening process of the BoI.   From a consideration of numerous minutes of various governmental committees, the Tribunal sees a problem of the left hand not seeming to know what the right hand was doing in various manifestations of government.  This phenomenon is exemplified in those records of meetings when conflicting views of what was needed for a CA were articulated by public servants.  The consequence of this equivocation  and confusion was correctly characterised by Professor Sompong in his evidence thus:  *"If any of the agencies of a state certify that a foreign investment is approved or is admitted or is legal, then we as a host government have to provide necessary protection under international law."*

4.33    The Respondent relies on the eight CAs that were granted to German investors from 1972 onwards until the 2003 announcement as evidence that a separate CA was required in all cases – even for those investments with a BoI approval.  This submission is made notwithstanding the fact that none of the eight with CAs had or needed BoI approval.

4.34    The 1972 application by Schering was considered by a committee of 12 representing eight different governmental bodies or departments.   The minutes produced of the meeting did not refer to any two-step process. Schering was not the holder of a BoI approval.  At the relevant meeting, a representative of the Ministry of Foreign Affairs gave his view as recorded in paragraph 3.12 above.

4.35    The DEG/Treuarbeit letters emanated from German companies with links to the German Government.   These entities specialised in investments and projects within certain developmental, environmental and social standards. For none of the DEG-backed projects had there been any preceding BoI approval.  The letters sought only investment approval pursuant to Part 1(b) of the Protocol to the 1961 Treaty.  Because other investments covered by that Treaty had been approved by the BoI, but Bangkok Ranch was not a BoI-approved project, a CA was sought.  As noted earlier, there was no letter from the Ministry of Foreign Affairs challenging DEG's view of the situation.  This understanding was also communicated directly to Dywidag by Treuarbeit prior to its making any investment in the tollway.  Dywidag was told that either BoI status or a letter of admission was an essential requirement for treaty protection.  DMT received BoI approval.  This letter to

33

Dywidag preceded the application to and approval by the Cabinet of the tollway project and the concession.

4.36    Professor Sompong stated, in evidence, that the agreed translations noted at paras 3.29 and 3.30 supported the view that, prior to the 2003 announcement, the BoI had been the agency looking after the promotion and protection of investments.   Also, the Claimant's investment in a government concession meant that treaty protection was built in automatically.   The very award of a concession must include approval.   The decision in 2003 that the BoI should become a "one-stop shop", not only for its statutory functions under the IPA but for issuing CAs as well, confirmed, in his view, the notion that the BoI had been the approval authority under the 1961 Treaty.

4.37    Professor Sompong concluded that it would be illogical to say that the Government had not approved this tollway project, which had been approved by several agencies, including the Cabinet.   It was obviously a Government project of high importance.

4.38    One can well understand a reluctance to grant CAs for the financing of private projects by way of loan from a German investor.   The financing of a huge concession of vital importance to the nation such as the tollway in question is quite a different matter.   One would have thought that, given the amount of government involvement in the tollway construction by way of both encouragement and approvals, that this was the epitome of a project which should receive the benefit of an investment treaty.

4.39    The minutes of the meetings of the Committee for Investment Approvals show concern by foreign governments (notably Germany) about the confusion created by the provision in investment treaties for CAs. Representatives of the Respondent, in response to questions from a German Government representative, said that a CA could amount to an approval for the purposes of the 1961 Treaty, meaning that it was possible to receive an approval for the purposes of the Treaty by way of a separate CA, even for a project without BoI approval.

4.40    In this context, the quotation from the decision of the Arbitral Tribunal in an
        ASEAN arbitral decision in *Yuang Chi Oo Trading v. Myanmar* (2003) 8
        ICSID Reports 432 is pertinent.

> "If Myanmar had wished to draw a distinction between an approval for
> the purposes of the 1987 ASEAN agreement and approval for the
> purposes of its internal law, it should have made it clear to potential
> investors that both procedures co-existed and further how an
> application for treaty protection could be made."

4.41    Although the facts in the *Myanmar* case were rather different, the dictum can
        be applied to the instant facts.  The Thai Government should have drawn to
        the attention of Dywidag, and indeed DEG and Treuarbeit, the distinction
        between a BoI and its cognate approvals and a CA.  It could easily have
        rejected the assumptions of DEG and Treuarbeit but there is no evidence of
        its having done so.

4.42    In the Tribunal's view, both the clear meaning of the Treaty and the available
        secondary evidence establish the same result, namely that there was no
        "two-step" process for obtaining a CA under the 1961 Treaty in cases where
        a BoI Certificate of Investment had been obtained.

4.43    This view accords with common sense, particularly when one considers the
        huge nature of the concession for the tollway being built by DMT for the
        Respondent.  It encouraged and permitted its construction and operation.
        The project clearly was an important piece of infrastructure for the country.
        To hold that the lack of a separate *ad hoc* authorisation deprived the
        Claimant of whatever protection the Treaty afforded to the Claimant runs
        contrary to common sense and justice.  The Tribunal is pleased that a clear
        interpretation of the Treaty itself, supported by the documentation and the
        subsequent conduct of the Respondent, makes this conclusion possible.

## 5    OBJECT OF INVESTMENT APPROVAL

5.1     The Respondent further submitted that, even if there were an approval in
        terms of the 1961 Treaty of the DMT "project", nevertheless, the
        *shareholding* of the Claimant's predecessor, Dywidag, was not an
        "investment" in terms of Article 8.  This was an additional argument to the
        one which postulated that no proper approval had ever been given by way of
        a special CA.  The Respondent contends that the approval under the 1961

Treaty, if any, extended only to the building of the highway and not to the investment made by Dywidag in DMT.

5.2    The Claimant's Request for Arbitration says that its investment in the tollway was through the purchase of shares in the concession company, DMT, by its predecessor, Dywidag.   The 1961 Treaty distinguished between shares in a company and business concessions under public law as different forms of investment.    The Respondent submits that any approval under the 1961 Treaty was of the tollway project.   Whereas, under the 2002 Treaty, the approval must relate to the shareholding.    The Claimant alleges that "approved investment" within the meaning of Article 8 of the 2002 Treaty should be understood to mean "investment" under the 2002 Treaty made in an approved project under the 1961 Treaty.

5.3    The Respondent submits that the two treaties are separate and distinct and that, upon the 2002 Treaty's entry into force, the 1961 Treaty was terminated. (See Article 11(2) of the 2002 Treaty.) This Treaty created two separate treaty regimes, there being no indication that the later treaty was intended to amend the earlier treaty.   Therefore, the 2002 Treaty should be assessed on its own terms.   The Respondent refers to a dictum in the *Myanmar* case which pointed out that inconsistencies can arise between successive treaties relating to the same subject-matter.

5.4    Under this argument, there was nothing in the 2002 Treaty to contain a single reference to a project approved other than under its terms and nothing in the preparatory documents to assert that the parties intended the phrase "Approved Investment" under the 2002 Treaty to have the same meaning as "investment in an approved project" in the 1961 Treaty. Consequently, approval under the 1961 Treaty is not necessarily approval for the purposes of the 2002 Treaty.

5.5    The Respondent submits that Part 1(b) of the Protocol to Article 1 of the 1961 Treaty gave the Thai Government a discretion to grant approval to an "Investment made in projects classified in the certificate of admission" in accordance with the Kingdom of Thailand's "legislation and administrative practice".    Included in the term "administrative practice" is a Cabinet resolution.   By contrast, there is nothing defined under Article 8 of the 2002 Treaty to limit the Respondent's discretion to grant approval for investments

made prior to the Treaty's entry into force but where investments must be made "consistent with... laws and regulations".

5.6   Moreover, the Respondent submits that, if there is a change of investment, the 2002 Treaty requires a fresh approval.  Part of Article 1 thereof reads:

> "Any alteration of the form in which assets are invested shall not affect their classification as investment, provided such altered investment is approved by the relevant Contracting Party so required by its laws and regulations."

5.7   Under this submission, the Claimant's investment changed from a direct investment to an indirect one as part of the renegotiation of the concession and refinancing of the DMT in 1996/7.  This submission assumes that a shareholding of under 10% is to be categorised as an "indirect" investment. Reference was made to some OECD guidelines which fixed 10 % as a benchmark.

5.8   The   Respondent   further   submits   that   Thai   legislation   concerning concessions  and  promotional  privileges  does  not  refer  to  the  Treaty protection approval nor does it confer rights upon equity shareholders in a concession company.

5.9   In  broad  terms,  this  argument  means  that  the  Tribunal  must  determine whether there is a distinction between the protection offered to investors by the 1961 Treaty as distinct from that offered by the 2002 Treaty.

5.10   Professor Sompong said in evidence and the Tribunal accepts:

> "I cannot presume that the Thai Government would want to try to alter the rights of foreign investors...  Nor is it intended by treaties to take away the rights already acquired."

5.11   Clearly, Article 8 of the 2002 Treaty is aimed at protecting investments approved under the pre-existing regime.  Applying a liberal interpretation of the aims of the Treaty as stated in the Preamble, the Tribunal agrees with Professor Sompong.  It would be inconceivable that rights acquired by an investor under an earlier treaty with the same aims which had lasted for 40 years  should  be  removed  through  some  drafting  sleight-of-hand.    The objects  of  both  Treaties  as  expressed  in  their  preambles  is  the  same. Expressed  broadly,  those  objects  are  the  encouragement  of  foreign investors  and  treaty  protection.    The  Tribunal  cannot  see  as  valid  a

difference in the two Treaties – one protecting "investments" and the other "investors" – based on a change in economic philosophy and direction over a 40 year period.  The plain interpretation of the documents precludes such a strained meaning.

5.12    The 2002 Treaty definition of "investments" is not hugely different from that in the 1961 Treaty.  Other than to prescribe nationality and legal form, there is no detailed definition of "investor".  Presumably, an "investor" under the 2002 Treaty is one of the appropriate nationality who has an "investment" as defined.

5.13    The Tribunal has difficulty in accepting the Respondent's argument.  In the Tribunal's view:

(a)    the Claimant is an "investor" under the 2002 Treaty because it had an "approved investment" under the 1961 Treaty;

(b)    there is no difference between the nature of the Claimant's "investment" or its status as an "investor" under either Treaty;

(c)    the Claimant is entitled as an "investor" under the 2002 Treaty to whatever benefits given to it by that Treaty.

5.14    There is nothing in the Treaty which imposes an arbitrary cap of a minimum shareholding required for investment treaty protection.  Nor is there any warrant for categorising the Claimant's 9.87% as an "indirect" investment.  A 10% shareholding in a project the size of the tollway may well be a very large investment.  Indeed, the investment only came below 10% after there had been a large increase of capital, with the Respondent taking an equity holding.  That fact did not make the quantum of the Claimant's investment any less.  A 10% investment in the financing of a small enterprise might be a minor investment such as not to warrant treaty protection under some *de minimis* principle.  There is nothing in either Treaty to so limit an investment.  It would have been easy enough for such a limitation to have been included.  ASEAN guidelines cited by the Respondent have no persuasive quality when interpreting this Treaty.  Neither have the references to a 10 % threshold expressed at certain meetings of government officials any relevance.

5.15    Professor Sompong's evidence confirms that the discussion at some of the meetings of a 10% cut-off point had nothing to do with investments such as a government infrastructure project like the tollway.  The officials were more concerned about giving protection to non-political commercial risks such as secondary investments in the stock-market.

5.16    The Tribunal also rejects, as without substance, the Respondent's submission that the reduction of the Claimant's shareholding to 9.87% was a change in the form of the investment.  There was no change of form.  The investment was, as before, a holding of shares.  Not debentures, secured notes or anything other form of investment in a company, but shares.

## 6    IS THE CLAIMANT AN INVESTOR FOR THE PURPOSES OF THE 2002 TREATY – ABSORPTION OF DYWIDAG

6.1    The Tribunal considers whether the merger by absorption of Dywidag into the Claimant, effective at 16 August 2001, means that the Claimant can maintain its claim under the 2002 Treaty.  Under Article 20 of the German Transformation Act,  Dywidag merged by absorption into Walter Bau, which became registered as the shareholder of the shares in DMT on 8 December 2004, before the filing of the Request for Arbitration.  Both Dywidag and the Claimant were German, so there was no change in the nationality of the juristic entity owning the shares.  Dywidag ceased to exist legally without having to be wound-up.

6.2    Under the laws of both Germany and Thailand, the legal succession of the Claimant's to Dywidag's rights and obligations, meant that that Dywidag's rights and obligations were assumed by the Claimant as if it were Dywidag. Because of this legal succession, the Claimant is entitled to receive the benefit of Dywidag's investment in DMT.

6.3    The Tribunal accepts the evidence of Professor Sompong that Thai law has a similar principle of universal succession, as does the German legal system, as can be deduced from the clear wording of the German statute. The Respondent was well aware of what had happened.  It approved the registration of the Claimant, Walter Bau, as an "investor" by a letter from the Ministry of Finance of 7 July 2003.  This approval was conditional on a number of matters which were all satisfied.  The conditions were satisfied

and no further approval was required of the Ministry of Finance, apart from being advised.

6.4    There is nothing to prevent the acquisition by merger of the shares of an investor in an "approved investment" under either Treaty provided that the investor, after the merger, is still a German national.

6.5    Accordingly, the various objections to jurisdiction articulated by the Respondent at this hearing are not accepted by the Tribunal.

**7      ESTOPPEL / PRECLUSION**

7.1    The Tribunal has considered evidence and argument on whether, assuming contrary to the Tribunal's view, that there was a requirement for a separate CA for the tollway project over and above the various approvals given by organs of the Thai Government, the Respondent is estopped from asserting this requirement.   Professor Sompong called the Respondent's conduct discussed earlier an example of the international law of preclusion or estoppel in common law.

7.2    The Tribunal is attracted to the Claimant's argument that, cumulatively, the grant of the concession, the various approvals and the equivocal stances taken by various arms of the Thai Government, operated to prevent the Respondent from asserting any requirement for a CA and that the Claimant thereafter acted to its detriment by not applying for one.

7.3    This argument, however, does rather depend on evidence – particularly evidence of detriment.

7.4    Accordingly, the Tribunal declines to consider this point at the jurisdictional stage.   It can be reserved for evidence and argument at the substantive hearing.

**8      ANSWERS TO QUESTIONS**

8.1    The questions posed for the Tribunal will, accordingly, be answered as follows:

(a)    *Do the treaties require that a German investment into Thailand be approved as a precondition for treaty protection?*

The 1961 Treaty reserved to each Contracting Party the freedom whether or not to admit an investment from a national of the other in accordance with its legislation and statutory regulations and with due regard to its policies and published plans.

In the case of investment in the territory of the Respondent, the term "investment" for the purpose of the Treaty is defined as one admitted for making in a project "approved" in accordance with the Respondent's legislation and administrative practice. Once admitted, the investment enjoys the full protection of the Treaty. The existence of such approval is therefore conclusive evidence of protection.

The 2002 BIT requires approval only to the extent that an investment is required to be specifically approved in writing by the laws and regulations of the Contracting Party. Irrespective of that, it applies to "approved investments" made before its entry into force.

(b)   *If so, and without limiting the scope of this question*:

   (i)   *What form must that approval take?*

   Approval of an investment includes:

   - BOI Approval

   - grant of a concession or other government project

   - CA

   In the case of a government project, approval is inherent and any form of specific approval is *ratione cessante*.

   (ii)   *What is the object of the approval?*

   The object of approval is the project or activity in which the foreign national's investment is made.

   (iii)   *Are there different approval requirements under the treaties?*

   No, the 2002 Treaty applies to approved investments made prior to its entry into force and thus by definition must be interpreted by *renvoi* to the 1961 Treaty. to the extent that Article 8 2002 Treaty

41

does not apply, Article 2(2) is similar in all material respects to Article 1 / Protocol 1 1961 Treaty.

(iv) *Has the Claimant satisfied the approval requirement(s) under the treaties?*

Yes, approval was given by reason of:

- The fact that this was a Government project.

- The approval of the grant of the Concession by the Respondent's Council of Ministers.

- The grant of the Concession by the Department of Highways with the approval of the Council of Ministers following scrutiny of the agreement by the Attorney-General's Office.

- The approval of the project itself for promotional privileges by the Council of Ministers.

- The approval of the amendments of the Concession to encompass the Northern Extension.

- The specific grants of promotional privileges to DMT by the Board of Investment.

- Entry into the Share Purchase Agreement of 17 May 1997 by the Respondent directly with the Claimant.

(c) *If the answer to Issue b(iv) is no, is the Respondent estopped or precluded from arguing (within the meaning of ¶ 60 of Professor Sucharitkul's Witness Statement) that the Claimant has not?*

Not applicable.

(d) *Is the Claimant entitled to bring this claim in arbitration in light of the "merger by absorption" of Dyckerhoff & Widmann Aktiengesellschaft into Walter Bau effective 16 August 2001?"*

Yes.

42

## 9   AWARD

9.1   The Tribunal having carefully considered the documentary evidence and the written and oral submissions of the parties and given due weight thereto, and rejecting all submissions to the contrary, hereby makes issues and publishes this Award and **FINDS, AWARDS, AND DECLARES AS FOLLOWS:**

    (a)   The Tribunal has jurisdiction to consider the Claimant's claim on the merits, subject to its considering at the substantive hearing any further jurisdictional arguments not already canvassed at the hearing in Hong Kong on 31 July / 1 August, 2007.

    (b)   The hearing of the Claimant's claim on the merits, plus the jurisdictional arguments referred to in (a) above, will take place in 2008 at a time and place to be fixed by the Tribunal.

    (c)   The questions posed for the Tribunal are answered as in para 8.1 above.

    (d)   The costs of the jurisdictional hearing are reserved for determination by the Tribunal if and when it considers a ruling on the costs of the substantive hearing.

9.2   The Respondent's claim for security for costs now needs to be ruled upon by the Tribunal.  The Claimant is to supply the information mentioned in para 1.30 hereof.

9.3   The Terms of Reference will need to be altered – particularly on the question of the remuneration on the Tribunal, consequent upon the replacement of Dr Suvarn by Mr Bunnag and the cancellation of the hearing in Kuala Lumpur.

**Date** at Geneva, Switzerland, Seat of the Arbitration

this        5ᵗʰ        day of October 2007

_____
**Hon. Sir Ian Barker**
**Chair**


_____
**Hon. Marc Lalonde P.C., O.C., Q.C.**

_____
**Mr. Jayavadh Bunnag**