IN THE MATTER OF AN ARBITRATION

UNDER THE UNCITRAL ARBITRATION RULES

BETWEEN:

WALTER BAU AKTIENGESELLSCHAFT (in liquidation)

Claimant

-and-

THE KINGDOM OF THAILAND

Respondent

RESPONDENT'S MEMORIAL ON JURISDICTION
AND REQUEST FOR BIFURCATION

2 October 2006

White & Case LLP
11, Boulevard de la Madeleine
75001 Paris, France
Telephone: +33 (0) 1 55 04 15 15
Facsimile: +33 (0) 1 55 04 15 16

Counsel for Respondent

PARIS 1016051 (2K)

Table of Contents

Page

I.   INTRODUCTION ................................................................................................ 1

II.  GENERAL PRINCIPLES APPLICABLE TO THE TRIBUNAL'S DETERMINATION
     OF JURISDICTION ........................................................................................ 5
     A. CONSENT TO ARBITRATION AND APPLICABLE LAW .......................... 5
     B. PRESUMPTIONS AND BURDEN OF PROOF ......................................... 7

III. NO BASIS FOR JURISDICTION ....................................................................... 8
     A. NO APPROVED INVESTMENT ................................................................ 11
        1. The Requirement for Approval ........................................................... 13
           a. The Approval Requirement in the 1961 Treaty ........................... 13
           b. The Approval Requirement in the Treaty .................................... 13
              (A)  The Thai Delegation Insisted on Keeping the Approval
                   Requirement in the Treaty ..................................................... 14
              (B)  The Treaty Confirmed and Extended the Approval Requirement
                   for Prior Investments ............................................................ 15
        2. Thailand's Approval Process ............................................................. 17
        3. Claimant Lacks the Requisite Certificate ......................................... 19
     B. NO JURISDICTION *RATIONE TEMPORIS* UNDER THE BIT ................ 26
        1. Treaty Obligations Are Binding Only After Entry Into Force ............ 26
        2. Temporal Scope of Application Under Article 8 of the BIT: No Retroactive
           Application to Disputes or Breaches Arising Before the BIT's Entry into
           Force ................................................................................................... 29
           a. No Jurisdiction Because the Dispute Arose Prior to the Treaty's Entry into
              Force ............................................................................................. 33
           b. In Any Event, No Jurisdiction for Breaches Arising Before 20 October
              2004 ................................................................................................ 36
              (A)  Continuing Breach ................................................................. 39
              (B)  Cumulative Breach ................................................................. 45
     C. NO JURISDICTION OVER CLAIMS UNDER THE 1961 TREATY .......... 46
        1. No Investor-State Arbitration Under the 1961 Treaty ...................... 46
        2. Article 10 of the BIT Does Not Apply to Claims Based on the 1961 Treaty ... 47
     D. NO *PRIMA FACIE* BREACH .................................................................. 49
        1. No Expropriation ............................................................................... 52
        2. Claimant Insufficiently Pleads Contractual Breaches ..................... 53
        3. Mere Breach of Contract Does Not Constitute Treaty Breach ....... 54
           a. No Umbrella Clause ...................................................................... 56
        4. If Article 7(2) Were an Umbrella Clause, It Would Only Encompass
           Obligations With Regard to the Investment ..................................... 57
        5. If Article 7(2) Were an Umbrella Clause, Claimant Would Still Have to Plead
           Contractual Breaches Beyond Mere Commercial Acts ................... 60

6.   If Article 7(2) Were An Umbrella Clause (And Somehow Permitted Claimant to Complain of Breaches of the Concession Agreement), Claimant Could Not Disregard Other Agreements or Waivers by DMT ....................................... 63

IV.   THESE PROCEEDINGS SHOULD BE BIFURCATED ................................................ 64

V.   CLAIMANT SHOULD BEAR THE COSTS OF THESE PROCEEDINGS ................... 66

VI.   CONCLUSION ............................................................................................................. 68

ii

1.     The Kingdom of Thailand ("Thailand" or "Respondent") respectfully submits this Memorial on Jurisdiction and Request for Bifurcation, together with supporting documentation, in accordance with the Procedural Timetable and Article 21(1) of the UNCITRAL Arbitration Rules (the "UNCITRAL Rules").[1]

## I.     INTRODUCTION

2.     This arbitration involves the purchase of shares in a Thai company (the Don Muang Tollway Co. ("DMT")) by Dyckerhoff & Widmann AG ("Dyckerhoff & Widmann"), the "*predecessor*" of Claimant, Walter Bau AG (in liquidation) ("Walter Bau"). Walter Bau is a construction company incorporated under the laws of Germany.

3.     In 1989, DMT and Thailand's Department of Highways ("DOH") entered into a Concession Agreement that granted DMT the right to build, operate and collect tolls from a tollway extending from central Bangkok to past the Don Muang Airport. To build the tollway, DMT engaged a construction consortium that included Dyckerhoff & Widmann.

4.     Construction of the tollway took approximately five years, with operations commencing in 1994.

5.     Claimant's investment in DMT—its shareholding—is trivial (only 9.87%).[2]     Its relationship with DMT has been richly rewarding nevertheless.   Claimant and its predecessor have been paid handsomely by DMT – in fact, tens of millions of dollars (Respondent believes that the figure is over US$ 150 million) – for their design and construction services in connection with the tollway.

---

[1]     UNCITRAL Arbitration Rules (1976), Art. 21(1) ("*The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.*") (Respondent's Legal Authority ("RA-") 1).

[2]     *See* DMT List of Shareholders dated 13 September 2005 (Respondent's Exhibit ("R-") 1).

6.   In addition, through a series of other arrangements, including a *"Financial Advisory Service Agreement"* and an *"Operation Advisory Service Agreement,"* Claimant and its predecessor have apparently claimed and/or received from DMT tens of thousands of dollars monthly.[3]

7.   On 29 November 1996, the Concession Agreement was amended by MoA2,[4] pursuant to which (*inter alia*) DMT agreed to build extensions to the existing tollway. Dyckerhoff & Widmann again provided design and construction services.[5]

8.   MoA2 also extinguished all claims arising under the Concession Agreement before MoA2. In addition, DMT expressly waived the right to bring any claims related to the change in use of the Don Muang Airport.

9.   On 24 June 2002, Thailand and Germany signed the Agreement between the Kingdom of Thailand and the Federal Republic of Germany for the Encouragement and Reciprocal Protection of Investments (the **"BIT"** or the **"Treaty"**). The Treaty entered into force on 20 October 2004.[6]

10.   Roughly one year later, after becoming insolvent, Claimant filed its Request for Arbitration against Respondent, alleging a dispute within the scope of Thailand's agreement to arbitrate in Article 10 of the Treaty.[7]

11.   Respondent expressly denies Walter Bau's claims.

---

[3]   These arrangements are set out in the financial statements of DMT for the years ended 31 March 1990, note 8(3) (R-2) and 1991, note 6(3) (R-3).

[4]   The Concession Agreement was first amended by MoA1 dated 27 April 2005.

[5]   Claimant is presently engaged in an arbitration against DMT for the payment of retained and additional sums for these services.

[6]   *See* Claimant's Request for Arbitration dated 21 September 2005 ("Request for Arbitration"), ¶ 20; Agreement between the Kingdom of Thailand and the Federal Republic of Germany for the Encouragement and Reciprocal Protection of Investments, done in Bangkok 24 June 2002, entered into force 20 October 2004 (the "BIT" or the "Treaty") (WB1, following Claimant's own annotation of its exhibits).

[7]   The Request for Arbitration was filed on 21 September 2005.

2

12.  Claimant complains that numerous acts and omissions by the Respondent during the life
     of the Concession, including (and in spite of the terms of MoA2) changes in the use of
     the Don Muang Airport and acts and omissions that occurred before MoA2, allegedly
     breached obligations owed to DMT (not Claimant itself) under the Concession
     Agreement. It further complains that as a result of these breaches, DMT's general
     economic health has deteriorated and there has been a decline in the anticipated return on
     the investment.[8]  Despite the fact that there are more than fifteen years left in the
     Concession, Walter Bau speculates that the value of the investment has been
     "*substantially and irreversibly impaired.*"[9]

13.  The Claimant is obviously aware that the majority of the events about which it complains
     in the Request occurred well before ratification and entry into force of the Treaty.
     Nevertheless, there is no discussion in the Request of this aspect of the case; no
     explanation of how events taking place prior to the Treaty can be the subject of this
     arbitration. Without acknowledging the elephant in the room, Claimant half-heartedly
     asserts that the Respondent breached the Treaty's predecessor (the "**1961 Treaty**").[10]
     However, only the BIT has investor-recourse to arbitration against the state, and hence it
     is the only treaty relevant to this arbitration.

14.  A more fundamental defect of the Request for Arbitration is the absence of any reference
     to the requirement – under both treaties – of Thai approval of the investment before it
     qualifies for treaty protection. In fact, the Request is silent on this point.

---

[8]   *See* Request for Arbitration, ¶ 12.

[9]   *Id*, ¶¶ 13 and 63(b)(iii).

[10]  Treaty between the Federal Republic of Germany and the Kingdom of Thailand Concerning the Promotion
      and Reciprocal Protection of Investments done in Bangkok 13 December 1961 (the "1961 Treaty") (WB2).

15. This requirement is hardly a secret. Indeed, in a direct reference to this requirement, one German Government website confirms that the BIT *"protects only approved investments"* (see ¶ 67).

16. Fatally, Walter Bau's investment has never been the subject of such an approval.

17. So, in many respects, the Claimant's Request is more notable for what it does not say, rather than what it does. It does not explain how acts complained of prior to the Treaty can form the subject of a claim. It does not address the absence of approval for the investment, a fundamental requirement under the Treaty. Nor does the Claimant provide any explanation (other than bold assertion) as to how the events complained of, which it largely characterizes as breaches of contractual obligations owed by Respondent to DMT (not Claimant), constitute breaches of the Treaty.

18. The Tribunal will also note that much of the investment (in the broadest sense of the term) was, in fact, effectuated by Dyckerhoff & Widmann, not Walter Bau. Walter Bau is put to strict proof of its rights to rely upon any investment of this different entity (which is simply described as a *"predecessor"* that *"was subsequently merged into Walter Bau"* in the Request for Arbitration).[11] This is not an idle debate. The Treaty protects *"Investments by Investors"*[12] and thus requires proof of entitlement by any third party (to the Investment when made) to establish its rights to protection in respect of that Investment. This includes proof of how and when Walter Bau acquired rights in respect of the same.

19. The Claimant's Request suffers from a number of other failings, which are set out in Section III subsequent to discussion of the fundamental issues of absence of approval and

---

[11] Request for Arbitration ¶ 4.

[12] *See, e.g.,* Treaty, Articles 2(3) and 4(2) (WB1).

4

lack of jurisdiction *ratione temporis*. As will be seen, this Tribunal has no jurisdiction over any of Claimant's claims (nor, hence, over any relevant counterclaims Respondent might wish to raise).

## II.   GENERAL PRINCIPLES APPLICABLE TO THE TRIBUNAL'S DETERMINATION OF JURISDICTION

### A.   CONSENT TO ARBITRATION AND APPLICABLE LAW

20.   Article 10 of the BIT provides, in relevant part:

> "(1) Disputes concerning investments between a Contracting Party and an investor of the other Contracting Party should as far as possible be settled amicably between the parties in dispute.
>
> (2) If the dispute cannot be settled within six months from the date on which it has been raised by one of the parties to the dispute, it shall, at the request of either party to the dispute be submitted for arbitration... ."[13]

21.   The consent to arbitration expressed by Thailand in Article 10 of the BIT is conditioned on a claimant's satisfaction of the conditions set forth in the Treaty. For example, the definition of *"investor"* in Article 1 of the BIT imposes nationality requirements that must be met in order for a claimant to qualify for Treaty protection. In a similar fashion, only those investments that have been specifically approved by the Thai authorities are accorded treaty protection under Article 2(2) of the Treaty.

22.   The BIT, being an international treaty, is an instrument governed by international law, to be construed in accordance with the rules of interpretation applicable to treaties as embodied in Articles 31-33 of the Vienna Convention on the Law of Treaties ("**Vienna Convention**").[14]

---

[13]   WB1.

[14]   See *Vienna Convention on the Law of Treaties*, done at Vienna (23 May 1969) UNTS Vol. 1155, 331, Art. 2(1)(a) ("'treaty' means an international agreement concluded between States in written form and governed by international law.") (RA-2). See also *Emilio Agustín Maffezini v. Kingdom of Spain (Decision on Jurisdiction)* (25 January 2000) ICSID Case No. ARB/97/7 ¶ 27, reprinted in (2001) 16 *ICSID Rev.-*

23. Although Thailand is not a party to the Vienna Convention, the Vienna Convention's terms are applicable to the extent that it embodies general principles of international law.[15]

24. Thus, in order to assess whether Walter Bau has met the conditions specified in the Treaty such that Thailand may be bound to arbitrate in this case, the relevant provisions of the BIT must be interpreted according to the rules of interpretation applicable to treaties.

25. In this vein, the Tribunal must have regard to the will of the state parties to the BIT to impose certain restrictions on their protection of investors and investments. As the ICSID Tribunal in *Amco Asia v. Indonesia* stated:

> "*like any other conventions, a convention to arbitrate is not to be construed restrictively, nor, as a matter of fact, broadly or liberally. It is to be construed in a way which leads to find out and to respect the common will of the parties : such a method of interpretation is but the application of the fundamental principle pacta sunt servanda, a principle common, indeed, to all systems of internal law and to international law.*"[16]

---

*FILJ* 212 ("*Like all other provisions of the BIT and in the absence of other specified applicable rules of interpretation, Article X [containing provisions on settlement of investment disputes] must be interpreted in the manner prescribed by Article 31 of the [Vienna Convention].*") (RA-3); *Grand River Enterprises Six Nations, Ltd. et al. v. United States of America* (Decision on Objections to Jurisdiction) (20 July 2006) NAFTA/UNCITRAL Arbitration ¶ 34 ("*NAFTA is an international agreement, to be construed in accordance with the ordinary rules of treaty construction as indicated in Articles 31 and 32 of the Vienna Convention on the Law of Treaties.*") (RA-4).

[15] See *Golder v. United Kingdom* (21 February 1975) ECHR Ser. A, No. 18 ¶ 29 (even though the Vienna Convention was not then in force, relying on its articles of interpretation as they "*enunciate in essence generally accepted principles of international law*") (RA-5); *Case Concerning Kasikili/Sedudu Island (Botswana v. Namibia)* 1999 ICJ (Judgment of 13 December 1999) reprinted in 39 *ILM* 310 (2000) ¶ 18 (although neither Botswana nor Namibia were parties to the Vienna Convention, the court noted that both considered it applicable "*inasmuch as it reflects customary international law*") (RA-6); De Arechaga, "International Law in the Past Third of a Century" (1978) 159 *Recueil des Cours* I, 42 ("*Legal rules concerning the interpretation of treaties constitute one of the Sections of the Vienna Convention which were adopted without a dissenting vote at the Conference and consequently may be considered as declaratory of existing law.*") (RA-7).

[16] *Amco Asia Corporation v. Indonesia (Award on Jurisdiction)* (25 September 1983) ICSID Case No. ARB/81/1 reprinted in (1984) 23 *ILM* 351, 359 (original emphasis) (RA-8).

26.  The Tribunal may, of course, also consider relevant decisions by other international arbitral tribunals and courts.

   B.  **PRESUMPTIONS AND BURDEN OF PROOF**

27.  According to Article 24(1) of the UNCITRAL Rules, *"[e]ach party shall have the burden of proving the facts relied on to support his claim or defence."*[17]

28.  It is a general principle of international law that a claimant must prove that the elements necessary to establish jurisdiction are present.[18]

29.  Notably, there is no presumption in favor of jurisdiction, particularly in a case in which a sovereign state is involved.[19] As the ICSID Tribunal in *Mihaly v. Sri Lanka* noted,

   > *"the question of jurisdiction of an international instance involving consent of a sovereign State deserves a special attention at the outset of any proceeding against a State Party to an international convention creating the jurisdiction."*[20]

---

[17]  RA-1.

[18]  *See Kimberly-Clark Corp. v. Bank Markzi Iran (Award No. 46-57-2)* (25 May 1983) 2 *Iran-US CTR* 334, *3 (dismissing claim because *"Claimant has failed to demonstrate that we have jurisdiction"*) (RA-9); *Lili Tour v. The Government of the Islamic Republic of Iran (Award No. 413-483-2)* (1 March 1989) ¶ 6, available from Westlaw (*"It was the particular burden of the Claimant to initially substantiate her Claim with adequate supporting evidence of U.S. nationality of herself and her children during the relevant period.... The Claim, therefore, fails for lack of proof of the jurisdictional requirements... ."*) (RA-10); *Creditcorp International, Inc. v. Iran Carton Co. (Award No. 443-965-2)* (12 October 1989), ¶ 6 available from Westlaw (dismissing claim because the claimants had failed *"to bear the burden of proving that the Claim in this Case [was] a claim of a national of the United States, as required for the Tribunal to assume jurisdiction."*) (RA-11). *See also Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Jurisdiction and Admissibility)* (1984) *ICJ Rep* 4 ¶ 101 (*"it is the litigant seeking to establish a fact who bears the burden of proving it."*) (RA-12).

[19]  *Southern Pacific Properties (Middle East) Ltd. (SPP(ME)) v. Arab Republic of Egypt (Decision on Jurisdiction)* (14 April 1988) ICSID Case No. ARB/84/3 ¶ 63 reprinted in (1995) 3 *ICSID Rep* 131 (RA-13).

[20]  *Mihaly International Corp. v. Democratic Socialist Republic of Sri Lanka (Award)* (15 March 2002) ICSID Case No. ARB/00/2 ¶ 56 reprinted in (2002) 17 *ICSID Rev.-FILJ* 142 (RA-14).

## III.   NO BASIS FOR JURISDICTION

30.   In defining the term *"investment,"* both the BIT and the 1961 Treaty distinguish between *"shares of companies"* and *"business concessions under public law"* as different types of investments.[21]

31.   This distinction comports with the ordinary meaning of the word *"investment,"* which Black's Law Dictionary defines as *"1. an expenditure to acquire property or assets to produce revenue; a capital outlay; 2. the asset acquired or the sum invested."*[22]

32.   Walter Bau has made only one investment falling within the treaties' definition of *"investment"*: its purchase of shares in the company DMT.[23]

33.   Accordingly, to the extent that Claimant alleges Respondent breached treaty obligations that were owed to Claimant's *"investment"* (e.g. Article 4(1) of the BIT provides that *"[i]nvestments by investors of either Contracting Party shall enjoy full protection and security ..."*)[24], such obligations must be understood as applying to <u>Walter Bau's</u> <u>shareholding.</u>

34.   The obligations under the 1961 Treaty and the BIT that Respondent has allegedly breached are summarized in the table below.[25]

---

[21]   BIT, Art. 1 (distinguishing between *"shares of companies"* and *"business concessions under public law"*) (WB1); 1961 Treaty, Art. 8 (distinguishing between *"shares or other kinds of interest in companies"* and *"business concessions under public law"*) (WB2).

[22]   Black's Law Dictionary (8th ed. 2004) (RA-15).

[23]   *See* Request for Arbitration, ¶ 4 (*"Walter Bau's Investment in the Tollway was through the purchase of shares in a concession company, the Don Muang Tollway Co. ("DMT") by its predecessor Dyckerhoff & Widmann AG which was subsequently merged into Walter Bau."*) and ¶ 109 (*"Walter Bau offered to sell its shares to the Government for a purchase price equal to 90% of the nominal investment ..."*).

[24]   Emphasis added (WB1).

[25]   This chart is based on ¶¶ 128-130A of the Request for Arbitration.

| Substantive Description | BIT Provision | 1961 Treaty Provision | (a) Delay Opening Tollway | (b) No change to toll rates/breach MoA2/No soft loan | (c) Build competing roads | (d) Blocking increases/ reducing tolls | (e) Moving to new airport | (f) Non respect of minority rights/failure to observe internal systems |
|---|---|---|---|---|---|---|---|---|
| Fair & equitable treatment | 2(3) | Via 1(2) & Dutch /UK/ Chinese treaties? | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| No arbitrary or discriminatory measures | 2(4) | 2 (no discrimination) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Full protection and security | 4(1) | 3(1) (most constant) | | | | | | ✓ |
| No nationalization or expropriation | 4(2) | 3(2) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Observe obligations | 7(2) | 7 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| National and most favored nation ("MFN") treatment | 3(1) & (2) | 1(2) | ?[24] | ?[25] | ?[26] | ?[26] | ?[25] | ?[26] |

24  While this is in many respects a comment of general application, Claimant does not plead what acts and omissions allegedly constitute breach of Articles 3(1) and (2) of the BIT.

35.   As discussed in the section that follows, there is no basis for jurisdiction over any of Walter Bau's claims because Walter Bau failed to seek the requisite approval from Thai authorities for treaty protection. This fact alone condemns the arbitration. Nevertheless, out of an abundance of caution, Respondent raises herein additional objections to jurisdiction.

36.   Respondent objects to jurisdiction on the grounds that there is —

- **No Approved Investment**

    o   The 1961 Treaty and the BIT apply only to approved investments.

    o   Walter Bau has never sought, let alone obtained, Thai approval of its investment.

- **No Jurisdiction *Ratione Temporis* under the BIT**

    o   The BIT does not apply retroactively to disputes or breaches that occurred prior to the Treaty's entry into force on 20 October 2004.

    o   The alleged dispute arose prior to 20 October 2004.

    o   Even if the alleged dispute had not arisen prior to 20 October 2004, there would still be no jurisdiction *ratione temporis* over Walter Bau's claims (with limited exception) because the alleged breaches occurred before 20 October 2004.

- **No Jurisdiction over Claims under the 1961 Treaty**

    o   The 1961 Treaty does not provide for investor-state arbitration.

- **No *Prima Facie* Breach**

    o   The Tribunal must be satisfied that the claims and facts presented, if proven true, are at least capable of establishing a treaty breach.

    o    Walter Bau has failed to particularize the legal basis for its claims.

    o    To the extent that Walter Bau's claims stem from Respondent's alleged performance or non-performance under the Concession Agreement (as amended) between DMT and Thailand's DOH, mere breach of contract does not constitute treaty breach. Nor is there a so-called "umbrella" clause in the treaties that would elevate contractual breaches to the level of treaty breaches.

37.    Respondent further puts Claimant to proof of its entitlement to complain of alleged breaches affecting Dyckerhoff & Widmann, for the reasons set out in ¶ 18 above.

38.    Respondent reserves the right to raise further issues of jurisdiction if and when new matters, and allegations (if admissible), are brought to its attention.

A.    NO APPROVED INVESTMENT

39.    Under customary international law, a foreigner's ability to invest in another country is subject to that country's sovereignty.[27] As there is no legal obligation to admit foreign investment, some countries retain flexibility regarding the commitments they make in an international investment agreement through approval (or screening) requirements.[28]

40.    For example, the Nigeria-United Kingdom BIT (1990) provides:

> "This Agreement shall, to the extent that a written approval is required for an investment, only extend to investment, whether made before or after the

---

[27]    Jeswald W. Salacuse, "BIT by BIT: The Growth of Bilateral Investment Treaties and Their Impact on Foreign Investment in Developing Countries" (1990) 24 *The International Lawyer* 655, 660 (RA-16). *See also* Ibrahim F.I. Shihata, "Recent Trends Relating to Entry of Foreign Direct Investment" (1994) 9 *ICSID Rev.-FILJ* 47, 47, ("*From the viewpoint of customary international law, the degree of freedom a country may allow for the entry, or admission, of foreign investment into its territory is basically a matter of policy left to the discretion of each country without any general legal obligation in this respect.*") (RA-17).

[28]    *See* United Nations Conference on Trade and Development, *International Investment Agreements: Key Issues, Volume I* (September 2004), 76 (countries may wish to retain some flexibility regarding the commitments they make in an international investment agreement) and 80 (noting that the right to screen has been adopted in a number of BITs and in the ASEAN Agreement for the Promotion and Protection of Investments) (RA-18).

> *coming into force of this Agreement, which is specifically approved in writing by the Contracting Party in whose territory the investment has been made or is subject to the laws in force of territory of the Contracting Party concerned and to the conditions, if any, upon which such approval shall have been granted.*"[29]

41.     Similarly, the Sweden-Malaysia BIT (1979) specifies:

> *"The term 'investment' shall comprise every kind of asset... provided that such asset when invested:*
>
> *(i) in Malaysia, is invested in a project classified by the appropriate Ministry in Malaysia in accordance with its legislation and administrative practice as an 'approved project'.  The classification as an 'approved project' may, on application, be accorded to investments made prior to the date of the entry into force of this Agreement on conditions to be stipulated for each individual case; and*
>
> *(ii) In Sweden, is invested under the relevant laws and regulations either before or after coming into force of this Agreement."*[30]

42.     States that include approval requirements in their investment treaties, such as those cited above, agree to be bound by treaty obligations only to the extent that their "domestic" approval requirements are met.  An investor's failure to meet these requirements thus constitutes a lack of jurisdiction.[31]

43.     As shown below, both the 1961 Treaty and the BIT require prior approval of an investment in order for it to be protected thereunder.  Claimant – despite the two treaties' clear and unambiguous statement of this requirement – never adverts to this fact.  It does

---

[29]     *Agreement between the Government of the Federal Republic of Nigeria and the Government of the United Kingdom of Great Britain and Northern Ireland for the Promotion and Protection of Investments,* done in Abuja (11 December 1990), Art. 2(2) (RA-19).

[30]     *Agreement between the Government of Sweden and the Government of Malaysia Concerning the Mutual Protection of Investments,* done in Kuala Lumpur (3 March 1979), Art. 1(1) (RA-20).

[31]     *See, e.g., Philippe Gruslin v. Malaysia (Award)* (27 November 2000) 5 *ICSID Reports* 483 ¶ 25.7 (RA-21). In *Gruslin v. Malaysia,* the Intergovernmental Agreement required that the investment be in an "*approved project by the appropriate Ministry in Malaysia, in accordance with the legislation and the administrative practice, based thereon.*" The ICSID Tribunal upheld Malaysia's objection to jurisdiction on the basis that the claimant's investment in securities listed on the Kuala Lumpur Stock Exchange did not constitute an "*approved*" project as required by the terms of the Intergovernmental Agreement to meet the definition of "*investment.*"

not do so for the simple reason that <u>approval was never sought, let alone given, in respect</u> <u>of Walter Bau's shareholding</u>. The Tribunal has no jurisdiction under either treaty.

### 1.    The Requirement for Approval

#### a.    The Approval Requirement in the 1961 Treaty

44.    The requirement for prior approval under the 1961 Treaty is set forth in its Protocol, which Thailand and Germany expressly *"agreed should be regarded as an integral part of the said Treaty."*[32]

45.    The Protocol states:

> "  ...
> *(1) To Article I ...*
> *(b) In respect of investments in the territory of the Kingdom of Thailand,*
> *the term 'investment', wherever it is used in this Treaty, shall refer to all*
> *investments made in projects classified in the <u>certificate of admission</u> by*
> *the appropriate authority of the Kingdom of Thailand in accordance with*
> *its legislation and administrative practice as an <u>'approved project.'</u>"*[33]

46.    In other words, a German investment in Thailand earns protection under the 1961 Treaty once -- and only once -- the investor obtains a *"certificate of admission"* in respect of such investment. The Protocol gives Thailand the right to decide, *"in accordance with its legislation and administrative practice,"* which investments are eligible for a certificate of admission.

#### b.    The Approval Requirement in the Treaty

47.    More pertinent to the current dispute, approval is required for protection under the BIT.

48.    Indeed, correspondence between the German and Thai delegations that negotiated the Treaty (*see* below) shows that retention of the approval requirement was a sticking point for Thailand in negotiations.    Respondent thus provides background regarding the

---

[32]    1961 Treaty, Protocol (WB2).

[33]    *Id.*, (emphasis added).

Treaty's drafting history before addressing the specific provisions in the BIT that deal with approval.

> (A)   The Thai Delegation Insisted on Keeping the Approval Requirement in the Treaty

49.   During negotiation of the Treaty, Thailand insisted on retaining the approval requirement in the 1961 Treaty so that it could maintain control over those investments it wished to protect. In its letter of 18 September 2000, the Thai delegation clearly explained that it wanted to retain the ultimate say as to which investments warrant Treaty protection:

> "2.   *Ad Article 1:   Prior Approval for Protection of Investment (Certificate of Admission – CA)*
>
> *The Thai side wishes to confirm our need for maintaining this principle in view of the fact that the new investment law recently enacted (Foreign Business Law B.E. 2542 (1999)) has greatly liberalized our investment regime and has substantially reduced the government's authority to regulate a foreign direct investment (FDI) to serve our development objective. We, therefore, feel it is essential to maintain this prior approval principle in order to ensure that the FDI flowing into Thailand will be channeled into the most needed sectors and will assist in our efforts to achieve early economic recovery. In addition, the Thai side is of the view that the CA granted for the protected investment will serve as evidence of the government's commitment to our obligation under the Agreement."*[34]

50.   The German side responded as follows:

> "2.   *Prior Approval of Investments, Art. 1 para 1 and Protocol Ad Article 1*
>
> *The German Government regrets that Thailand continues to see the need for prior approval of investments. Investors' confidence in Thailand's economic development and stability would certainly be increased if Thailand were to renounce to this requirement [sic.]. If Germany has to accept prior approval in Thailand we would continue to suggest the wording submitted earlier last year in our proposal, as if [sic.] also covers*

---

[34]   Letter No. 0504/3539 from Thailand Ministry of Foreign Affairs to the Embassy of the Federal Republic of Germany, Bangkok, dated 18 September 2000 (R-4; emphasis added).

> *the situation in Germany where investments are not subject to prior approval. The protocol should contain a similar wording.*[35]

51. Thus, although the German side was reluctant to let Thailand keep a prior approval requirement, it proposed language that would cover both the situation in Germany where no prior approval is needed, and the situation in Thailand where it is. That wording was then set out in the agreed draft discussed in May 2002 which reads:

> *"(2)   The Treaty shall apply only to investments that have been specifically approved in writing by the competent authority, if so required by the laws and regulations of that Contracting Party."*[36]

52. This is the wording that is found in Article 2(2) of the Treaty as ratified.[37]

53. As the drafting history of Article 2(2) demonstrates, the Thai Government preserved its right under the 1961 Treaty to determine which investments would enjoy treaty protection, and which would not. It did so by reserving the right to afford protection only to those investments that are the subject of a specific, treaty-based approval.

(B)    The Treaty Confirmed and Extended the<br>Approval Requirement for Prior Investments

54. Pursuant to Article 2(2) of the BIT, the Treaty applies only to investments that have been specifically approved in writing by the competent authority.

55. In accordance with the principle of non-retroactive application of treaties as embodied in Article 28 of the Vienna Convention (discussed in detail in Section III.B.1 below), Article 2(2) must be understood as applying to investments made after the Treaty's entry into force.

---

[35] *Note Verbale* No. 125/2001 from the Embassy of the Federal Republic of Germany, Bangkok, to the Thailand Ministry of Foreign Affairs dated 23 March 2001 (R-5; emphasis added).

[36] Draft treaty, Annex I to Agreed Minutes of meetings from 13 to 16 May 2002 between Thai and German delegations, 3 (R-6).

[37] The Tribunal will have noted that the state parties referred in correspondence to a protocol. Ultimately, however, none was produced.

15

56.     For investments that were made prior to the Treaty's entry into force, such as that of

Walter Bau,[38] Article 8 applies.  Article 8 limits the Treaty's application

> "*to _approved_ investments made ... by investors of either Contracting Party
> in the territory of the other Contracting Party consistent with the latter's
> laws and regulations.*"[39]

57.     The salient difference between Articles 2(2) and 8 is that Article 8 does not condition the

need for investment approval upon requirements of domestic law.

58.     Thus, in respect of the Treaty, whereas the rule for new investments (under Article 2(2))

is that they must be approved only "*if so required*" by domestic law, the rule for all

investments made prior to the BIT's entry into force (under Article 8) is that they must be

approved, irrespective of any domestic law "*requirement*" for approval.[40]

59.     This interpretation of Article 8 is confirmed by the fact that, of the provisions in the BIT

that reference "*approval*", only Article 8 does not contain language indicating that the

need for approval is conditioned on the specifications of domestic law or practice.[41]

60.     It can therefore be seen that, by the express terms of Article 8, Walter Bau's investment –

its shareholding in DMT – required approval of the Thai State.

61.     As a practical matter, however, the Treaty's different standards for approval of "new"

and "old" investments (under Articles 2(2) and 8, respectively) are immaterial, since, as

---

[38]    *See* Request for Arbitration ¶ 6 ("*During the first years of the Concession, Walter Bau initially held
35,343,000 shares in DMT, increasing to 54,813,600 shares by 1996, all at a cost of 10 Baht per share.*").

[39]    Emphasis added (WB1).

[40]    Hence, Article 8 specifies an absolute requirement for approval in respect of all investments made prior to
the Treaty's entry into force, regardless of whether such approval is "*required*" domestically (and
regardless of whether the investment is made in Thailand or in Germany, where no prior approval
requirement exists).

[41]    In addition to Article 2(2), with which the Tribunal is familiar, Article 1 of the Treaty provides, in relevant
part, that:

> "*[a]ny alteration of the form in which assets are invested shall not affect their
> classification as investment, provided such altered investment is _approved_ by the relevant
> Contracting Party if so required by its laws and regulations.*"  (Emphasis added.)

discussed below, Thai law does in fact require that all investments be approved for treaty protection.

## 2.   Thailand's Approval Process

62.   Since the entry into force of the 1961 Treaty, many German investors have sought and obtained a *"certificate of admission"* from Thailand's Ministry of Foreign Affairs, as contemplated by the Protocol to the 1961 Treaty. This is illustrated by six certificates exhibited hereto, each of which expressly confirms that the relevant investment is:

> *"an 'approved project' as defined in paragraph 1 (b) of the Protocol to the Treaty ... signed on the 13th day of December ... and that accordingly the said investment is entitled to full protection under the said Treaty as from the date of the present Certificate of Admission and as long as the aforementioned licence remains valid."*[42]

63.   On 22 October 2003, the Ministry of Foreign Affairs issued an Announcement (circulated to all relevant foreign embassies) that modified from that date onwards its approval requirements for investment protection under its investment treaties.[43]

64.   In the Announcement, which represents the Thai Government's exercise of its recognized discretion under the treaties, the Ministry of Foreign Affairs confirmed its practice that it would give treaty protection only to direct, as distinct from indirect, investments.

65.   Hence Clause 4 of the Announcement – enumerating those investments that would be approved automatically – speaks only of *"direct investments"*. Clause 5 lays down the requirement that *"[a]ll other direct investments which are not covered by paragraph 4*

---

[42]   *See* Ministry of Foreign Affairs Certificate of Admission No. 0501/C.A. 2 dated 29 July 1984 included in representative Certificates of Admission (with similar language) dated between 27 October 1972 and 20 February 1991 issued by the Thailand Ministry of Foreign Affairs (R-7; emphasis added).

[43]   Announcement of the Committee on the Approval for the Protection of Investment between Thailand and Other Countries No. MFA 0704/1/2003 Concerning Foreign Investment Protection under the Agreements on the Promotion and Protection of Investments between the Government of the Kingdom of Thailand and Foreign Governments dated 22 October B.E. 2546 (Buddhist calendar equivalent for 2003) (the "Announcement"; R-8).

but seek protection under the agreement, must apply for the [certificate] in order to obtain the protection" (emphasis added). No allowance whatsoever is made for indirect investments.

66. As concerns those direct investments which would be approved automatically, the Announcement declared that effective 22 October 2003, a direct investment that was granted (i) a license from the Ministry of Commerce, (ii) a certificate of promotion from the Board of Investment ("BOI"), or (iii) was in the form of a government concession contract, would be deemed to have a certificate of approval for protection (previously known as a certificate of admission).[44]

67. Thailand's strict requirement that all investments be approved for treaty protection, as well as the details of the approval process outlined above, are recognized and acknowledged in Germany. According to the website for Germany's Foreign Trade and Investment Promotion Scheme, which relates to Germany's insurance program for foreign investment, for a German investment made in Thailand:

> "[t]he necessary prerequisites for legal protection are provided by the German-Thai investment support treaty that went into effect on October 20, 2004. Because this treaty protects only approved investments, a federal guarantee must be available at the time of acceptance, typically in the form of a so-called Certificate of Approval for Protection (C.A.P.). Based on information from the federal government, a license according to the Foreign Business Act, a Certificate of Promotion from the Board of Investment or a government concession as a C.A.P. approved by the Minister of Trade or by the General Director of the Department of Business Development, should also be obtained."[45]

---

[44]   The Announcement, ¶ 4 (R-8).

[45]   See German to English translation of excerpt from Germany's website for its Foreign Trade and Investment Promotion Scheme <http://agaportal.de> (RA-22; emphasis added).

68.    It follows that Walter Bau's shareholding in DMT was entitled to protection under the
       1961 Treaty and the BIT only if the Ministry of Foreign Affairs granted the shareholding
       a certificate of admission (or certificate of approval for protection).

   3.    **Claimant Lacks the Requisite Certificate**

69.    Claimant has never sought, let alone obtained, a certificate from the Ministry of Foreign
       Affairs, or equivalent documentation as described above, that would entitle its investment
       to protection under the 1961 Treaty and the BIT.

70.    The reason is easy to understand.  Although the Ministry of Foreign Affairs made it
       easier, following its 2003 Announcement, for direct investments to obtain approval for
       treaty protection, at all times since the Announcement was issued, Claimant's investment
       has been a 9.87% shareholding in a company which in turn has rights under a Concession
       Agreement.[46]  Under any definition, this investment is indirect, and hence not eligible for
       protection.

71.    As discussed below, countries and industries around the world generally accept that
       indirect investments in companies, such as shareholdings, can be considered direct
       investments only if the investor has thereby obtained control over the foreign company.
       Bloomberg, for example, defines foreign direct investment as:

           *"The acquisition abroad of physical assets such as plant and equipment,
           with operating control residing in the parent corporation."*[47]

72.    Walter Bau cannot reasonably contend that it has control over DMT.  Indeed, it
       repeatedly complains in the Request for Arbitration that it has no control over DMT.  For
       example, Walter Bau says:

---

[46]    *See* DMT List of Shareholders dated 13 September 2005 (R-1).

[47]    Bloomberg.com, Financial Glossary <http://www.bloomberg.com/invest//glossary/bfglosf.htm> (RA-23).

> "*In December 2004, the Respondent pressured DMT (against the objections of Walter Bau and DMT's other foreign shareholders) ...*"[48]

\* \* \*

> "*[T]he Share Purchase Agreement paved the way for the Respondent to exercise a high degree of control over DMT ...*"[49]

\* \* \*

> "*By its conduct as shareholder and through the organs of DMT, further or alternatively by the disregarding of Walter Bau's interests as a minority shareholder in DMT ... Respondent is in breach of its obligations ...*"[50]

73. Moreover, Walter Bau's investment meet the internationally prevalent definition -- to which Thailand (and Germany) subscribe -- of direct investment. In order to identify direct investment, as a proxy for control, most countries employ a numerical threshold of ownership of ordinary shares or voting stock.

74. In Europe, the threshold for defining a direct investment was traditionally 20%:

> "*The new European System of Accounts, ESA(95), definitions were introduced from the 1997 First Release. The changes were as follows:*
>
> i) <u>*Prior to 1997 for the measurement of direct investment, an effective voice in the management of an enterprise was taken as the equivalent of a 20 per cent shareholding. This is now 10 per cent.*</u>"[51]

75. Germany applied this 20% threshold to identify foreign direct investment until at least 2000 (before 1989 it was 25%).[52]

---

[48] Request for Arbitration, ¶ 14.10.

[49] *Id.*, ¶ 75.

[50] *Id.*, ¶ 130A(f).

[51] National Statistics, "First Release: Foreign direct investment 2004" dated 13 December 2005, 5 (RA-24; emphasis added).

[52] *See* Anna M. Falzoni, "Statistics on Foreign Direct Investment and Multinational Corporations: A Survey" (15 May 2000), 17 (in Germany, "*[t]he threshold for shares to be held in an enterprise in order for an investor to be considered as a direct investor is 20% (before 1989 it was 25%).*") (RA-25). *See also* OECD, "OECD Benchmark Definition of Foreign Direct Investment" (3rd ed., 1996) ¶ 83 ("*Enterprises resident in Germany required to report their outward direct investment assets are: (a) residents (including private individuals) who on the reporting date hold directly or indirectly more than 20 per cent of the*

20

76.    Thailand follows the approach taken by the International Monetary Fund ("IMF"), the

       Organization of Economic Cooperation and Development ("**OECD**"), and the United

       Nations ("UN") in using a 10% cut-off to define foreign direct investment.  Respondent

       cites the IMF study "Foreign Direct Investment Statistics – How Countries Measure FDI:

       2001"[53] and the UN "World Investment Report: 2005".[54]

77.    The IMF study advises:

       "*4.2    According to the [OECD] Benchmark [Definition] and the BPM5
       [IMF Balance of Payments Manual, 5th Edition], a direct investment
       enterprise is an incorporated or unincorporated enterprise in which a
       direct investor that is resident of another economy has 10 percent or more
       of the ordinary shares or voting power (for an incorporated enterprise) or
       the equivalent (for an unincorporated enterprise). The direct investor may
       be an individual, an incorporated or unincorporated private or public
       enterprise, a government, or an associated group of individuals or
       enterprises that has a direct investment enterprise in an economy other
       than that in which the direct investor resides.   The ownership of 10
       percent of ordinary shares or voting power is the criterion for determining
       the existence of a direct investment relationship.*

       *4.3    Although the 10 percent equity ownership is specified in the
       Benchmark and the BPM5, some countries have chosen to permit two
       types of qualifications to that criterion. First, if a direct investor owns
       less than 10 percent of an enterprise but has an effective voice in
       management, the transactions between the investor and the enterprise are
       included in the FDI statistics. Second, if the investor owns 10 percent or
       more of the equity of the enterprise but does not have an effective voice in*

       ----

       *shares or voting rights in a non-resident enterprise which has a balance sheet total equivalent to more than
       DM 1 million.*") (RA-26).

[53]    International Monetary Fund, "Foreign Direct Investment Statistics – How Countries Measure FDI: 2001"
       (2003) (RA-27).

[54]    United Nations "World Investment Report: 2005" (RA-28).  The Report says that foreign direct investment
       (297; emphasis added):

       "*(FDI) is defined as an investment involving a long-term relationship and reflecting a
       lasting interest and* control *by a resident entity in one economy (foreign direct investor or
       parent enterprise) in an enterprise resident in an economy other than that of the foreign
       direct investor.*"

       "*An equity capital stake of 10 per cent or more of the ordinary shares or voting power for
       an incorporated enterprise, or its equivalent for an unincorporated enterprise, is
       normally considered as the threshold for the control of assets.*"

*management, the enterprise is excluded from the FDI statistics. The application of these two qualifications is not recommended by the Benchmark or by the BPM5.*"[55]

It goes on to confirm:

"*Use of the 10 percent ownership rule for identifying FDI: Ninety percent of the 61 countries use the 10 percent ownership rule as their basic criterion for identifying direct investment enterprises in at least part of their inward FDI transactions data, and 82 percent use the rule as the basic criterion for identifying direct investors in their outward FDI transactions data. (See Tables 4.1 and 4.2 and Tables 15 and 17 of Appendix I for further details.)*"[56]

<u>Indeed, tables to the study confirm that Thailand follows this approach.</u>[57]

---

[55]   International Monetary Fund, "Foreign Direct Investment Statistics – How Countries Measure FDI: 2001" (2003), 23 (RA-27; emphasis added).

[56]   *Id.*, ¶ 2.6.

[57]   *Id.*, 85-90. *See also* OECD, "OECD Benchmark Definition of Foreign Direct Investment" (3rd ed., 1996) 8 (RA-26), which states, *inter alia* (emphasis added):

"*7.     OECD recommends that a direct investment enterprise be defined as an incorporated or unincorporated enterprise in which a foreign investor owns 10 per cent or more of the ordinary shares or voting power of an incorporated enterprise or the equivalent of an unincorporated enterprise.*

*8.     <u>The numerical guideline of ownership of 10 per cent of ordinary shares or voting stock determines the existence of a direct investment relationship.</u> An effective voice in the management, as evidenced by an ownership of ot least 10 per cent, implies that the direct investor is able to influence or participate in the management of an enterprise : it does not require absolute control by the foreign investor.*

*9.     Although not recommended by the OECD, some countries may still feel it necessary to treat the 10 per cent cut-off point in a flexible manner to fit the circumstances. In some cases, the ownership of 10 per cent of the ordinary shares or voting power may not lead to the exercise of any significant influence while, on the other hand, a direct investor may own less than 10 per cent but have an effective voice in the management. OECD does not recommend any qualifications to the 10 per cent rule. Consequently, countries that choose not to follow the 10 per cent rule in all cases should identify, where possible, the aggregate value of transactions not falling under the 10 per cent cut-off rule, so as to facilitate international comparability.*"

IMF Committee on Balance of Payments Statistics and OECD Workshop on International Investment Statistics, Direct Investment Technical Group (DITEG), "Issues Paper (DITEG) #20: Definition of Foreign Direct Investment (FDI) Terms" (November 2004), Annex I, attached to "Eighteenth Meeting of the IMF Committee on Balance of Payments Statistics, Washington D.C., June 27–July 1, 2005: Definition of Direct Investment Terms," available at <http://www.imf.org/external/pubs/ft/bop/2005/18.htm> (discussing proposed (re)definition of "*foreign direct investment enterprise*") (RA-30).

78. Representatives of the Bank of Thailand additionally have confirmed that Thailand follows this approach, in a statement made to the United Nations Conference on Trade and Development ("UNCTAD") in December 2005:

> "*Direct investment reflects the lasting interest of a non-resident of an economy in a resident entity. According to the BPM5 [IMF Balance of Payments Manual, 5th Edition], direct investment can be classified into investment in forms of equity capital, other capital and reinvested earnings.*
>
> 1. *Investment in equity where the direct investor owns 10 percent or more of the ordinary shares or voting power for an incorporated enterprise or the equivalent for an unincorporated enterprise ...*"[58]

79. And enquiries of the Ministry of Foreign Affairs (Departments of Economic Affairs and of Treaties) have demonstrated that Thailand has never granted a certificate of approval for protection (or its predecessor, a certificate of admission) in respect of an equity investment of less than 10%.

80. The rationale applied by Thailand in limiting treaty protection to direct investments with reference to a 10% stakeholding can be readily understood; countries do not want investment protection extended to just any foreign entity that may take a shareholding (however small) in a local company, particularly in circumstances such as the present, where the state has no control over the identity of such an investor or the sale of all or part of its interest.

81. Indeed, this was made clear to the German delegation on numerous occasions during negotiation of the Treaty. For example, in its letter dated 18 September 2000, the Thai delegation stressed:

---

[58] Pusadee Ganjarerndee, Bank of Thailand, "Thailand's Balance of Payments Foreign Direct Investment Statistics", published in United Nations Conference on Trade and Development, "Expert Meeting on Capacity Building in the Area of FDI: Data Compilation and Policy Formulation in Developing Countries" dated 12-14 December 2005, 2 (RA-29; emphasis added); *see also* pp. 5-6 concerning Thailand's adherence to this principle.

> *"it is essential to maintain this prior approval principle in order to ensure that the FDI flowing into Thailand will be channeled into the most needed sectors and will assist in our efforts to achieve early economic recovery."*[59]

82.   To similar effect, the Announcement advised that relevant considerations in making case-by-case determinations of whether to approve an investment for treaty protection include:

> *"the benefits in relation to the nation's safety and security, economic and social development, technology transfer and research for development, public order and good moral, art, culture and tradition, of the country, natural resource conservation, energy and environment protection, and consumer protection."*[60]

83.   In the present case, Walter Bau's shareholding does not meet the 10% threshold required to be considered a direct investment. Accordingly, it has never been entitled to protection under the 1961 Treaty or the BIT.

84.   Not surprisingly, then, Claimant glaringly avoids any mention of the approval requirement in its pleading.

85.   Walter Bau pleads only that the *"Concession"* received BOI approval on 16 May 1991.[61]

86.   BOI approval of DMT is a red herring. DMT is not the investment at issue in this arbitration, nor is its Concession Agreement. Walter Bau did not purchase DMT or the concession. Walter Bau purchased shares of DMT. It is those shares, and those shares alone, that require approval under the treaties.

87.   But accepting for the sake of argument that BOI approval of DMT were relevant to this arbitration (it is not), Walter Bau could not just rest on its assertion that BOI approval was given on 16 May 1991. Walter Bau would have to prove (i) that it continuously

---

[59]   Letter No. 0504/3539 from Thailand Ministry of Foreign Affairs to the Embassy of the Federal Republic of Germany, Bangkok, dated 18 September 2000 (R-4).

[60]   The Announcement, Art. 5 (R-8).

[61]   *See* Request for Arbitration, ¶ 51.

satisfied the fourteen conditions that the BOI specified in the promotion certificate (*see* R-9),[62] and (ii) that the extension of the tollway was approved for investment promotion.

88.    Moreover, even if Walter Bau met its burden of proof on these points, the fact of BOI approval would not mean that the investment was protected under the treaties until the Announcement was issued in October 2003. Only at this point in time did the BOI's certificate of promotion become equivalent to the Ministry of Foreign Affairs' certificate of approval for protection. This is made clear by the Announcement, which states:

> "*[T]he Certificate of Promotion from the Board of Investment … shall be considered as the Certificate of Approval for Protection – C.A.P. for the investment.    Such investment shall be granted protection under the agreement on the promotion and protection of investments between the Government of Kingdom of Thailand and the Government of the country of the foreign investors.*
>
> …
>
> *The announcement shall be effective as of this date.*"[63]

So, even if Walter Bau could piggyback on BOI approval of DMT (it cannot), unless DMT received a certificate of admission prior to the Announcement (it did not), there would be treaty protection only from the date of the Announcement.

89.    Try as it may, Walter Bau cannot escape that its investment required specific approval for treaty protection, and that whether it obtained such approval is case-dispositive. The simple truth is that Walter Bau's investment was not approved. As a result, this arbitration must be dismissed.[64]

---

[62]    *See* Board of Investment Certificate of Promotion issued to DMT dated 16 May 1991 (R-9). In this regard, while Claimant asserts that BOI approval was given on 16 May 1991, it also acknowledges that certain conditions "*imposed at the time of BOI approval*" were not implemented until MoAI was entered into on 27 April 1995. *See* Request for Arbitration, ¶ 59.

[63]    The Announcement, arts. 4 and 5 (R-8).

[64]    *See* ¶ 42 and the footnote thereto.

B.     NO JURISDICTION *RATIONE TEMPORIS* UNDER THE BIT

90.    Putting aside the approval requirement (an exercise which involves a courageous or foolhardy ignorance of reality), Walter Bau's claims suffer from other fundamental flaws. Among other things, the Tribunal lacks jurisdiction *ratione temporis* under the BIT to the extent that the alleged dispute and/or Thailand's alleged breaches occurred before the BIT entered into force. Although the Tribunal would have jurisdiction *ratione temporis* under the 1961 Treaty (*see* section C below), that treaty does not apply for other reasons that are set forth in this memorial.

i.     Treaty Obligations Are Binding Only After Entry Into Force

91.    Under general principles of international law, a state is responsible for breach of an international obligation only if the obligation is binding at the time of the alleged breach.[65]

92.    A treaty obligation becomes binding only once the treaty has come into force.[66]

93.    This principle of non-retroactive application of treaties is embodied in Article 28 of the Vienna Convention, which states:

> "*Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.*"[67]

---

[65]   *See* International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts* (2001), Art. 13 ("*[a]n act of a State does not constitute a breach of an international obligation unless the State is bound by the obligation in question at the time the act occurs.*") (RA-31). *See also Case Concerning the Northern Cameroons (Cameroon v. United Kingdom)* (2 December 1963) (1963) *ICJ Rep* 15, 129 (2 December 1963) (separate opinion of Judge Fitzmaurice) ("*An act which did not, in relation to the party complaining of it, constitute a wrong at the time it took place, obviously cannot ex post facto become one.*") (RA-32).

[66]   Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) § 612 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) ("*a treaty only becomes binding upon the contracting states when it has come into force*") (RA-33).

[67]   Vienna Convention, Art. 28 (RA-2).

94.    Thus, there is a presumption that a state is not responsible for any act, fact or situation which ceased to exist before the date of entry into force of the treaty for that state.[68]

95.    As Article 28 of the Vienna Convention expressly states, such presumption exists unless a different interpretation clearly appears from the treaty or is otherwise established. In this regard, commentary by the International Law Commission affirms that:

> "*a treaty is not to be regarded as intended to have retroactive effects unless such an intention is <u>expressed</u> in the treaty or is <u>clearly to be implied</u> from its terms.*"[69]

96.    The International Court of Justice ("ICJ") applied the non-retroactivity rule in the *Ambatielos Case*.[70] The Court rejected the Greek Government's contention that it was entitled to present a claim for acts that had occurred in 1922 and 1923 under a treaty that had entered into force in 1926, stating:

> "*To accept this theory would mean giving retroactive effect to Article 29 of the Treaty of 1926, whereas Article 32 of this Treaty states that the Treaty, which must mean all the provisions of the Treaty, shall come into force immediately upon ratification. Such a conclusion might have been rebutted if there had been any special clause or any special object necessitating retroactive interpretation. There is no such clause or object*

---

[68]    Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) § 620 ("*The general rule is that a treaty does not bind a party with retroactive effect, ie in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty for that party.*") (RA-33). *See also* International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts* (2001), Art. 13 ("*[a]n act of a State does not constitute a breach of an international obligation unless the State is bound by the obligation in question at the time the act occurs.*") (RA-31).

[69]    International Law Commission, Final Draft Articles on the Law of Treaties, Commentary to Article 24 (same as Article 28), reprinted in 2 Sir Arthur Watts, "The International Law Commission 1949-1998" (1999) 669 (RA-34; emphasis added). *See also Elettronica Sicula S.p.A. (United States v. Italy)* (1989) *ICJ Rep* 15, 42 (an important principle of customary international law should not "*be held to have been tacitly dispensed with, in the absence of any words making clear an intention to do so*") (RA-35).

[70]    *Ambatielos Case (Greece v. United Kingdom) (Judgment on Preliminary Objection)* (1 July 1952) *ICJ Rep* 28 (RA-36).

*in the present case. It is therefore impossible to hold that any of its provisions must be deemed to have been in force earlier.*"[71]

97.   Therefore, according to the principle of non-retroactivity, absent an unambiguous indication to the contrary, Thailand's Treaty obligation in Article 10 to arbitrate "*[d]isputes concerning investments*" became binding only upon entry into force of the BIT on 20 October 2004.[72] Therefore, the BIT must have been in force when the alleged dispute arose.[73]

98.   Similarly, and absent an unambiguous indication to the contrary, the BIT must also have been in force when the alleged breaches arose.[74]

99.   Unless each of these conditions is met, the Tribunal lacks jurisdiction *ratione temporis*.

---

[71]   *Id.* The Court also stated that the fact that an earlier treaty contained substantive provisions similar to substantive provisions in the treaty in force was not a basis for giving retroactive effect to the treaty in force: *Id.*

[72]   *See Impregilo S.p.A. v. Islamic Republic of Pakistan, (Decision on Jurisdiction)* (22 April 2005) ICSID Case No. ARB/03/3 ¶ 310, available at <http://ita.law.uvic.ca> ("*[I]t is to be noted that Article 1(1) of the BIT does not give the substantive provisions of the Treaty any retroactive effect. Thus, the normal principle stated in Article 28 of the Vienna Convention on the Law of Treaties applies, and the provisions of the BIT: '... do not bind the Party in relation to any act of facts which took place or any situation which ceased to exist before the date of entry into force of the Treaty.'*") (RA-37, *citing SGS Société Générale de Surveillance S.A. v. Republic of the Philippines, (Decision of the Tribunal on Objections to Jurisdiction)* (29 January 2004) ICSID Case No. ARB/02/6, available at <www.worldbank.org/icsid> ¶¶ 166 and 167 (RA-38).

[73]   *See* Christoph H. Schreuer, "The ICSID Convention: A Commentary" (2001) 211 (in order for a bilateral investment treaty to provide a basis for jurisdiction, it must be in force at the relevant time) (RA-39); BIT, Art. 10(1) (WB1); 2 Oppenheim's International Law, Treaties, § 620 at 1249 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) ("*The general rule is that a treaty does not bind a party with retroactive effect, ie in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty for that party.*") (RA-33; emphasis added).

[74]   *See* Schreuer, *id., citing Tradex Hellas S.A. v. Republic of Albania (Decision on Jurisdiction)* (24 December 1996) ICSID ARB/94/2 reprinted in (1999) 14 *ICSID Rev.-FILJ* 161, 178-180 (the Tribunal found that there was no jurisdiction on the basis of the BIT between Albania and Greece because both the alleged expropriation and the Request for Arbitration occurred before its entry into force) (RA-40); *Mondev International Ltd. v. United States of America (Award)* (11 October 2002) ICSID Case No. ARB(AF)/99/2 ¶ 70 (the NAFTA Tribunal stated: "*events or conduct prior to the entry into force of an obligation for the respondent State may be relevant in determining whether the State has subsequently committed a breach of the obligation. But it must still be possible to point to conduct of the State after that date which is itself a breach.*") (RA-41; emphasis added).

100.   In the following Sections, Respondent shows that the BIT does not apply retroactively to disputes and/or breaches arising prior to entry into force. Accordingly, there is no jurisdiction *ratione temporis* because the alleged dispute arose prior to that time. Respondent further demonstrates that, even if the alleged dispute had arisen before the Treaty entered into force, the Tribunal would not have jurisdiction over the alleged breaches (with limited exceptions) because they too arose prior to the Treaty's entry into force.

### 2.   Temporal Scope of Application Under Article 8 of the BIT: No Retroactive Application to Disputes or Breaches Arising Before the BIT's Entry into Force

101.   In respect of the scope of the Treaty's application, Thailand and Germany agreed in Article 8 of the BIT that:

> "*[t]his Treaty shall also apply to approved investments made prior to its entry into force by investors of either Contracting Party in the territory of the other Contracting Party consistent with the latter's laws and regulations.*"[75]

102.   Pursuant to Article 31 of the Vienna Convention, Article 8 of the BIT must be interpreted "*in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"

103.   According to its ordinary meaning, Article 8 of the BIT does not deviate from the general rule of non-retroactivity codified in Article 28 of the Vienna Convention. It merely states that the Treaty applies to investments – not disputes, not breaches – made prior to 20 October 2004, the date of its entry into force. It does not state that the BIT shall apply to any act or conduct or event which took place prior to this time.

---

[75]   WB1 (emphasis added).

104.   On its face, Article 8 accordingly provides only that approved investments made prior to the BIT's entry into force shall benefit from the Treaty's protections in the same way as investments made after its entry into force, *i.e.* with respect to acts or conduct or events or situations occurring <u>after</u> entry into force.

105.   If the state parties had intended the Treaty to apply to past conduct or disputes, then they would have stated so explicitly.[76]

106.   Continuous use of the future tense through repeated reference to what the state parties "*shall*" do connotes that the parties agreed to be bound by the obligations – *i.e.*, to conform their conduct – in the future.[77]  Because the obligations undertaken in the Treaty are drafted in a forward-looking way and because the normal rule in international law is that treaties do not apply retroactively, it stands to reason that the state parties to the BIT

---

[76]   *See, e.g., Agreement Between the United States of America and Albania on the Settlement of Certain Outstanding Claims,* done in Tirana (10 March 1995) 12611 TIAS, Art. 1 ("*The claims settled pursuant to this agreement are: (a) the claims of United States nationals (including natural and juridical persons) against Albania arising from any nationalization, expropriation, intervention, and other taking of, or measures affecting, property of nationals of the United States <u>prior to the date of this agreement</u>; and (b) the claims of nationals of Albania (including natural and juridical persons) against the United States <u>prior to the date of this agreement</u>.*") (RA-42; emphasis added); United Nations Security Council Resolution 687 (1991), U.N. Doc S/RES/687 (8 April 1991) ¶ 16, available at <http://www.unog.ch/uncc/resolutio/res0687.pdf> ("*<u>Reaffirms that Iraq, without prejudice to the debts and obligations of Iraq arising prior to 2 August 1990</u>, which will be addressed through the normal mechanisms, is liable under international law for any direct loss, damage, including environmental damage and the depletion of natural resources, or injury to foreign Governments, nationals and corporations, as a result of Iraq's unlawful invasion and occupation of Kuwait*") and ¶ 18 ("*Decides also to create a fund to pay compensation for claims that fall within paragraph 16 above and to establish a Commission that will administer the fund.*") (RA-43; emphasis added).

[77]   For example, the BIT provides that "*[e]ach Contracting Party shall in its territory <u>promote</u> as far as possible investments by investors of the other Contracting Party and admit such investments in accordance with its laws and regulations*" (Art. 2(1));"*[n]either Contracting Party shall <u>subject</u> investments in its territory owned or controlled by investors of the other Contracting Party to treatment less favourable than it accords to investments of its own investors or to investments of investors of any third State*" (Art. 3(1)); "*[i]nvestments by investors of either Contracting Party shall <u>enjoy</u> full protection and security in the territory of the other Contracting Party*" (Art. 4(1)) (WB1; emphasis added).

would have expressly stated any intention that the BIT apply retroactively to past breaches and disputes.[78] They did not.

107.    Support for the view that the BIT does not apply retroactively, even in respect of approved investments existing at the time of its entry into force, is found in decisions of various international tribunals that, faced with provisions worded similarly to Article 8, held that treaty protection did not extend to breaches or disputes occurring before the treaty in question came into force.

108.    In *SGS v. Philippines*, for example, the ICSID Tribunal interpreting the meaning of Article II of the Switzerland-Philippines BIT (which provided that the treaty applies to investments *"made in accordance with its laws and regulations ... whether prior to or after the entry into force of the Agreement"*) concluded that:

> "*Article II does not, however, give the substantive provisions of the BIT any retrospective effect. The normal principle stated in Article 28 of the [Vienna Convention] applies: the provisions of the BIT 'do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty'.*"[79]

109.    Similarly, the ICSID Tribunal in *Salini v. Jordan* found that treaty obligations did not have any retrospective effect by virtue of the treaty's definition of *"investment"* as

---

[78]    *See Tradex Hellas S.A. v. Republic of Albania (Decision on Jurisdiction)* (24 December 1996) ICSID ARB/94/2 reprinted in (1999) 14 *ICSID Rev.-FILJ* 161, 179-180 (considering Article 8 of the Albania-Greece BIT (1991), which states that the BIT applies to investments made prior to its entry into force, the Tribunal stated: "*it seems clear that the Contracting Parties had the intention to only submit to ICSID jurisdiction regarding alleged expropriation and requests for arbitration occurring in the future, even if they concerned investments made earlier.*") (RA-40; emphasis added); *Tecnicas Medioambientales Tecmed S.A. v. The United Mexican States (Award)* (29 May 2003) ICSID ARB(AF)/00/2 ¶ 64 ("*Although the Agreement applies to investments existing as of the date of its entry into force—which suggests as a logical conclusion that the situations surrounding investments existing at the time do not escape its provisions—, the way the provisions on which the Claimant relies are drafted suggests that application thereof is forward-looking.*") (RA-44).

[79]    *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines, (Decision of the Tribunal on Objections to Jurisdiction)* (29 January 2004) ICSID Case No. ARB/02/6 ¶ 166, available at <www.worldbank.org/icsid> (RA-38).

including "*any kind of property invested before or after the entry into force of this Agreement.*"[30]

110. NAFTA tribunals have also held that jurisdiction did not extend to acts or omissions that occurred before the treaty's entry into force, notwithstanding a provision in NAFTA which states that "*this Chapter covers investments existing on the date of entry into force of this Agreement as well as investments made or acquired hereafter.*"[31]

111. For the foregoing reasons, no intention appears from the Treaty or is otherwise established that — contrary to the general rule codified in Article 28 of the Vienna Convention (or indeed, as a matter of simple common sense) — the state parties to the BIT intended it to apply retroactively to disputes or breaches.

112. Nevertheless, if the Tribunal were to find that Article 8 is in any way unclear as to whether the BIT applies retroactively to disputes or breaches, Respondent submits that the Tribunal must still find that the BIT does not so apply. This is because the general principle of treaty interpretation is that, where the meaning of a provision is unclear, the meaning which is less onerous to the state assuming an obligation is to be preferred ("*in dubio mitius*").[32]

---

[30]  *Salini Costruttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan*, *(Decision on Jurisdiction)* (29 November 2004) ICSID Case No. ARB/02/13 ¶¶ 66, 177 (RA-45).

[31]  *See*  Notes  to  North  American  Free  Trade  Agreement,  available  at <http://www.sice.oas.org/trade/nafta/notes.asp>, note 39 ("*Article 1101 (Investment – Scope and Coverage) : this Chapter covers investments existing on the date of entry into force of this Agreement as well as investments made or acquired thereafter*") (RA-46); *Marvin Roy Feldman Karpa v. United Mexican States*, *(Interim Decision on Preliminary Jurisdictional Issues)* (6 December 2000) ICSID Case No. ARB(AF)/99/1 ¶ 62 ("*Given that NAFTA came into force on January 1, 1994, no obligations adopted under NAFTA existed, and the Tribunal's jurisdiction does not extend, before that date. NAFTA itself did not purport to have any retroactive effect. Accordingly, this Tribunal may not deal with acts or omissions that occurred before January 1, 1994.*") (RA-47); *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, ¶ 68 (RA-41).

[32]  Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) § 633 (RA-33).

113. Applying the principle *in dubio mitius*, the ICJ's predecessor, the Permanent Court of International Justice ("PCIJ"), has held that *"if the wording of a treaty provision is not clear, in choosing between several admissible interpretations, the one which involves the minimum of obligations for the Parties should be adopted."*[83]

114. Here, the meaning of Article 8 which is less onerous to the state is that the BIT does not apply retroactively to disputes or breaches.[84]

115. Such interpretation is less onerous to the state for the additional reason that if the BIT did not apply, investors would have no recourse to arbitration for disputes or breaches occurring prior to the BIT's entry into force. (As explained in Section C, although such disputes or breaches could be covered under the 1961 Treaty, that treaty does not provide for any investor-state dispute resolution.)

116. Accordingly, the non-retroactive interpretation of Article 8 must be preferred.

### a. No Jurisdiction Because the Dispute Arose Prior to the Treaty's Entry Into Force

117. The ICJ has defined a dispute as *"a disagreement on a point of law or fact, a conflict of legal views or interests between parties."*[85]

118. According to Claimant's own words:

> *"The dispute arises from the matters described in the summary of facts. ... Walter Bau has raised <u>the dispute</u> with the Respondent, both directly itself and through the German Government, <u>since at least October 2001</u>."*[86]

---

[83]   *The Frontier Between Iraq and Turkey (Advisory Opinion)* (1925) PCIJ Ser. B, No. 12, 25 (RA-48).

[84]   While it is true that such disputes or breaches would still be subject to obligations undertaken by the state in the 1961 Treaty, the state's obligations under the 1961 Treaty are less onerous than its obligations under the BIT in at least one material respect: under the 1961 Treaty, an investor cannot compel arbitration.

[85]   *Case Concerning East Timor (Portugal v. Australia) (Judgment)* (1995) *ICJ Rep* 89, 99 (RA-49).

[86]   Request for Arbitration, ¶¶ 29-30 (emphasis added).

119. Walter Bau itself thus pleads that it seeks to arbitrate a dispute that arose no later than October 2001.

120. Pursuant to the principle of non-retroactivity, because the Request for Arbitration alleges a dispute that arose prior to the BIT's entry into force, there is no jurisdiction *ratione temporis.*

121. Support for Respondent's interpretation of the BIT comes from views expressed by Peruvian delegates concerning the scope of the bilateral investment treaty between the United Kingdom and Peru, which defines the term *"investment"* as including *"all investments whether made before or after the date of entry into force of this Agreement"*:[57]

> *"[A] BIT applies to investments made after it goes into effect, and in some cases to investments made before it went into effect, provided the dispute in question arises after the treaty has entered into force. Therefore, if a treaty goes into effect July 7, 1993, and a subsequent dispute arises between an investor and the government involving an investment made prior to the effective treaty date, the conflict resolution clause will apply to the dispute."*[58]

122. Respondent's interpretation is also affirmed by a recent case before the ICJ in which the Court determined that it did not have jurisdiction over a continuing dispute that had arisen before the effective date of Yugoslavia's consent to jurisdiction.

123. In *Yugoslavia v. Belgium,* Yugoslavia sought to litigate claims based on a bombing campaign by NATO that began on 24 March 1999 and that was *"conducted*

---

[57]   *Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Peru for the Promotion and Protection of Investments,* done in London (4 October 1993), Article 1(a) (RA-50).

[58]   Enrique Miguel Chavez Bardales, "The Settlement of Disputes Under the United Kingdom-Peru Bilateral Investment Treaty" at <http://www.servilex.com.pe/arbitraje/colaboraciones/discr1.html>, s. 2.3.6 (RA-51; emphasis added).

*continuously*" over a period extending beyond 25 April 1999.[89] Yugoslavia's declaration accepting compulsory jurisdiction of the Court contained a limitation *ratione temporis* precluding any retrospective jurisdiction of the Court to disputes arising prior to 25 April 1999, the date it signed the declaration.[90] In rejecting jurisdiction, the Court held that the dispute concerning the legality of the bombings, "*taken as a whole*," had arisen well before 25 April 1999, and found that the bombings had continued and that the "*dispute concerning them has persisted since that date is not such as to alter the date on which the dispute arose.*"[91]

124. The ICSID Tribunal in *Lucchetti v. Peru* adopted similar reasoning in finding that it did not have jurisdiction under a treaty between Peru and Chile because the parties' dispute had arisen prior to the treaty's entry into force.[92] It was common ground between the parties that, prior to the treaty's entry into force, a dispute had arisen in which "*each side held conflicting views regarding their respective rights and obligations*," but the parties disagreed as to whether the dispute had continued or a new dispute had arisen.[93] Finding that the subject matter of the present dispute was the same as that of the earlier dispute (the municipality's repeated efforts to compel claimants to comply with the rules and regulations applicable to the construction of their factory), the *Lucchetti* Tribunal

---

[89]   *Case Concerning Legality of Use of Force (Yugoslavia v. Belgium) (Request for the Indication of Provisional Measures)* (2 June 1999) *ICJ Rep* 124 ¶ 28 (RA-52).

[90]   *Id.,* ¶ 26 (RA-52).

[91]   *Id.,* ¶¶ 28-29 (RA-52).

[92]   *Empresas Lucchetti, S.A. and Lucchetti Peru, S.A. v. Republic of Peru (Award)* (7 February 2005) ICSID Case No. ARB/03/4 ¶¶ 53, 59 (RA-53).

[93]   *Id.,* ¶ 49-50 (RA-53).

determined that there was only one continuing dispute which had "*crystallized*" prior to the treaty's entry into force.[94] Accordingly, it denied jurisdiction.

125.   Here, too, jurisdiction must be denied. Walter Bau seeks to arbitrate a continuing dispute concerning Thailand's obligations to its investment,[95] a dispute that arose, according to Claimant's own words, by "*at least October 2001.*"[96]

b.   **In Any Event, No Jurisdiction for Breaches Arising Before 20 October 2004**

126.   As discussed in Section III.B.1 above, in order for the Tribunal to find jurisdiction *ratione temporis*, Claimant must establish that both the dispute <u>and</u> the alleged <u>breaches</u> occurred while the BIT was in force. This is because Thailand's obligation to arbitrate disputes is separate and distinct from its substantive obligations to afford investors the protections set forth in the Treaty.[97]

127.   Thus, even if the Tribunal were to find that it has jurisdiction *ratione temporis* over the dispute, there is, in any event, no jurisdiction *ratione temporis* over any alleged breaches that occurred before 20 October 2004, the date upon which the BIT entered into force.

---

[94]   *Id.*, ¶ 53 (RA-53).

[95]   Claimant consistently refers to "*the dispute*" (in singular form) in the Request for Arbitration. *See, e.g.*, ¶ 2 ("*[t]he dispute arises directly out of Walter Bau's investment in a tollway concession in Bangkok ... and concerns breaches by the Respondent of obligations it owed under the Treaty to Walter Bau as an investor*").

[96]   *See* Request for Arbitration, ¶ 30.

[97]   *See* Christoph H. Schreuer, "The ICSID Convention: A Commentary" (2001) 211 (in order for a bilateral investment treaty to provide a basis for jurisdiction, it must be in force at the relevant time) (RA-39), *citing Tradex Hellas S.A. v. Republic of Albania (Decision on Jurisdiction)* (24 December 1996) ICSID ARB/94/2 reprinted in (1999) 14 *ICSID Rev.-FILJ* 161, 178-180 (the Tribunal found that there was no jurisdiction on the basis of the BIT between Albania and Greece because both the alleged expropriation and the Request for Arbitration occurred before its entry into force) (RA-40); Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) § 620 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) ("*The general rule is that a treaty does not bind a party with retroactive effect, ie in relation to <u>any act or fact which took place or any situation which ceased to exist</u> before the date of the entry into force of the treaty for that party.*") (RA-33; emphasis added).

128.  Just as it is necessary to isolate when the cause of action accrued in the context of establishing whether an action has been brought within a limitation period, Claimant must be able—in order to establish jurisdiction *ratione temporis*— to isolate when the conduct alleged to have breached an obligation occurred.

129.  Walter Bau contends that the alleged acts and omissions summarized in ¶ 130A of the Request for Arbitration constitute, *"both cumulatively and each individually,"* breaches of the Respondent's Treaty obligations and that Respondent *"continuously"* breached its obligations.[98]

130.  If the alleged acts and omissions in ¶ 130A are taken *"individually"*, it is apparent on the face of Claimant's pleading that the Tribunal cannot have jurisdiction *ratione temporis* over at least the following alleged acts and omissions, since, by Walter Bau's admission, they occurred before 20 October 2004 —

  •  **Alleged Act/Omission**: causing delay to the opening of the Tollway and to the charging of tolls.[99]

     Allegedly Occurred: May 1993 to July 1996.[100]

  •  **Alleged Act/Omission**: failing adequately or at all to respond to DMT's requests to adjust the toll rates in light of changes in the economic situation; failing to enter into negotiations with DMT to remedy negative effects set out in paragraph 25.2 of the Concession Agreement.[101]

---

[98]  *See* Request for Arbitration, ¶ 130.

[99]  *Id.*, ¶ 130A(a).

[100]  *Id.*, ¶ 14.1 (*"completion and opening of the Tollway were delayed from May 1993 to July 1996"*).

[101]  *Id.*, ¶ 130A(b).

Allegedly Occurred: September 1999;[102] September 2001;[103] October 2002.[104]

- **Alleged Act/Omission**: exploiting DMT's difficulties to procure or effect amendments to the original conditions of the Concession by virtue of MoA2 and the Share Purchase Agreement.[105]

  Allegedly Occurred: 29 November 1996 (MoA2); 1997 (Share Purchase Agreement).[106]

- **Alleged Act/Omission**: failing to arrange the Soft Loan; free floating the Baht.[107]

  Allegedly Occurred:   June 1997 (Soft Loan); 2 July 1997 (currency free floating).[108]

- **Alleged Breach**: failing to observe Thailand's own internal systems regarding the administration of private concessions.[109]

  Allegedly Occurred: beginning of 1999 and at every 6 month interval thereafter.[110]

---

[102]  *Id.*, ¶ 100 ("*On 16 September 1999 DMT requested the DoH to enter into negotiations to remedy the effects on its financial position under Article 25 of the Concession Agreement and Article 15 of MoA 2/1996 in connection with Appendix F*.").

[103]  *Id.*, ¶ 105 ("*In September 2001 these negotiations [concerning an Assessment of Financial Damages Report] suddenly ceased before they could come to any conclusion*.").

[104]  *Id.*, ¶ 106 ("*In an effort to revive negotiations with the DoH, DMT submitted an update of its original Assessment of Financial Damages Report on 31 October 2002.*").

[105]  *Id.*, ¶ 130A(b).

[106]  *Id.*, ¶ 6 (the parties entered into MoA2 on 29 November 1996, and the Share Purchase Agreement in 1997).

[107]  *Id.*, ¶ 130A(b).

[108]  *Id.*, ¶ 14.2 ("*The Respondent failed to arrange [the Soft Loan], immediately putting DMT under renewed pressure from its banks and, by June 1997, forcing it to enter into arm's length commercial loans ... on 2 July 1997, the Respondent decided to float the Baht free of other major currencies ...*").

[109]  *Id.*, ¶ 65.

[110]  *Id.*, ¶¶ 101-107.  Walter Bau alleges that under the Act on Letting Private Persons Participate in or Undertake Activities of State, the Director General of DOH was required "*to report at least every six months to the minister-in-charge*" (*Id.*, ¶ 102). Respondent acknowledges that, as pleaded, certain reports would have been due after the BIT's entry into force. Respondent addresses the issue of reports occurring after this time in ¶¶ 149-150.

- Alleged Act/Omission: blocking or otherwise delaying the toll increases granted to DMT and its investors.[111]

    Allegedly Occurred: 2 December 1988; 16 June 1999; 16 June 2004.[112]

- Alleged Breach: approving and implementing road schemes in competition with the Tollway.[113]

    Allegedly Occurred: 1998.[114]

131. As most of the *"individual"* acts and omissions which Walter Bau alleges are temporally barred under the BIT,[115] the question becomes whether there is nevertheless jurisdiction over this conduct because, as Claimant asserts, the Respondent *"continuously"* breached such obligations, or the alleged acts and omissions *"cumulatively"* constitute breaches of Respondent's Treaty obligations.[116] As discussed below, there is not.

### (A) Continuing Breach

132. The concept of continuing breach is set forth in Article 14(2) of the International Law Commission's Articles on State Responsibility, which states that:

> *"The breach of an international obligation by an act of a State having a continuing character extends over the entire period during which the act*

---

[111]   *Id.*, ¶ 130A(d).

[112]   *Id.*, ¶ 89 (toll increase upon completion of the DOH U-turns was postponed until 2 December 1988); ¶ 93 (the Northern Extension opening should have resulted in toll increases on 16 June 1999); ¶¶ 87, 97 (automatic toll increase should have been implemented on 16 June 2004).

[113]   *Id.*, ¶ 130A(e).

[114]   *Id.*, ¶ 82 ("*By the later part of 1998, ..., the Respondent implemented road schemes ... In particular, it decided to convert the main carriageways of the VRR step by step into an attractive alternative toll free expressway, thus creating it into direct competition for the Tollway... .*") (emphasis added).

[115]   In addition to the acts and omissions set forth in ¶ 130, the Tribunal *prima facie* does not have jurisdiction over the *"individual"* act and omission of *"moving or directing or approving the move of all scheduled air traffic from Don Muang airport to the new Suvarnabhumi International Airport"* since Walter Bau did not plead when the decision to move air traffic to the new airport was allegedly made and thus cannot establish that this occurred after the BIT entered into force. *See id.*, ¶¶ 98, 130A(e).

[116]   *See id.*, ¶¶ 130, 130A.

> *continues and remains not in conformity with the international obligation.*"[117]

133. Commentary to the Articles on State Responsibility provides the following examples of continuing wrongful acts:

> "*the maintenance in effect of legislative provisions incompatible with treaty obligations of the enacting State, unlawful detention of a foreign official or unlawful occupation of embassy premises, maintenance by force of colonial domination, unlawful occupation of part of the territory of another State or stationing armed forces in another State without its consent.*"[118]

134. Claimant will presumably argue that the Tribunal could have jurisdiction (in theory) if Claimant established that there was conduct capable of breaching obligations that continued after the BIT's entry into force (even though, of course, the Claimant could not seek compensation in respect of the earlier conduct).

135. But Claimant's mere assertion that there is continuing breach here does not make it so.

136. First, the conduct at issue in the present case cannot be characterized as continuing. As demonstrated by the dates ascribed by the Request for Arbitration to the alleged acts and omissions outlined in ¶ 130, Claimant's Request for Arbitration makes it clear that such acts and omissions constitute discrete, isolated events, not ongoing, enduring ones as exemplified in the Commentary to the Articles on State Responsibility.

137. For example, regarding Respondent's alleged breach of its treaty obligations by causing delay to the opening of the Tollway and to the charging of tolls, Claimant readily admits that the Tollway has been open and that tolls have been charged since July 1996.[119] As

---

[117] RA-31.

[118] James Crawford, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (2002) 136 (commentary (3) to Article 14) (RA-54; emphasis added).

[119] *See* Request for Arbitration, ¶ 41.

40

such, Respondent's allegedly wrongful conduct happened well before the BIT's entry into force.

138. As another example, in respect of Respondent's alleged breach of its treaty obligations by approving and implementing road schemes in connection with the Tollway, Respondent's so-called wrongful conduct occurred when Respondent approved and implemented the road schemes. Claimant pleads that Respondent "*implemented*" (note past tense) road schemes in 1998.[120] Again, this is well before the BIT's entry into force.

139. At best, Claimant pleads that Respondent's alleged acts and omissions had continuing effects on the value of its shares in DMT after the Treaty entered into force. Tellingly, Claimant says:

> "*As a result of these acts and failures of the Respondent, as well as the economic crisis triggered by the Respondent's free floating of the Baht against world currencies, DMT's financial position continuously and rapidly declined*."[121]

> * * *

> "*The cumulative effect of all these measures on Walter Bau's investment has been devastating.*"[122]

140. Assuming that Claimant could prove that wrongful conduct prior to the BIT's entry into force continued to effect the value of its investment after the BIT's entry into force, that would not establish jurisdiction on the basis of continuing breach because the wrongful conduct itself was completed before entry into force.

141. As the *Mondev* Tribunal observed, "*there is a distinction between an act of a continuing character and an act already completed, which continues to cause loss or damage.*"[123]

---

[120]   *Id.*, ¶ 82.

[121]   *Id.*, ¶ 149.

[122]   *Id.*, ¶ 15.

142. This principle is codified in Article 14(1) of the Articles on State Responsibility: "*[t]he breach of an international obligation by an act of a State not having a continuing character occurs at the moment when the act is performed, <u>even if its effects continue</u>.*"[124]

143. Commentary to Article 14 explains:

> "*An act does not have a continuing character merely because its effects or consequences extend in time. It must be the wrongful act as such which continues.   In many cases of internationally wrongful acts, their consequences may be prolonged. The pain and suffering caused by earlier acts of torture or the economic effects of the expropriation of property continue even though the torture has ceased or title to the property has passed.*"[125]

144. Claimant has the burden here to establish that the alleged acts and omissions occurred at the relevant time.  Claimant clearly has not met that burden in its Request for Arbitration.

145. <u>Second</u>, Claimant does not point to conduct of the state after entry into force, which, in and of itself, is a breach.

146. In this regard, while the NAFTA Tribunal in *Mondev v. U.S.A.* found that "*events or conduct prior to the entry into force of an obligation for the respondent State may be relevant in determining whether the State has subsequently committed a breach of the obligation,*" it emphasized that "*it must still be possible to point to conduct of the State*

---

[124]   *Mondev International Ltd. v. United States of America (Award)* (11 October 2002) ICSID Case No. ARB(AF)/99/2 ¶ 58 (RA-41; emphasis added).

[124]   RA-31 (emphasis added).

[125]   James Crawford, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (2002) 136 (commentary (6) to Article 14) (RA-54).  *See also,* International Law Commission, Commentary on Article 18 of the Draft Articles on State Responsibility Provisionally Adopted by the Commission on First Reading (1996) ¶ 21, available at <http://icil.law.cam.ac.uk/projects/state_document_collection.php#4> ("*[A] 'continuing' act of the State must not be confused with 'an instantaneous act producing continuing effects,' for example, an act of confiscation.  In this case, the act of the State as such ends as soon as the confiscation has taken place, even if its consequences are lasting.  In the latter event, the existence of a breach of an international obligation will be established solely on the basis of an obligation which was in force for the State at the time when the instantaneous act occurred, and the conclusion reached cannot be altered by the fact that the effects of the act continue after an obligation to refrain from such an act has entered into force.*") (RA-55).

*after that date which is itself a breach.*"[126]   The Tribunal pointed out that one must look at not only the facts but also *"the obligation said to have been breached."*[127]

147.   In Paragraph 128 of the Request for Arbitration, Claimant lists the Treaty provisions that Respondent has allegedly breached.   Then, in Paragraph 130A, Claimant summarizes Respondent's alleged wrongful acts and omissions and declares (with no explanation) which of the Treaty provisions each act and omission supposedly breached.   Thus, Claimant says what Respondent allegedly did, and concludes that Respondent violated the Treaty.   Claimant fails, however, to explain how Respondent's acts and omissions violated the Treaty.

148.   Assertion cannot replace argument.   In ¶¶ 171-180, Respondent explains that Claimant has a burden in respect of jurisdiction *ratione materiae* to particularize its claims, and Respondent shows why Claimant's allegations are not, *prima facie*, capable of triggering Respondent's treaty obligations.   Claimant's failure to particularize the legal basis for its claims, however, is also fatal in respect of jurisdiction *ratione temporis.*   Absent a showing that Respondent's alleged conduct is <u>capable</u> of triggering Respondent's treaty obligations, Claimant cannot establish either the duration of the alleged breaches (*i.e.,* whether there was continuing breach) or that any breaching conduct took place after the BIT's entry into force.

149.   The only acts and omissions that Claimant pleads took place after the Treaty's entry into force are as follows:

---

[126]   *Mondev International Ltd. v. United States of America (Award)* (11 October 2002) ICSID Case No. ARB(AF)/99/2 ¶ 70 (RA-41; emphasis added). *See also Tecnicas Medioambientales Tecmed S.A. v. The United Mexican States (Award)* (29 May 2003) ICSID Case No. ARB(AF)/00/2 ¶ 66 (following *Mondev*) (RA-44).

[127]   *Mondev id.,* ¶ 58 (RA-41; emphasis added).

- **Alleged Act/Omission:** Imposing or otherwise effecting a reduction of the tolls.[128]

  Allegedly Occurred: December 2004.[129]

- **Alleged Act/Omission:** Disregarding Walter Bau's interests as a minority shareholder in DMT.[130]

  Allegedly Occurred: December 2004 and following.[131]

- **Alleged Breach:** Failing to observe Thailand's own internal systems regarding the administration of private concessions.[132]

  Allegedly Occurred: Every six months.[133]

150. As discussed in Section III.D below, Claimant has made no effort to particularize the Treaty obligations supposedly breached by these alleged acts and omissions. It is for Claimant to establish that, by *"imposing or otherwise effecting a reduction of the tolls,"* *"disregarding of Walter Bau's interests as a minority shareholder,"* and *"failure to observe its own internal systems regarding the administration of private concessions"*, Respondent could have failed to comply with the treaty obligations specified in the

---

[128]   Request for Arbitration, ¶ 130A(d).

[129]   *Id.,* ¶ 14.10 ("*In December 2004, the Respondent pressured DMT (against the objections of Walter Bau and DMT's other foreign shareholders) into accepting a supposedly three-month 'trial' of reduced toll fees, against a promise of compensation.*").

[130]   *Id.,* ¶ 130A(f).

[131]   *See Id.,* ¶ 117 ("*DMT sent Intel's report to the Respondent on 30 November 2004*"); ¶ 119 ("*Just two weeks after receiving Intel's report, the Respondent forced through a unilateral reduction of the tolls…*"); ¶ 120 ("*This reduction was made with total disregard to the interests and to the detriment of DMT and in breach of the Respondent's treaty obligations to Walter Bau. The Respondent used its position as director and shareholder of DMT and also its influence on the non-foreign board members and shareholders of DMT to obtain DMT's consent to this measure against the strong objections of Walter Bau and the other foreign shareholders and without the prior consent of DMT's lenders.*"). See also id., ¶¶ 124-25.

[132]   *Id.,* ¶ 65.

[133]   *See* footnote 111.

Request for Arbitration (at ¶¶ 130A(d) and (f), respectively).[134]  Because Claimant has

failed to do so, there is no jurisdiction *ratione temporis* on the basis of continuing breach.

(B)    Cumulative Breach

151.    In describing Respondent's alleged acts and omissions as *"cumulatively"* constituting

breaches of Respondent's Treaty obligations, Respondent understands Claimant to posit

that Respondent breached Treaty obligations through a composite act, *i.e.*, a series of

actions and omissions that are wrongful in aggregate.

152.    This concept is described in Article 15 of the International Law Commission's Articles

on State Responsibility, which states:

> *"(1)    The breach of an international obligation by a State through a
> series of actions or omissions defined in aggregate as wrongful, occurs
> when the action or omission occurs which, taken with the other actions or
> omissions, is sufficient to constitute the wrongful act.*
>
> *(2)    In such a case, the breach extends over the entire period starting
> with the first of the actions or omissions of the series and lasts for as long
> as these actions or omissions are repeated and remain not in conformity
> with the international obligation."[135]*

153.    Claimant might well argue that jurisdiction *ratione temporis* could exist if Respondent's

alleged conduct cumulatively amounted to a breach of its Treaty obligations, and such

conduct occurred, in part, after entry into force.

154.    However, not just any series of acts and omissions can, in aggregate, give rise to the

breach of an international obligation.    To amount to a breach of an international

obligation, there must be an accumulation of identical or analogous breaches which are

---

[134]    *See* discussion of *Mondev* (RA-41), ¶ 146.

[135]    International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*
(2001) (RA-31).

sufficiently numerous and interconnected to constitute a systematic policy or practice, as in the case of genocide and crimes against humanity.[135]

155.    On the face of the Request for Arbitration, that is not the case here. It is for Claimant to establish otherwise. Because Claimant has failed to do so, there is no jurisdiction *ratione temporis* on the basis of cumulative breach.

C.    NO JURISDICTION OVER CLAIMS UNDER THE 1961 TREATY

156.    In apparent recognition of the lack of temporal jurisdiction over its alleged claims under the BIT, Walter Bau asserts that Respondent's alleged conduct breached the 1961 Treaty. This assertion is unavailing, because the 1961 Treaty does not provide for investor-state arbitration.

1.    No Investor-State Arbitration Under the 1961 Treaty

157.    The 1961 Treaty was terminated upon entry into force of the BIT.[127]   And even prior to this event, no investor had the right to bring suit.

158.    Indeed, not all investment treaties provide recourse to investors for breach of treaty obligations, and this possibility of recourse was in fact the exception in the early days of these treaties. For example, neither the Germany-Pakistan BIT (1959) nor the Ecuador-Switzerland BIT (1971) provide for investor-state arbitration.[138]  The state parties to each of those treaties instead negotiated that any disputes concerning their interpretation or application would be resolved only at a state-to-state level.  (This is perhaps not surprising given that each of these treaties, including the 1961 Treaty, was signed before

---

[136]    *See* James Crawford, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (2002) 135 (commentary (3) to Article 14) (RA-54).

[137]    BIT, Art. 11 (WB 1).

[138]    *Pakistan and Federal Republic of Germany Treaty for the Promotion and Protection of Investments (with Protocol and exchange of notes)*, done in Bonn (25 November 1959), Art. 11 (RA-56); *Accord entre la Confédération Suisse et la République de l'Equateur relatif à la protection et à l'encouragement des investissements*, done in Berne (2 May 1968), Art. 7 (RA-57).

the creation of ICSID in 1966.[139]   Today, advance consents by governments to ICSID arbitration can be found in more than 900 investment treaties.)[140]

159.   The only state consent to arbitrate in the entire 1961 Treaty is contained in Article 11, pursuant to which the state parties agreed that "*[d]isputes concerning the interpretation or application*" of the 1961 Treaty could be submitted to an arbitral tribunal upon the request of either state party.

160.   Needless to say, Walter Bau is not a state party; nor does it seek to arbitrate a dispute concerning interpretation or application of the 1961 Treaty.   No consent to arbitrate Walter Bau's claims under the 1961 Treaty can thus be found therein.

161.   And yet, the Claimant would have you believe that this fundamental right – absent from the 1961 Treaty – was somehow created, without express provision, in the BIT.

### 2.   Article 10 of the BIT Does Not Apply to Claims Based on the 1961 Treaty

162.   Claimant appears to contend that Article 10 of the BIT contains state consent to arbitrate claims arising under the 1961 Treaty.[141]   In other words, Claimant contends that the Tribunal should override the unambiguous intent of the state parties not to provide for investor-state arbitration in the 1961 Treaty.

163.   Pursuant to Article 31 of the Vienna Convention, Article 10 of the BIT must be interpreted "*in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[142]

---

139   The World Bank Group, International Centre for Settlement of Investment Disputes, "About ICSID", available at <http://www.worldbank.org/icsid/about/about.htm> (RA-58).

140   *Id*

141   Request for Arbitration, ¶ 20 ("*Respondent's consent to the submission of the dispute referred to in this Request to the Centre is contained in Article 10 of the Treaty.*").

142   RA-2.

164. Interpreted according to its ordinary meaning, the consent to arbitrate expressed in Article 10 does not encompass claims arising under the 1961 Treaty. Article 10 contains no reference to the 1961 Treaty. Instead, Article 10 refers to *"[d]isputes concerning investments"*, and *"investments"* is a defined term in the Treaty. The use of this defined term in Article 10 signifies that the state parties intended that the scope of Article 10's application would be confined to claims in connection with the BIT.

165. In any event, it stands to reason that, if the signatories had intended that an investor could arbitrate disputes both arising under a <u>separate treaty</u> and in respect of which the investor would otherwise <u>have no right to arbitration</u>, they would have done so in the clearest possible terms.

166. Respondent's interpretation of Article 10 is consistent with the object and purpose of the Treaty. In entering into the BIT, the state parties intended to replace the obligations undertaken in the 1961 Treaty with new ones. It would be contrary to the object and purpose of the BIT if, as Walter Bau suggests, its dispute resolution provision could be invoked by an investor to compel the arbitration of claims based on treaty obligations that the BIT had replaced.

167. Even if the Tribunal were to find that the meaning of Article 10 is ambiguous as to whether it envelops claims based on the 1961 Treaty, the Tribunal must apply the *in dubio mitius* principle, which specifies that, if the meaning of a provision is unclear, the meaning which is less onerous to the state assuming an obligation is to be preferred.[143] The less onerous meaning of Article 10 is that it does not apply to disputes arising under separate treaties.

---

[143] Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) § 633 (RA-33).

168.    Applied in the particular context of claims arising under the 1961 Treaty, it is apparent that this interpretation of Article 10 is less onerous to the state because it means that investors are not given a right to arbitrate that they otherwise would not have.

169.    Accordingly, the interpretation of Article 10 that limits the right of investors to compel arbitration to disputes that are related to the BIT must be preferred.

170.    This interpretation is more reasonable in light of the meaningful difference between the dispute resolution provisions in the two treaties.  Without question, the state's dispute resolution obligations are more onerous under the BIT.  In such circumstances, if the state parties had intended in the BIT to take on more obligations for claims based on the 1961 Treaty than would otherwise exist under that treaty, then they would have said so expressly.  They did not, and the Tribunal should accordingly find that it has no jurisdiction over claims based on the 1961 Treaty.

D.    NO *PRIMA FACIE* BREACH

171.    As summarized in the table on page 9 of this memorial, Walter Bau alleges that the Respondent has violated obligations under the BIT and the 1961 Treaty to guarantee:

> *"fair and equitable treatment; not to impair the management, use, enjoyment or disposal of the Investment by arbitrary or discriminatory measures; full and most protection and security; compliance with the treaties as regards the standard for expropriation and measures tantamount to expropriation of investments; observance of other obligations the Respondent has assumed with regard to the investment; and national and Most-Favoured-Nation-Treatment."[144]*

172.    The Tribunal must be satisfied that the claims and facts presented are at least capable of establishing a breach of the treaties.[145]

---

[144]    Request for Arbitration, ¶ 130.

[145]    *See Ethyl Corp v. Government of Canada (Award on Jurisdiction)* (24 June 1998) NAFTA/UNCITRAL Arbitration ¶ 61, reprinted in (1999) 38 *ILM* 708 (finding that the claimant's allegations were sufficient to

173.   As the tribunal in *UPS v. Canada* stated:

> "*[The Tribunal] must conduct a <u>prima facie analysis</u> of the NAFTA
> obligations, which UPS seeks to invoke, and determine whether the facts
> alleged are <u>capable of constituting a violation</u> of these obligations.*"[146]

174.   Following the ruling of the ICJ in the *Oil Platforms* case, the ICSID Tribunal in *SGS v.*

*Philippines* held in its decision on jurisdiction that, when assessing whether a tribunal has

jurisdiction *ratione materiae* in respect of a dispute alleged to be arising under a treaty,

the tribunal "*must ascertain whether the violations of the [treaty] pleaded by [Claimant]*

*do or do not fall within the provisions of the Treaty and whether, as a consequence, the*

*dispute is one which the [Tribunal] has jurisdiction <u>ratione materiae</u> to entertain*"

pursuant to the treaty's dispute resolution provisions.[147]

175.   The Tribunal said: "*it is not enough for the Claimant to assert the existence of a dispute*

*as to fair treatment or expropriation. The test for jurisdiction is an objective one and its*

*resolution may require the definitive interpretation of the treaty provision which is relied*

*on.*"[148]

---

"*satisf[y] prima facie the requirements of Article 1116 to establish the jurisdiction of this Tribunal.*") (RA-59).

[146]   *United Parcel Service of America, Inc. v. Government of Canada (Award on Jurisdiction)* (22 November 2002)   NAFTA   Chapter   11   Arbitration,   available   at   <http://www.dfait-maeci.gc.ca/tna-nac/documents/Jurisdiction%20 Award 22Nov02.pdf> ¶ 33 (RA-60) (unitalicized original emphasis; underline emphasis added). *See also Pan American Energy LLC, and BP Argentina Exploration Co. v. Argentine Republic and BP America Production Co., et. al. v. Argentine Republic (Decision on Preliminary Objections)* (27 July 2006) ICSID Case Nos. ARB/03/13 and ARB/04/8 ¶ 51 ("*[T]he question is* [sic] *here whether the Claimants' claims, if well founded, a matter to be examined at the following stage, may denote violations of the BIT and therefore fall within the Centre's jurisdiction and this Tribunal's competence under the relevant provisions of the BIT and Article 25 of the ICSID Convention.*") (RA-61).

[147]   *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines, (Decision of the Tribunal on Objections to Jurisdiction)* (29 January 2004) ICSID Case No. ARB/02/6 ¶ 26, available at <www.worldbank.org/icsid> (RA-38, *quoting Case Concerning Oil Platforms (Islamic Republic of Iran v. United States)* (1996) *ICJ Rep* 803 810 (RA-62), and *citing Case Concerning Legality of Use of Force (Yugoslavia v. Belgium) (Request for the Indication of Provisional Measures)* (2 June 1999) *ICJ Rep* 124 ¶ 137 (RA-52)).

[148]   *SGS v. Philippines, id.,* ¶ 157 (RA-38).

176. The *Salini* Tribunal's decision on jurisdiction supports the *SGS-Philippines* Tribunal's conclusion that, in order to assess whether claims fall within the terms of a treaty, it is not sufficient for a claimant merely to say so. The *Salini* Tribunal held that it did not have jurisdiction over treaty claims where, "*after having presented the contractual claim in detail, the Claimant[] [cited] the articles of the BIT which, in [its] opinion, had been violated without giving any further explanation.*"[149]

177. As in *Salini*, the Claimant here falls far short of the standard for jurisdiction *ratione materiae.* (It must also be recalled that Claimant had a second opportunity to remedy this when invited by the Tribunal to clarify its claims.)

178. First, although Claimant rattles off in its pleading various treaty provisions that Respondent has allegedly violated,[150] in Paragraph 130A of the Request for Arbitration – in which Walter Bau links Respondent's alleged acts and omissions to the specific treaty obligations supposedly breached – Claimant neglects to particularize all of its claims. Specifically, Claimant fails to aver any factual basis whatsoever for claiming violation of Respondent's obligations under Articles 3(1) and (2) of the BIT not to treat Claimant's investment less favorably than investments of Thailand's own nationals or companies or investments of nationals or companies of any third state. As Claimant's pleading is

---

[149]   *Salini Costruttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan, (Decision on Jurisdiction)* (29 November 2004) ICSID Case No. ARB/02/13 ¶ 161 (RA-45). *See also Ambatielos Case (Greece v. United Kingdom) (Judgment on the Obligation to Arbitrate)* (19 May 1953) *ICJ Rep* 10, 18 ("*The Court must determine ... whether the arguments advanced by the Helenic [sic] Government in respect of the treaty provisions on which the Ambatielos claim is said to be based, are of a sufficiently plausible character to warrant a conclusion that the claim is based on the Treaty.*") (RA-63); *Case Concerning Legality of Use of Force (Yugoslavia v. Belgium) (Request for the indication of Provisional Measures)* (2 June 1999) *ICJ Rep* 124 ¶ 38) ("*in order to determine, even prima facie, whether a dispute within the meaning of Article IX of the Genocide Convention exists, the Court cannot limit itself to noting that one of the Parties maintains that the Convention applies, while the other denies it; ... [It] must ascertain whether the breaches of the Convention alleged by Yugoslavia are capable of falling within the provisions of that instrument and whether, as a consequence, the dispute is one which the Court has jurisdiction ratione materiae to entertain pursuant to Article IX*") (RA-52).

[150]   *See* Request for Arbitration, ¶¶ 128-29.

deficient in this respect, there is no jurisdiction *ratione materiae* over claims based on Articles 3(1) and (2) of the BIT.

179.    Second, as concerns Walter Bau's other claims, Claimant does nothing more than describe Respondent's alleged acts and omissions and cite the treaty provisions that it alleges Respondent violated.[151] In short, Walter Bau alleges legal conclusions that Respondent breached the treaties without saying how Respondent breached them. The Tribunal need only look to Paragraphs 128-130A of the Request for Arbitration, in which Claimant specifies its treaty claims, to confirm that this is the case. Claimant's failure to particularize the legal basis for its claims constitutes a lack of jurisdiction *ratione materiae*.

180.    Third, the facts pleaded by the Claimant, if proven to be true, are not capable of triggering Respondent's obligations under the treaties.

        1.    No Expropriation

181.    Although Claimant vaguely alleges that Respondent expropriated its investment through acts and omissions that devalued DMT, as a matter of law, any such acts and omissions would not constitute expropriation unless Walter Bau was substantially deprived of the economic value, use or enjoyment of its investment.

182.    Walter Bau's complaints of deprivation center around an assertion that as a result of the Respondent's alleged acts and omissions, the anticipated return on Walter Bau's investment has declined.[152] With more than fifteen years left in the life of the

---

[151]    *Id.*, ¶¶ 128-130A.

[152]    *See id.*, ¶ 12.

Concession, Walter Bau cannot seriously contend that it has been <u>substantially</u> deprived of the economic value, use or enjoyment of its investment.[153]

183.   Since it is clear on the face of the Request for Arbitration that Walter Bau has not suffered a substantial erosion of the value of its shareholding in DMT, Walter Bau cannot make a case for expropriation.

### 2.   Claimant Insufficiently Pleads Contractual Breaches

184.   To the extent that, despite Walter Bau's failure to particularize the legal basis for its claims, Respondent can discern from the Request for Arbitration any rational connection between the alleged acts and omissions and Walter Bau's claims, it appears that the alleged treaty breaches stem almost entirely from DOH's alleged performance or non-performance under the Concession Agreement (as amended by MoAl and MoA2) between DOH and DMT.

185.   In fact, Claimant effectively concedes in its Request for Arbitration that alleged contractual breaches are the essence of its complaint.   For example, Claimant characterizes attempts to seek redress for Respondent's alleged wrongful conduct as a contractual matter, and even characterizes attempts to negotiate settlement as being contract – not treaty – based:

> *"DMT has persistently sought to negotiate with the Respondent for remediation of its situation, <u>as it is entitled to do under the Concession Agreement</u>.   Starting from 2001, Walter Bau sought in parallel and in good faith to seek a commercial solution with the Respondent ..."*[154]

186.   Claimant describes Respondent's alleged wrongful conduct, first and foremost, in terms of breach of contract:

---

[153]   *Id.,* ¶ 63(b)(iii).

[154]   *Id.,* ¶ 14.9 (emphasis added).

> *"As will be seen from Section D below, the Respondent has persistently breached its obligations to DMT under the Concession Agreement and other contracts ..."*[155]

187.    Claimant contends that every one of Thailand's alleged breaches (summarized in ¶ 130A of the Request for Arbitration) amounts to a failure by Thailand *"to fulfil obligations it has entered into under the Concession Agreement."*[156]

188.    Yet, while Walter Bau attempts to hang its treaty claims upon breaches of contractual obligations, it curiously fails to plead facts sufficient to establish such breaches.  In particular, Claimant does not aver how each of Respondent's alleged acts and omissions breached a specific term of the Concession Agreement.  Claimant has not even produced signed copies of the Concession Agreement (WB8), MoA1 (WB10) or MoA2 (WB16).  *Prima facie*, then, Claimant has not pled claims and facts capable of establishing breach of the 1961 Treaty or BIT (Respondent refers to the 1961 Treaty purely to demonstrate that Claimant's case falls on any analysis of jurisdiction).

### 3.    Mere Breach of Contract Does Not Constitute Treaty Breach

189.    Even if Walter Bau had properly pleaded the elements of a cause of action for breach of contract, there would still be no jurisdiction.  Claimant cannot state a cause of action under the treaties by merely recasting breach of contract claims as treaty violations.  It is well-established in investor-state jurisprudence that whether there has been a treaty breach and whether there has been a breach of contract are different questions.[157]

---

[155]    *Id.* (emphasis added).

[156]    *See Id.*, ¶ 130A (a)(iii), (b)(iii), (c)(iii), (d)(iii), (e)(iii), (f)(iv) (emphasis added).

[157]    *See Compañia de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic (Decision on Annulment)* (3 July 2002) ICSID Case No. ARB/97/3 ¶ 96 ("*[w]hether there has been a breach of the BIT and whether there has been a breach of contract are different questions. Each of these claims will be determined by reference to its own proper or applicable law—In the case of the BIT, by international law; In the case of the Concession Contract, by the proper law of the contract.*" ) (RA-64); *Salini Costruttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan, (Decision on Jurisdiction)* (29 November

190. The Tribunal does not have jurisdiction over purely contractual claims which do not amount to a treaty violation.[158] In the words of the Annulment Committee in *Vivendi v. Argentina*:

> "*A treaty cause of action is not the same as a contractual cause of action; it requires a clear showing of conduct which is in the circumstances contrary to the relevant treaty standard.*"[159]

191. Accordingly, in order to satisfy the Tribunal that Claimant's allegations are the sort of allegations capable of triggering Respondent's treaty obligations, Walter Bau must establish that the treaties specifically protect investors against contractual breaches by the state, and that Walter Bau is entitled to any such protection under the treaties.

192. In this regard, Claimant only pleads that Respondent had a duty to observe obligations "*stemming from the Concession Agreement*" in accordance with Article 7(2) of the BIT and Article 7 of the 1961 Treaty.[160]

193. The question thus arises whether Walter Bau can elevate alleged contract claims to the level of treaty claims by virtue of Article 7(2) of the BIT and Article 7 of the 1961 Treaty, *i.e.* whether each of these provisions is tantamount to a so-called "umbrella" clause that places contracts under the protection of the Treaty.

---

2004) ICSID Case No. ARB/02/13 ¶ 154 ("*[N]ot any breach of an investment contract could be regarded as a breach of a BIT*") (RA-45); *SGS Société Generale de Surveillance S.A. v. Islamic Republic of Pakistan (Decision on Objections to Jurisdiction)* (6 August 2003) ICSID Case No. ARB/01/13 ¶ 167 (a violation of a contract entered into by a state with an investor of another state, is not, by itself, a violation of international law) (RA-65).

158   *See Pan American Energy LLC, and BP Argentina Exploration Co. v. Argentine Republic and BP America Production Co., et. al. v. Argentina Republic (Decision on Preliminary Objections)* (27 July 2006) ICSID Case Nos. ARB/03/13 and ARB/04/8 ¶ 91 ("*The Tribunal ... has only jurisdiction over treaty claim [sic], and cannot entertain purely contractual claims which do not amount to a violation of the BIT.*") (RA-61).

159   *Compañía de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic (Decision on Annulment)* (3 July 2002) ICSID Case No. ARB/97/3 ¶ 113 (RA-64).

160   *See* Request for Arbitration, ¶¶ 128(e), 129(d).

a.   No Umbrella Clause

194.   Article 7(2) of the BIT provides, in relevant part, that *"[e]ach Contracting Party shall observe any other obligation it has assumed with regard to investments in its territory by investors of the other Contracting Party."*[161]   Similarly, Article 7 of the 1961 Treaty specifies, in relevant part, that *"[e]ach Contracting Party shall observe any other obligation it may have entered into with regard to investments within its territory by nationals or companies of the other Contracting Party."*[162]   As there is no substantive difference between these provisions (and because under any view the 1961 Treaty does not apply), Respondent henceforth discusses only Article 7(2) of the BIT.

195.   As mentioned above (*see* ¶ 102), pursuant to Article 31 of the Vienna Convention, Article 7(2) of the BIT must be interpreted *"in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."*

196.   Interpreted according to its ordinary meaning, in context and in the light of its object and purpose, it is apparent that Article 7(2) of the BIT does not elevate contractual breaches to treaty breaches.

197.   First, Article 7(2) does not refer to *"contracts"* or *"contractual obligations"*.

198.   Second, Article 7(2) is separated from the substantive obligations undertaken by the state Parties in Articles 2 to 5 of the BIT, concerning admission, protection and treatment of investments, national and most-favoured-nation treatment, protection and compensation, and free transfer. These substantive obligations are grouped together and marked-off by Article 6 (entitled *"Subrogation"*). The separation of Article 7(2) from those obligations

---

[161]   WB1.

[162]   WB2.

indicates that it was not meant to give rise to a substantive obligation like those set out in Articles 2 to 5 of the BIT.

199. The reasoning of the ICSID Tribunal in *SGS-Pakistan*, which was confronted with a very similar structure and sequence of provisions in the Swiss-Pakistan BIT, is apposite:

> "*[g]iven the above structure and sequence of the rest of the Treaty, we consider that, had Switzerland and Pakistan intended Article 11 to embody a substantive "first order" standard obligation, they would logically have placed Article 11 among the substantive "first order" obligations set out in Articles 3 to 7. The separation of Article 11 from those obligations by the subrogation article and the two dispute settlement provisions (Articles 9 and 10), indicates to our mind that Article 11 was not meant to project a substantive obligation like those set out in Articles 3 to 7, let alone one that could, when read as SGS asks us to read it, supersede and render largely redundant the substantive obligations provided for in Articles 3 to 7.*" [163]

200. For the foregoing reasons, Article 7(2) of the BIT cannot be construed as an "umbrella" clause that elevates contractual breaches to the level of treaty violations.

201. This interpretation of Article 7(2) follows from the provision's plain and ordinary meaning. If, however, the Tribunal considers that the provision is unclear, the Tribunal must also reach this interpretation of Article 7(2), in accordance with the *in dubio mitius* principle of treaty interpretation. [164]

### 4. If Article 7(2) Were an Umbrella Clause, It Would Only Encompass Obligations With Regard to the Investment

202. In the event that the Tribunal finds that Article 7(2) is an umbrella clause, the Tribunal would still lack jurisdiction over Walter Bau's asserted breaches because Article 7(2)

---

[163] *SGS Société Generale de Surveillance S.A. v. Islamic Republic of Pakistan (Decision on Objections to Jurisdiction)* (6 August 2003) ICSID Case No. ARB/01/13 ¶ 170 (RA-65). *See also Joy Mining Machinery Limited v. Arab Republic of Egypt (Decision on Jurisdiction)* (6 August 2004) ICSID Case No. ARB/03/11 ¶ 81 (expressing doubt as to whether the so-called umbrella clause could elevate contractual breaches to treaty breaches, even if there was state interference with the contract, given that the clause was not inserted very prominently in the treaty) (RA-66).

[164] *See* ¶¶ 112-113 above.

applies only to obligations that Thailand assumed *"with regard to [the] investment[],"* i.e., with regard to Walter Bau's shares in DMT. Stated simply, Walter Bau cannot overlook that it is not a party to the contracts it complains have been breached.

203. Because Article 7(2) expressly applies only to obligations assumed *"with regard to [the] investment[],"* the Tribunal must determine the scope of Article 7(2) with reference to the definition of *"investment"* in Article 1 of the BIT. In defining *"investment,"* Article 1 distinguishes between *"shares of companies"* and *"business concessions under public law"* as different types of investment.

204. Walter Bau's investment within the meaning of the Treaty was the purchase of shares in the company DMT, not the purchase of a business concession.[165]  To the extent that Article 7(2) is an umbrella clause (it is not), it follows from the plain wording of Article 7(2) that Claimant can invoke the clause only in respect of obligations assumed with regard to its shares, such as obligations assumed under a shareholder agreement (although even here, other fundamental barriers to a treaty claim apply).

205. But as shown in Section III.D.2, Walter Bau apparently contends that the alleged breaches in the Request for Arbitration constitute breaches of the Concession Agreement (or MoA1 or MoA2) between DOH and DMT. <u>Walter Bau thus complains about alleged breaches of contractual obligations assumed with regard to DMT, not contractual obligations assumed with regard to Walter Bau's shares.</u>

206. Apparently, then, Walter Bau wants the Tribunal not only to find that Article 7(2) of the BIT confers jurisdiction over contractual claims (it does not), but also that it protects

---

[165]    *See* ¶¶ 30-33.

strangers to contractual obligations undertaken by the state from any breach of those obligations.

207. It is unreasonable to assume that Thailand would open itself up to contract-based claims by non-parties to those contracts.

208. The recent decision of the ICSID Tribunal in *Azurix v. Argentina* accords with this view. In that case, the Tribunal rejected the claimant's argument that it could submit claims for breach of a concession agreement under Article II(2)(c) of the US-Argentina BIT (stating that "*[e]ach party shall observe any obligation it may have entered into with regard to investments*"). It did so because the claimant was not a party to the agreement. In finding that there was no "*obligation with regard to an investment*," the Tribunal reasoned as follows:

> "*None of the allegations made by the Claimant refer to breaches of the Province in relation to Azurix itself. The obligations undertaken by the Province in the Concession Agreement were undertaken in favor of ABA not Azurix. As the Respondent itself has asserted, Argentina is not party to the Concession Agreement, and ABA is not party to these proceedings. Therefore, the underlying premise of Article II(2c) of the BIT – that a party to the BIT has entered into an obligation with regard to an investment – is inexistent. Neither the Respondent nor the Province, as a political subdivision of the Respondent, has entered into a contractual relationship with Azurix itself.*"[166]

209. The Tribunal stated further:

> "*While Azurix may submit a claim under the BIT for breaches by Argentina, there is no undertaking to be honored by Argentina to Azurix other than the obligations under the BIT. Even if for argument's sake, it would be possible under Article II(2)(c) to hold Argentina responsible for the alleged breaches of the Concession Agreement by the Province, it was ABA and not Azurix which was the party to this Agreement.*"[167]

---

[166]   *Azurix Corp. v. Argentine Republic (Award)* (14 July 2006) ICSID Case No. ARB/01/12 ¶ 52 (RA-67).

[167]   *Id.*, ¶ 384 (RA-67).

210. Here, too, Claimant is not party to the Concession Agreement allegedly breached. Accordingly, jurisdiction over any claims under Article 7(2) based on alleged breaches of the Concession Agreement should be denied.

     5.    **If Article 7(2) Were an Umbrella Clause, Claimant Would Still Have to Plead Contractual Breaches Beyond Mere Commercial Acts**

211. Even if Article 7(2) were to elevate contractual claims to treaty claims (which is denied), and even if Walter Bau were entitled to seek redress for breach of contractual obligations owed to DMT (which is also denied), the Tribunal would still not have jurisdiction over Respondent's alleged contractual breaches to the extent that the alleged breaches are a consequence of the state acting merely as a contracting party, as opposed to as sovereign authority.[168]

212. This view has been adopted by various international tribunals in determining whether claimant's breach of contract claims could constitute treaty claims.

213. For example, while the ICSID Tribunal in *Joy Machinery Limited v. Arab Republic of Egypt* noted that a discussion of the alleged "umbrella" clause was not necessary for the outcome of the case, it concluded, in principle, that such a clause could not have the effect of transforming all contract disputes into treaty disputes "*unless of course there*

---

[168]   *See* Stephen M. Schwebel, "On Whether the Breach by a State of a Contract with an Alien is a Breach of International Law" reprinted in "Justice in International Law: Selected Writings of Stephen M. Schwebel" (1994) 425, 431 ("*[T]here is more than doctrinal authority in support of the conclusion that, while mere breach by a State of a contract with an alien (whose proper law is not international law) is not a violation of international law, a 'non-commercial' act of a Sote contrary to such a contract may be.*") (RA-68); *Restatement (Third) of Foreign Relations Law of the United States* (1987) § 712 (note 8) ("... *international law is not implicated if a state repudiates or breaches a commercial contract with a foreign national for commercial reasons as a private contractor might, e.g. due to inability of the state to pay or otherwise perform, or because the performance has become uneconomical* ...") (RA-69; emphasis added).

*would be a clear violation of the Treaty rights and obligations or a violation of contract rights of such a magnitude as to trigger the Treaty protection.*"[169]

214.   The Tribunal clarified: "*a basic general distinction can be made between commercial aspects of a dispute and other aspects involving the existence of some form of State interference with the operation of the contract involved.*"[170]

215.   This view was also taken by the ICSID Tribunals in *Salini v. Jordan* and *Impreglio S.p.A. v. Islamic Republic of Pakistan.*  The *Impreglio* Tribunal quoted the *Salini* Tribunal with approval as follows:

> "*[i]n order that the alleged breach of contract may constitute a violation of the BIT, it must be the result of behaviour going beyond that which an ordinary contracting party could adopt. Only the State in the exercise of its sovereign authority ('puissance publique'), and not as a contracting party, may breach the obligations assumed under the BIT.*"[171]

216.   In the present case, many of the alleged acts or omissions that make up Walter Bau's claims concern conduct which, on its face, was merely commercial in character.

217.   For example, any other contracting party could have stood in Respondent's place and delayed the opening of the Tollway by failing to procure land needed for flyovers and ramps,[172] or rejected requests by DMT to negotiate under the contract.  And certainly any other contracting party could have disregarded Walter Bau's interests as a minority

---

[169]   *Joy Mining Machinery Limited v. Arab Republic of Egypt (Decision on Jurisdiction)* (6 August 2004) ICSID Case No. ARB/03/11 ¶ 81 (RA-66).  Notably, the *Joy Mining* Tribunal did not accept that the so-called umbrella clause could elevate contractual breaches to treaty breaches, even if there was state interference with the contract.  *See Id.*, ¶ 81 (observing that the clause was not inserted very prominently in the treaty).

[170]   *Id.*, ¶ 72 (RA-66).

[171]   *Impreglio S.p.A. v. Islamic Republic of Pakistan, (Decision on Jurisdiction)* (22 April 2005) ICSID Case No. ARB/03/3 ¶ 260, available at <http://ita.law.uvic.ca> (RA-37); *Salini Costruttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan, (Decision on Jurisdiction)* (29 November 2004) ICSID Case No. ARB/02/13 ¶ 154 (RA-45).

[172]   *See* Request for Arbitration, ¶ 130A(a).

shareholder in DMT "*[b]y its conduct as shareholder and through the organs of DMT.*"[173]

218.   It is for Claimant to establish that the facts upon which it relies, if proven, could be capable of triggering Respondent's treaty obligations.   Insofar as the Request for Arbitration fails to allege that Respondent committed the alleged wrongful conduct in its capacity as sovereign, the Tribunal lacks jurisdiction *ratione materiae* over at least the following alleged acts and omissions:

- acts and omissions causing delay to the opening of the Tollway;[174]

- failing adequately or at all to respond to DMT's requests to adjust the toll rates in light of changes in the economic situation (in accordance with paragraph 25.2 of the Concession Agreement);[175]

- failing to enter into negotiations with DMT to remedy negative effects set out in paragraph 25.2 of the Concession Agreement;[176]

- exploiting DMT's difficulties to procure or effect amendments to the original conditions of the Concession by virtue of MoA2 and the Share Purchase Agreement;[177]

- failing to arrange the Soft Loan;[178]

- imposing or otherwise effecting a reduction of the tolls;[179] and

---

[173]   *See Id.*, ¶ 130A(f).

[174]   *Id.*, ¶ 130A(a).

[175]   *Id.*, ¶ 130A(b).

[176]   *Id.*, ¶ 130A(b).

[177]   *Id.*, ¶ 130A(b).

[178]   *Id.*, ¶ 130A(b).

[179]   *Id.*, ¶ 130A(d).

■  disregarding Walter Bau's interests as a minority shareholder in DMT.[180]

### 6.  If Article 7(2) Were An Umbrella Clause (And Somehow Permitted Claimant to Complain of Breaches of the Concession Agreement), Claimant Could Not Disregard Other Agreements or Waivers by DMT

219.  If, despite the above, the Tribunal finds that Walter Bau is entitled to seek redress under Article 7(2) of the BIT for contractual obligations owed by DOH to DMT, Walter Bau should be bound by the effect of amendments to the Concession Agreement and other relevant agreements entered into by DMT.

220.  Claimant pleads, *inter alia*, that alleged acts and omissions causing delay to the opening of the Tollway and the charging of tolls, which allegedly occurred between May 1993 and July 1996, constituted a breach of obligations that Thailand assumed under the Concession Agreement.[181]

221.  Claimant also pleads that "*[b]y its terms, MoA 2 settled all claims arising under the Concession Agreement before the date of MoA 2.*"[182]

222.  If Claimant can seek redress under Article 7(2) for the DOH's alleged violations of the Concession Agreement, it should not be permitted to seek redress for any alleged violations

(a)  arising prior to 29 November 1996, the effective date of MoA2, because MoA2 expressly settled any violations of the Concession Agreement pre-dating the MoA2;[183] or

---

[180]  *Id.*, ¶ 130A(f).

[181]  *Id.*, ¶ 130A(a)(iii), ¶ 14.1 ("*completion and opening of the Tollway were delayed from May 1993 to July 1996*").

[182]  *Id.*, ¶ 64(a).

[183]  *Id.*

63

(b)    based on *"moving or directing or approving the move of all scheduled air traffic from Don Muang airport to the new Suvarnabhumi International Airport and the consequent downgrading of Don Muang airport,"* because in MoA2, DMT expressly waived the right to bring any claims related to the change in use of the Don Muang Airport.[184]

223.    In addition, Walter Bau should not be permitted to assert any claims that its investment was expropriated by Respondent, because, in 1998, <u>DMT expressly waived its rights to any guarantee and protection</u> that the *"State [would] not nationalize the activity of the promoted person."*[185]

## IV.    THESE PROCEEDINGS SHOULD BE BIFURCATED

224.    Article 21(4) of the UNCITRAL Rules states, in part, that *"[i]n general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question."*[186]

225.    Efficiency, *i.e.*, the cost in time and money to the parties and the practicality of bifurcation, is the primary factor in determining whether a tribunal should rule on jurisdictional objections as a preliminary matter.[187]

---

[184]    *See* MoA2, Art. 14.2 (*"Any change in the use of the Bangkok Airport ... shall not be regarded as an act in competition to the concession highway according to Clause 25.2 (d) of the Existing Tollway Concession Agreement or an act of the Government which causes Vehicle Loss"*) (WB16).  *See also* DMT's Assessment of Financial Damages Suffered by the Company and Requested Remedies for Restoring Its Financial Position in Accordance with Clause 25.3 of the Tollway Concession Agreement, dated 31 May 2000 (acknowledging that DMT agreed not to use as reasons for compensation claims under the Concession Agreement *"the relocation of flight operations from Don Muang Airport to the new airport at Nong Ngu Hao."*) (WB24).

[185]    *See* Letter from DMT to the Secretary General of the Board of Investment dated 25 February 1998 (*"The Company hereby confirms the waiver of the rights particularly to the extent of Sections 43-46 of the Investment Promotion Act B.E. 2520 [1977]."*) (R-10); Investment Promotion Act B.E. 2520 (as amended) s. 43 (*"The State shall not nationalize the activity of the promoted person."*) (RA-70).

[186]    RA-1.

[187]    *See* David D. Caron, Lee M. Caplan, Matti Pellonpää, "The UNCITRAL Arbitration Rules: A Commentary" (2006) 450-51 (efficiency is the primary factor in determining whether a tribunal should rule on pleas concerning jurisdiction as a preliminary matter) (RA-71); *Glamis Gold v. United States of America (Procedural Order No. 2)* (31 May 2005) UNCITRAL/NAFTA Chapter 11 Arbitration ¶ 11 (*"In examining*

226.   The rationale of this rule lies in a respondent's right to see that it is not unnecessarily dragged into an international arbitration; it also demonstrates that consent is the basis for jurisdiction.[188]

227.   Thus, although the Tribunal has the power to join jurisdictional objections to the merits of a dispute:

> "It does not make sense to go through lengthy and costly proceedings dealing with the merits of the case unless the tribunal's jurisdiction has been determined authoritatively. On the other hand, some jurisdictional questions are so intimately linked to the merits of the case that it is impossible to dispose of them in preliminary form."[189]

228.   That is not the case here.

---

the drafting history of Article 21(4) of the UNCITRAL [sic] Rules, the Tribunal finds that the primary motive for the creation of a presumption in favor of the preliminary consideration of a jurisdictional objection was to ensure efficiency in the proceedings.") (RA-72); Ghaffari v. Islamic Republic of Iran (Order dated 2 February 1998)) (Case No. 968), Case No. 968, Dissenting Opinion of Judge Khalilian (signed 10 February 1988), reprinted in (1988-I) 18 Iran-US CTR 79 ("[T]he Tribunal has demonstrated that by following a general rule in international proceedings—namely the necessity of separating preliminary objections from the merits—it saves the parties from making an unnecessary waste of energy, time and expense.") (RA-73); Starrett Housing Corp. v. Islamic Republic of Iran, (Interlocutory Award No. ITL 32-24-1) (19 December 1983), reprinted in (1984-III) 7 Iran-US CTR 119, *44 at *55 (stating that issue of standing must be considered as a preliminary issue in accordance with Article 21(4), "so as to take a decision as to its lack of jurisdiction before burdening the Parties with any further trouble and expense") (RA-74); United Parcel Service of America, Inc. v. Government of Canada (Award on Jurisdiction) (22 November 2002) NAFTA Chapter 11 Arbitration, available at <http://www.dfait-maeci.gc.ca/tna-nac/documents/Jurisdiction%20 Award.22Nov02.pdf> ¶ 31 ("This power [under Article 21(4)] both supports the efficient and effective administration of the arbitral process and reflects the fact that parties, notably State parties, to arbitration processes are subject to jurisdiction only to the extent they have consented.") (RA-60).

[188]   See Ghaffari v. Islamic Republic of Iran (Order dated 2 February 1998)) (Case No. 968), Case No. 968, Dissenting Opinion of Judge Khalilian (signed 10 February 1988), reprinted in (1988-I) 18 Iran-US CTR 79 (RA-73), quoting V.S. Mani, "International Adjudication: Procedural Aspects" (1980) 123-24 ("[Although] one party has a right to have its claim recognized by a competent tribunal, the other party has an equal right to see that it is not unnecessarily dragged into an international litigation before a tribunal before which the claim is either non-receivable or otherwise barred. Moreover, preliminary objection procedure demonstrates that the basis of international jurisdiction is the sovereign consent of States.") (RA-75).

[189]   Christoph H. Schreuer, "The ICSID Convention: A Commentary" (2001) 545 (considering Article 41 of the ICSID Convention, which provides, in relevant part, that with respect to a question on jurisdiction, a Tribunal "shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.") (RA-39).

229.   First, Respondent has submitted virtually no additional evidence to substantiate its jurisdictional challenge, relying instead on the plainly obvious deficiencies in Claimant's pleading.

230.   Second, Respondent's jurisdictional objections are not dependent on testimony or other evidence that can only be obtained through a full hearing of the merits; rather, they can be resolved largely on the face of the Request for Arbitration and according to legal argument by the parties.

231.   Third, a preliminary ruling by the Tribunal on Respondent's jurisdictional objections (for example, on the approval requirement) would be case-dispositive.

232.   Bifurcation is warranted in these circumstances.[190]

## V.   CLAIMANT SHOULD BEAR THE COSTS OF THESE PROCEEDINGS

233.   Thailand requests that the Tribunal order Claimant to bear all costs of arbitration.

234.   Article 9(5) of the BIT generally provides that each party shall bear *"the cost of its own member and of its representatives in the arbitration proceedings; the cost of the chairman and the remaining costs shall be borne in equal parts [by the parties]*," however, the *"arbitral tribunal may make a different regulation concerning costs*."[191]

---

[190]   *See* Schreuer, *id.*, 547 *("The need for a joinder to the merits is apparent where the answer to the jurisdictional questions depends on testimony and other evidence that can only be obtained through a full hearing of the case.")* (RA-39); *id.* at 545 (treatment of jurisdictional issues as preliminary questions is standard procedure in ICSID practice). *See also, e.g., Methanex Corp. v. United States of America, (Partial Award on Jurisdiction)* (7 August 2002) NAFTA Chapter 11 Arbitration ¶ 160 (concluding that the *"exceptional procedure"* of joining jurisdictional issues to the merits may be appropriate under Article 21(4) *"where jurisdictional issues are intertwined with the merits, it may be impossible or impractical to decide the former without also hearing argument and evidence on the latter")* (RA-76; emphasis added); *Ethyl Corp v. Government of Canada (Award on Jurisdiction)* (24 June 1998) NAFTA/UNCITRAL Arbitration ¶ 54, reprinted in (1999) 38 *ILM* 708 (determining certain jurisdictional objections as a preliminary question, *"in adherence to Article 21(4)")* (RA-59).

[191]   Article 10(2) of the BIT, which pertains to the settlement of disputes between a Contracting Party and an investor, specifies that Article 9(5) of the BIT, which pertains to the settlement of disputes between the Contracting Parties, shall be applied *mutatis mutandis* (WB1).

235.    In agreeing to arbitrate their dispute under the UNCITRAL Rules, the parties agreed to a different allocation of costs than that according to the general principle in Article 9(5) of the BIT.  Pursuant to Article 40 of the UNCITRAL Rules, the default allocation of the "*costs of arbitration*" is that they shall be borne by the unsuccessful party.[192]

236.    The "*costs of arbitration*" are defined in Article 38 of the UNCITRAL Rules as including: (a) the fees of each arbitrator; (b) the travel and other expenses incurred by the arbitrators; (c) the costs of expert advice and of other assistance required by the Tribunal; (d) the travel and other expenses of witnesses, provided such expenses are approved by the Tribunal; (e) the reasonable costs for legal representation and assistance of the successful party; and (f) any fees and expenses of the appointing authority.[193]   The Tribunal is obliged to fix the costs of arbitration in its award.

237.    Thailand has incurred considerable expense defending itself against unmeritorious claims brought by a bankrupt company desperate for cash.[194]   In accordance with Article 40 of the UNCITRAL Rules, Thailand respectfully requests that the Tribunal issue an award requiring Claimant to compensate Thailand for all costs of arbitration.

---

[192]   Article 40 of the UNCITRAL Rules provides, in relevant part:

> "*(1) Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.*
>
> *(2) With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.*"

Article 38(e) refers to the "*costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable*" (RA-1; emphasis added).

[193]   *Id.*, Article 38 (RA-1).

[194]   *See* Respondent's Application for Security for Costs dated 30 June 2006, ¶¶ 24-29.

238.  Claimant reserves the right to make submissions quantifying the costs of arbitration at a later stage of these proceedings.

## VI.    CONCLUSION

239.  For all the reasons set forth above, the Tribunal should resolve Thailand's jurisdictional objections as a preliminary issue, Walter Bau's claims should be dismissed in their entirety and Walter Bau should bear all costs of arbitration.

Respectfully submitted on 2 October 2006

WHITE & CASE LLP

Michael A. Polkinghorne
Leon Ioannou

*Counsel for Respondent*
*The Kingdom of Thailand*

| EXHIBIT NO. | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Exhibit R-7 | Representative Certificates of Admission dated between 27 October 1972 and 20 February 1991 issued by the Thailand Ministry of Foreign Affairs | RMoJ (62) |
| Exhibit R-8 | Announcement of the Committee on the Approval for the Protection of Investment between Thailand and Other Countries No. MFA 0704/1/2003 Concerning Foreign Investment Protection under the Agreements on the Promotion and Protection of Investments between the Government of the Kingdom of Thailand and Foreign Governments dated 22 October B.E. 2546 (Buddhist calendar equivalent for 2003) (the "Announcement") | RMoJ (63, 66, 82, 88) |
| Exhibit R-9 | Board of Investment Certificate of Promotion issued to DMT dated 16 May 1991 | RMoJ (87) |
| Exhibit R-10 | Letter from DMT to the Secretary General of the Board of Investment dated 25 February 1998 | RMoJ (223) |

IN THE MATTER OF AN ARBITRATION
UNDER THE UNCITRAL ARBITRATION RULES


BETWEEN:


WALTER BAU AKTIENGESELLSCHAFT (in liquidation)

Claimant

- and -

THE KINGDOM OF THAILAND

Respondent


LIST OF RESPONDENT'S LEGAL AUTHORITIES
(AS AT 2 OCTOBER 2006)

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-1 | UNCITRAL Arbitration Rules (1976) | RMoJ (1, 27, 236) |
| Authority RA-2 | *Vienna Convention on the Law of Treaties*, done at Vienna (23 May 1969) UNTS Vol. 1155, 331 | RMoJ (22, 93) |
| Authority RA-3 | *Emilio Agustin Maffezini v. Kingdom of Spain (Decision on Jurisdiction)* (25 January 2000) ICSID Case No. ARB/97/7 reprinted in (2001) 16 *ICSID Rev.-FILJ* 212 | RMoJ (22) |
| Authority RA-4 | *Grand River Enterprises Six Nations, Ltd. et al. v. United States of America (Decision on Objections to Jurisdiction)* (20 July 2006) NAFTA/UNCITRAL Arbitration (excerpt) | RMoJ (22) |
| Authority RA-5 | *Golder v. United Kingdom* (21 February 1975) ECHR Ser. A, No. 18 | RMoJ (23) |
| Authority RA-6 | *Case Concerning Kasikili/Sedudu Island (Botswana v. Namibia)* 1999 ICJ (Judgment of 13 December 1999) reprinted in 39 *ILM* 310 (2000) (excerpt) | RMoJ (23) |
| Authority RA-7 | De Arechaga, "International Law in the Past Third of a Century" (1978) 159 *Recueil des Cours* I (excerpt) | RMoJ (23) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-8 | *Amco Asia Corporation v. Indonesia (Award on Jurisdiction)* (25 September 1983) ICSID Case No. ARB/81/1 reprinted in (1984) 23 *ILM* 351 | RMoJ (25) |
| Authority RA-9 | *Kimberly-Clark Corp. v. Bank Markazi Iran (Award No. 46-57-2)* (25 May 1983) 2 *Iran-US CTR* 334 | RMoJ (28) |
| Authority RA-10 | *Lili Tour v. The Government of the Islamic Republic of Iran (Award No. 413-483-2)* (1 March 1989) available from Westlaw | RMoJ (28) |
| Authority RA-11 | *Creditcorp International, Inc. v. Iran Carton Co. (Award No. 443-965-2)* (12 October 1989) available from Westlaw | RMoJ (28) |
| Authority RA-12 | *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Jurisdiction and Admissibility)* (1984) ICJ Rep 4 (excerpt) | RMoJ (28) |
| Authority RA-13 | *Southern Pacific Properties (Middle East) Ltd. (SPP(ME)) v. Arab Republic of Egypt (Decision on Jurisdiction)* (14 April 1988) ICSID Case No. ARB/84/3 reprinted in (1995) 3 *ICSID Rep* 131 | RMoJ (29) |
| Authority RA-14 | *Mihaly International Corp. v. Democratic Socialist Republic of Sri Lanka (Award)* (15 March 2002) ICSID Case No. ARB/00/2 reprinted in (2002) 17 *ICSID Rev.-FILJ* 142 | RMoJ (29) |
| Authority RA-15 | Black's Law Dictionary (8th ed. 2004) (excerpt) | RMoJ (31) |
| Authority RA-16 | Jeswald W. Salacuse, "BIT by BIT: The Growth of Bilateral Investment Treaties and Their Impact on Foreign Investment in Developing Countries" (1990) 24 *The International Lawyer* 655 | RMoJ (39) |
| Authority RA-17 | Ibrahim F.I. Shihata, "Recent Trends Relating to Entry of Foreign Direct Investment" (1994) 9 *ICSID Rev.-FILJ* 47 | RMoJ (39) |
| Authority RA-18 | United Nations Conference on Trade and Development, *International Investment Agreements: Key Issues, Volume I* (September 2004) (excerpt) | RMoJ (39) |
| Authority RA-19 | *Agreement between the Government of the Federal Republic of Nigeria and the Government of the United Kingdom of Great Britain and Northern Ireland for the Promotion and Protection of Investments*, done in Abuja (11 December 1990) | RMoJ (40) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-20 | *Agreement between the Government of Sweden and the Government of Malaysia Concerning the Mutual Protection of Investments*, done in Kuala Lumpur (3 March 1979) | RMoJ (41) |
| Authority RA-21 | *Philippe Gruslin v. Malaysia (Award)* (27 November 2000) 5 *ICSID Reports* 483 | RMoJ (42) |
| Authority RA-22 | German to English translation of excerpt from Germany's website for its Foreign Trade and Investment Promotion Scheme <http://agaportal.de> | RMoJ (67) |
| Authority RA-23 | Bloomberg.com, Financial Glossary <http://www.bloomberg.com/invest//glossary/bfglosf.htm> | RMoJ (71) |
| Authority RA-24 | National Statistics, "First Release: Foreign direct investment 2004" dated 13 December 2005 | RMoJ (74) |
| Authority RA-25 | Anna M. Falzoni, "Statistics on Foreign Direct Investment and Multinational Corporations: A Survey" (15 May 2000) | RMoJ (75) |
| Authority RA-26 | OECD, "OECD Benchmark Definition of Foreign Direct Investment" (3rd ed., 1996) | RMoJ (75, 77) |
| Authority RA-27 | International Monetary Fund, "Foreign Direct Investment Statistics – How Countries Measure FDI: 2001" (2003) (excerpt) | RMoJ (76, 77) |
| Authority RA-28 | United Nations "World Investment Report: 2005" (excerpt) | RMoJ (76) |
| Authority RA-29 | Pusadee Ganjarerndee, Bank of Thailand, "Thailand's Balance of Payments Foreign Direct Investment Statistics", published in United Nations Conference on Trade and Development, "Expert Meeting on Capacity Building in the Area of FDI: Data Compilation and Policy Formulation in Developing Countries" dated 12-14 December 2005 | RMoJ (78) |
| Authority RA-30 | IMF Committee on Balance of Payments Statistics and OECD Workshop on International Investment Statistics, Direct Investment Technical Group (DITEG), "Issues Paper (DITEG) #20: Definition of Foreign Direct Investment (FDI) Terms" (November 2004), Annex I, attached to "Eighteenth Meeting of the IMF Committee on Balance of Payments Statistics, Washington D.C., June 27–July 1, 2005: Definition of Direct Investment Terms," available at <http://www.imf.org/external/pubs/ft/bop/2005/18.htm> (excerpt) | RMoJ (77) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-31 | International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts* (2001) | RMoJ (91, 94, 132, 152) |
| Authority RA-32 | *Case Concerning the Northern Cameroons (Cameroon v. United Kingdom)* (2 December 1963) (1963) *ICJ Rep* 15 (excerpt) | RMoJ (91) |
| Authority RA-33 | Sir Robert Jennings and Sir Arthur Watts, "Oppenheim's International Law" (9th ed., 1992) (excerpt) | RMoJ (92, 94, 97, 112, 126, 167) |
| Authority RA-34 | International Law Commission, Final Draft Articles on the Law of Treaties, Commentary to Article 24, reprinted in 2 Sir Arthur Watts, "The International Law Commission 1949-1998" (1999) (excerpt) | RMoJ (95) |
| Authority RA-35 | *Elettronica Sicula S.p.A. (United States v. Italy)* (1989) *ICJ Rep* 15 (excerpt) | RMoJ (95) |
| Authority RA-36 | *Ambatielos Case (Greece v. United Kingdom)* (Judgment on Preliminary Objection) (1 July 1952) *ICJ Rep* 28 | RMoJ (96) |
| Authority RA-37 | *Impregilo S.p.A. v. Islamic Republic of Pakistan, (Decision on Jurisdiction)* (22 April 2005) ICSID Case No. ARB/03/3 available at <http://ita.law.uvic.ca> | RMoJ (97, 215) |
| Authority RA-38 | *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines, (Decision of the Tribunal on Objections to Jurisdiction)* (29 January 2004) ICSID Case No. ARB/02/6, available at <www.worldbank.org/icsid> | RMoJ (97, 108, 174, 175) |
| Authority RA-39 | Christoph H. Schreuer, "The ICSID Convention: A Commentary" (2001) | RMoJ (97, 98, 126, 227, 231) |
| Authority RA-40 | *Tradex Hellas S.A. v. Republic of Albania (Decision on Jurisdiction)* (24 December 1996) ICSID ARB/94/2 reprinted in (1999) 14 *ICSID Rev.-FILJ* 161 | RMoJ (98, 106, 126) |
| Authority RA-41 | *Mondev International Ltd. v. United States of America (Award)* (11 October 2002) ICSID Case No. ARB(AF)/99/2 | RMoJ (98, 110, 141, 146, 150) |
| Authority RA-42 | *Agreement Between the United States of America and Albania on the Settlement of Certain Outstanding Claims*, done in Tirana (10 March 1995) 12611 TIAS | RMoJ (105) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-43 | United Nations Security Council Resolution 687 (1991), U.N. Doc S/RES/687 (8 April 1991) available at <http://www.unog.ch/unce/resolutio/res0687.pdf> | RMoJ (105) |
| Authority RA-44 | *Tecnicas Medioambientales Tecmed S.A. v. The United Mexican States (Award)* (29 May 2003) ICSID Case No. ARB(AF)/00/2 | RMoJ (106, 146) |
| Authority RA-45 | *Salini Costruttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan, (Decision on Jurisdiction)* (29 November 2004) ICSID Case No. ARB/02/13 | RMoJ (109, 176, 189, 215) |
| Authority RA-46 | Notes to North American Free Trade Agreement, available at <http://www.sice.oas.org/trade/nafta/notes.asp> | RMoJ (110) |
| Authority RA-47 | *Marvin Roy Feldman Karpa v. United Mexican States, (Interim Decision on Preliminary Jurisdictional Issues)* (6 December 2000) ICSID Case No. ARB(AF)/99/1 | RMoJ (110) |
| Authority RA-48 | *The Frontier Between Iraq and Turkey (Advisory Opinion)* (1925) PCIJ Ser. B, No. 12 | RMoJ (113) |
| Authority RA-49 | *Case Concerning East Timor (Portugal v. Australia) (Judgment)* (1995) *ICJ Rep* 89 (excerpt) | RMoJ (117) |
| Authority RA-50 | *Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Peru for the Promotion and Protection of Investments, done in London* (4 October 1993) | RMoJ (121) |
| Authority RA-51 | Enrique Miguel Chavez Bardales, "The Settlement of Disputes Under the United Kingdom-Peru Bilateral Investment Treaty" at <http://www.servilex.com.pe/arbitraje/colaboraciones/diser1.html> | RMoJ (121) |
| Authority RA-52 | *Case Concerning Legality of Use of Force (Yugoslavia v. Belgium) (Request for the Indication of Provisional Measures)* (2 June 1999) *ICJ Rep* 124 | RMoJ (123, 174, 176) |
| Authority RA-53 | *Empresas Lucchetti, S.A. and Lucchetti Peru, S.A. v. Republic of Peru (Award)* (7 February 2005) ICSID Case No. ARB/03/4 | RMoJ (124) |
| Authority RA-54 | James Crawford, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (2002) (excerpt) | RMoJ (133, 143, 154) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-55 | International Law Commission, Commentary on Article 18 of the Draft Articles on State Responsibility Provisionally Adopted by the Commission on First Reading (1996) available at <http://lcil.law.cam.ac.uk/projects/state_document_collectio n.php#4> (excerpt) | RMoJ (143) |
| Authority RA-56 | *Pakistan and Federal Republic of Germany Treaty for the Promotion and Protection of Investments (with Protocol and exchange of notes),* done in Bonn (25 November 1959) | RMoJ (158) |
| Authority RA-57 | *Accord entre la Confédération Suisse et la République de l'Equateur relatif à la protection et à l'encouragement des investissements,* done in Berne (2 May 1968) (with translation) | RMoJ (158) |
| Authority RA-58 | The World Bank Group, International Centre for Settlement of Investment Disputes, "About ICSID", available at <http://www.worldbank.org/icsid/about/about.htm> | RMoJ (158) |
| Authority RA-59 | *Ethyl Corp v. Government of Canada (Award on Jurisdiction)* (24 June 1998) NAFTA/UNCITRAL Arbitration, reprinted in (1999) 38 *ILM* 708 | RMoJ (172, 231) |
| Authority RA-60 | *United Parcel Service of America, Inc. v. Government of Canada (Award on Jurisdiction)* (22 November 2002) NAFTA Chapter 11 Arbitration, available at <http://www.dfait-maeci.gc.ca/tnanac/documents/Jurisdiction%20 Award.22Nov02.pdf> | RMoJ (173, 225) |
| Authority RA-61 | *Pan American Energy LLC, and BP Argentina Exploration Co. v. Argentine Republic and BP America Production Co., et. al. v. Argentine Republic (Decision on Preliminary Objections)* (27 July 2006) ICSID Case Nos. ARB/03/13 and ARB/04/8 | RMoJ (173, 190) |
| Authority RA-62 | *Case Concerning Oil Platforms (Islamic Republic of Iran v. United States)* (1996) *ICJ Rep* 803 (excerpt) | RMoJ (174) |
| Authority RA-63 | *Ambatielos Case (Greece v. United Kingdom) (Judgment on the Obligation to Arbitrate)* (19 May 1953) *ICJ Rep* 10 | RMoJ (176) |
| Authority RA-64 | *Compañia de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic (Decision on Annulment)* (3 July 2002) ICSID Case No. ARB/97/3 | RMoJ (189, 190) |

| AUTHORITY | DESCRIPTION | LOCATION (PARAGRAPH(S)) |
|---|---|---|
| Authority RA-65 | *SGS Société Generale de Surveillance S.A. v. Islamic Republic of Pakistan (Decision on Objections to Jurisdiction)* (6 August 2003) ICSID Case No. ARB/01/13, | RMoJ (189, 199) |
| Authority RA-66 | *Joy Mining Machinery Limited v. Arab Republic of Egypt (Decision on Jurisdiction)* (6 August 2004) ICSID Case No. ARB/03/11 | RMoJ (199, 213, 214) |
| Authority RA-67 | *Azurix Corp. v. Argentine Republic (Award)* (14 July 2006) ICSID Case No. ARB/01/12 | RMoJ (208) |
| Authority RA-68 | Stephen M. Schwebel, "On Whether the Breach by a State of a Contract with an Alien is a Breach of International Law" reprinted in "Justice in International Law: Selected Writings of Stephen M. Schwebel" (1994) (excerpt) | RMoJ (211) |
| Authority RA-69 | *Restatement (Third) of Foreign Relations Law of the United States*(1987) | RMoJ (211) |
| Authority RA-70 | *Investment Promotion Act B.E. 2520* (as amended) (excerpt) | RMoJ (223) |
| Authority RA-71 | David D. Caron, Lee M. Caplan, Matti Pellonpää, "The UNCITRAL Arbitration Rules: A Commentary" (2006) (excerpt) | RMoJ (225) |
| Authority RA-72 | *Glamis Gold v. United States of America (Procedural Order No. 2)*(31 May 2005) UNCITRAL/NAFTA Chapter 11 Arbitration | RMoJ (225) |
| Authority RA-73 | *Ghaffari v. Islamic Republic of Iran (Order dated 2 February 1998))* (Case No. 968), Case No. 968, Dissenting Opinion of Judge Khalilian (signed 10 February 1988), reprinted in (1988-I) 18 *Iran-US CTR* 79 | RMoJ (225) |
| Authority RA-74 | *Starrett Housing Corp. v. Islamic Republic of Iran, (Interlocutory Award No. ITL 32-24-1)* (19 December 1983), *reprinted in* (1984-III) 7 *Iran-US CTR* 119 | RMoJ (225) |
| Authority RA-75 | V.S. Mani, "International Adjudication: Procedural Aspects" (1980) | RMoJ (226) |
| Authority RA-76 | *Methanex Corp. v. United States of America, (Partial Award on Jurisdiction)* (7 August 2002) NAFTA Chapter 11 Arbitration | RMoJ (231) |