# Exhibit 1

ADVICE AND OPINION REQUESTED BY WALTER BAU AG

Sompong Sucharitkul

OPINION ON THE PROTECTION OF GERMAN INVESTMENTS IN THAILAND

In the Matter of an Arbitration
Under the UNCITRAL Arbitration Rules
BETWEEN

WALTER BAU AKTIENGESELLSCHAFT in Liquidation (Claimant)

AND

THE KINGDOM OF THAILAND (Respondent)

**CONSIDERED OPINION OF PROFESSOR SOMPONG SUCHARITKUL** on jurisdictional issues relating to the promotion and protection of German investments in the Kingdom of Thailand arising in the afore-mentioned arbitration.

## A. INTRODUCTION

1.    I, Sompong Sucharitkul, have been asked by Walter Bau Aktiengesellschaft in Liquidation, Claimant in this case, to address three jurisdictional issues and related questions in the matter under consideration:

    1.1.    whether, under the facts as commonly noted and/or contended by the Parties, the investment of capital brought into Thailand by the Claimant was owned by, or under the management or effective control of nationals or companies of the Republic of Germany in accordance with the terms of the bilateral Treaty between the Republic of Germany and the Kingdom of Thailand concerning the promotion and reciprocal protection of investments signed by the Parties on 13 December 1961;

    1.2.    whether, under the facts as commonly noted and/or contended by the Parties, the investment in question made in a project classified in the Certificate of Admission by the appropriate authority of the Kingdom of Thailand in accordance with the legislation and administrative practice as an "approved project" under the terms of the 1961 Treaty, is not also an "approved investment made prior to the entry into force of the 2002 Treaty"; and

1

1.3.     whether, under the facts as commonly noted and/or contended by the Parties, the investment in question is entitled to the measures of protection agreed upon in the bilateral Treaty of 1961 and further reaffirmed by the subsequent Treaty between the Federal Republic of Germany and the Kingdom of Thailand concerning the Encouragement and Reciprocal Protection of Investments of 24 June 2002.

2.     I feel obliged to place on record at the outset a disclaimer and a disclosure that may to some extent account for an inevitable imperfection in the formation of my considered opinion.  I will then explain to the best of my knowledge and belief why I am distinctly qualified to address these three questions.  I will thereafter set out the basic object and purpose of the bilateral treaty and the treaty régime in operation between Germany and Thailand, designed primarily and expressly to promote, encourage and ensure reciprocal protection of investments between the two countries.  It is in this context that the provisions of the bilateral treaties should be construed, interpreted, understood and applied by both Parties to attain the avowed aims and objectives, enunciated in no uncertain terms by the Parties in particular regard to the jurisdictional issues under review..

## B.     DISCLAIMER AND DISCLOSURE

3.     In the first place, I do not profess an expertise on all aspects of the intricate niceties in every branch of the domestic and internal law of any national legal system in which I have served and been recognized as an "international legal professional".  My publications in the past few decades relating to the practice of national legal systems have been limited mainly to questions of public rather private international law, including constitutional and administrative law and the practice of selected countries, and confined notably to such topics as the law of nationality, legal personality and the treaty law and practice of a State best known to me, namely Thailand.   More often as a specialist in public international law and sometimes as a Special Rapporteur appointed by the International Law Commission on a particular topic, my methodology in the examination of the practice of States has been in an effort to identify the rules of customary international law from the general practice of States and subsidiarily to induce such rules from the general principles of law, civil law as well as common law, recognized by the principal legal systems of the world. My OPINION in the pages that follow will be made from the combined perspective of a practicing international legal professional and that of a scholar and teacher of international and comparative law.  I might observe nonetheless that, in spite of my avowed limitations, the Federal District Court of New York, in Lehman Brothers v. Finance One, was neither precluded nor deterred from appointing me in 2002 as Special Master of the Court in that case upon consultations with the Parties and with their concurrence, nor from requesting me to submit an OPINION as a neutral expert witness in the form of a report.  In that case, it may be recalled, the two Party-appointed Thai expert witnesses on both sides, one a former Member of the Supreme *Dika* Court and the other a Professor of Law at Thammasat

2

University, gave opposing opinions on the question of set-off under Thai law. After reviewing my initial report, the District Court requested a supplemental report, and accepting the recommendations contained in the two reports I submitted, decided the case accordingly.

4.    In the second place, I feel duty-bound to disclose the fact that I am a loyal subject of the Kingdom of Thailand and cannot conceal my long-termed undivided loyalty to the Kingdom. My considered opinion is incurably and favorably partial to Thailand in the general interest of the beloved fatherland. Next in priority after Thailand are all the Members of ASEAN and all other countries with which Thailand maintains durable friendship and partnership in progress. I would not hesitate to come to the assistance of countries friendly to Thailand, especially in time of need and with an opportunity to further enhance the friendly cooperation and mutually fruitful relations between Thailand and her friends and partners in economic development.

## B. MY BACKGROUND AND QUALIFICATIONS

5.    I graduated from Oxford University with B.A (Honours School of Jurisprudence) (1953), a D.Phil. and M.A. (1955), and a D.C.L. and B.C.L. by accumulation (1990). From the University of Paris (Faculté de Droit) I hold a Docteur en Droit(1954) with a Diplôme d'Études Supérieures de Droit International Public. I graduated from Harvard Law School with an LL.M. (International Legal Studies) in 1956. I was admitted to practice as a Barrister-at-Law of the Middle Temple in the United Kingdom in 1954, and in 1958, I was awarded the Diplôme de l'Académie de Droit International of The Hague Academy of International Law in the Private International Law Section.

6.    Returning from years of legal studies in Europe and the United States, with scholarships from Thammasat University, from Gurusabha (under the auspices of the Ministry of Education) and from Harvard, I began my academic career in 1956 at Chulalongkorn University, Legal Section of the Political Science Department, teaching International Law and Relations at LL.B. and LL.M. levels, and serving as a special lecturer in the graduate division of Thammasat University, teaching a course on the Law of the Sea. In 1957, I was invited by Norman Marsh, law reform commissioner of the UK to assist him in his capacity as Secretary-General of the International Commission of Jurists at The Hague until 1959, when Marsh was succeeded by Jean-Flavien Lalive and subsequently by Sir Leslie Monroe and Sean McBride. The Commission moved its headquarters to Geneva in 1959' and I returned to Bangkok to serve as Secretary

3

to the Prime Minister while waiting to enter the Ministry of Foreign Affairs in the same year.

7. It was during the two years tour of duty at The Hague that I was exposed to the practice of international and comparative law, as law officer and editor of the Journal, theBulletin and the Newsletters of the Commission. I had the experience of representing the Commission at NGO meetings in Geneva and presenting the Commission publication on the Hungarian Situation in 1957 to the President of the UN General Assembly, then Prince Wan of Thailand, at Rome, on his way to the UN from Thailand. It was at The Hague that I attended in 1957 the Research Centre of the Hague Academy of International Law, a research seminar on the Protection of Foreign Investments or the Treatment of Aliens, conducted by Professor A. Freeman of New York. In 1958, I was awarded a diploma by The Hague Academy. It was also at The Hague that had my first experience with the International Court of Justice, attending hearings in the Bulgarian Aerial Incident Case and the case concerning the Right of Passage over Indian Territory, meeting former classmates and friends from the US and UK serving as counsels and advocates respectively for Israel and for India.

8. At the hearings of the International Court of Justice, I witnessed Shabtai Rosenne pleading for the exercise of jurisdiction by the Court on the plain ground that otherwise the declaration of acceptance of compulsory jurisdiction of Thailand, like that of Bulgaria, of the Permanent Court of International Justice would have equally lapsed, since neither Bulgaria nor Thailand was a member of the United Nations at its inception in 1945. In spite of this moving plea, the Court declined jurisdiction. This inspired me to propose that Thailand raised a preliminary objection to the jurisdiction of the ICJ in the Temple of Phra Viharn Case in 1960, soon after I joined the Legal Adviser's Office of the Ministry of Foreign Affairs, and was appointed a member and secretary of the combined defence team of international counsels and advocates in that case.

9. Meanwhile during the research seminar at The Hague Academy of International Law in 1957, I became deeply interested in the problem of balancing or finding a proper balance between the interests of the capital exporting and the capital importing countries, or between the home and the host States. It appeared difficult and delicate to establish, and more so still to maintain, such a balance. Regardless of the inviting incentives and effective measures of preferential treatment that have been offered to attract foreign direct investments, there is still no assurance of actual investments which are generally motivated by countless other factors. It was not a coincidence that in October 1997, some three decades later, I found myself conducting a course of lectures and seminars at the invitation of The Hague Academy at its 26th external session in Hanoi on The Law of International Investments for young professors and diplomats from Cambodia, China, Indonesia, Laos, Malaysia, Singapore, Thailand and Vietnam

4

10.  Back to the sixties, my personal interest in international law and in the development of Thai law grew as I was appointed a member of the National Research Council of Thailand in 1960 and served for ten years until 1970 as secretary of the Law Branch, consisting of no more than a dozen of Thai lawyers, judges and law-makers, such as President and Members of the Supreme Dika Court and Secretary General of the Juridical Council.  As a most junior member of the Council, I was chosen to serve as secretary and conductor of legal research. The Council presented two projects authored by myself, one on the introduction of maritime transport law and the establishment of Thai merchant marine as an autonomous office, and another project on the introduction of Thai Patent Law and the establishment of a Thai Patent Office in the Ministry of Commerce, both projects being in the field of national economic development.

11.  Concurrently with the decade of my duties as a legal researcher in the National Research Council, I was serving initially as Second Secretary in the Legal Division of the Legal Adviser's Office, directly under the Division Chief who was also Acting Legal Adviser, Mr. Chapikorn Sresthaputra, a member and secretary of the National Committee to Review Treaties and Conventions.  Subsequently the Legal Adviser's Office was renamed Treaty and Legal Department and ultimately Department of Treaties and Legal Affairs. My main duties were to assist the Legal Adviser, subsequently Director-General of the Department, in his review of all the draft treaties submitted to the Department and to engage in all of Thailand's major treaty negotiations and treaty-making practice in addition to serving in the Temple of Phra Viharn Case.  My very first involvement in bilateral treaty negotiations came in 1961, the bilateral investment treaty (BIT) with the Federal Republic of Germany.  I found myself engaging in the preparation of all drafts and counter-drafts, in the active participation in the conduct of negotiations, both at the plenary level, serving principally as secretary of the Thai Delegation, preparing opening and closing statements for the Chairman of the Thai Delegation, keeping all the records and drafting the Minutes of the proceedings in English and in Thai, and at the legal sub-committee level, heading the Thai team and serving as the principal Thai negotiator together with Dr. Schulz, the German legal counterpart.  As such, I was responsible at both levels for the preparation of executive summaries for the Minister of Foreign Affairs and the final report to be submitted to the Council of Ministers for approval.  This could only be finalized after several sessions of deliberations within the National Committee to Review Treaties.  Within a short time, I became secretary and also member of that National Committee, and remained attached to the Committee, regardless of my subsequent promotion and new assignments as Director of SEATO Affairs in 1963, and as Directeur de Cabinet of the Minister of Foreign Affairs in 1965 and ultimately as Director General of the Economic Department and ASEAN Secretary-General for Thailand in 1967.  It was very exceptional and unique for any diplomatic officer to serve in Bangkok, at any Home post, for longer than three or four years.  In my case, I remained at different posts in the Home Office (Thailand) for more than ten years and because of my uniquely diverse qualifications I continued to serve on this Treaty Review Committee throughout

that decade until I became Ambassador Extraordinary and Envoy Plenipotentiary, Chief of Mission of Thailand to the Benelux Countries and accredited to the European Economic Communities.

12. In 1960 I was launched into the ring of diplomacy by conference by an appointment as an alternate representative on the Thai Delegation to the fifteenth regular annual session of the General Assembly of the United Nations and was assigned as representative on the Sixth (Legal) Committee. Sir Francis Vallat of the UK nominated me to serve as Chairman of the Free World Group which participated in the drafting of resolution 1514 and a successful attempt to replace a proposed study group on Peaceful Coexistence by one on the Principles of Friendly Relations and Cooperation of States under the Charter of the United Nations, culminating ten years later in the declaration of principles of international law adopted in resolution 2625 in 1970. Several events occurred in the United Nations General Assembly which will be specifically addressed in relation to the jurisdictional issues under consideration

13. On the average of every other annual session of the UN General Assembly, I became a regular representative on the Thai Delegation, especially on the legal side, and particularly as an elected Member of the International Law Commission since 1977 until 1986 when my eighth report on Jurisdictional Immunities was finally approved by the ILC at first complete reading. This set of draft articles were to be adopted by the General Assembly as the UN Convention in December 2004. My diplomatic career as head of mission started with the Benelux and the EEC in 1970, then Japan from 1973 to 1977, and France, Portugal and UNESCO in 1977 and 1978. From 1978 to 1980 I returned to Bangkok as Director General of the Department of Treaties and Legal Affairs, formerly known as principal legal adviser. I resumed my last diplomatic post as chief of mission in Rome, Athens and Israel with accreditation to FAO from 1980 to 1985.

14. From 1985, I have resumed my teaching career, first as Fulbright Professor of International Law and Relations at UNCC in North Carolina, USA, then at NUS in Singapore. Thereafter I was given the Robert Short Chair in International Human rights Law at Notre Dame Law School and later moved to Lewis and Clark at Portland, Oregon, and in 1989 was awarded the Cleveringa Endowed Chair at Leiden University in the Netherlands. In 1990, I returned to the United States to take up a distinguished chair of international and comparative law at Golden Gate University School of Law from 1990 until today.

15. During the past two decades I have been active as counsel and arbitrator in State/Investor arbitration. I have represented the Department of Natural Resources of Thailand in an arbitration involving an American concessionaire in the Gulf of Thailand and appeared at the hearing in Zurich in 1986. Since 1987, I have chaired several ICSID Annulment Committees, and served as President or Sole Arbitrator in ICSID arbitral tribunals and presided over the first and so far only ASEAN Arbitral Tribunal for Investment Disputes in 2002-2003.

16.  In 1996, I was appointed a member of the United Nations Compensation Commission, Panel E 3 to examine claims submitted by Governments arising from the invasion and occupation of Kuwait by Iraq in construction and engineering contracts.  Panel E 3 completed its work in 2003, with some feedback from the Governing Council.  Claims already assessed are being paid out of the United Nations Compensation Fund allocated by the Security Council from the proceeds of the sale of Iraqi crude oil authorized half yearly by the UN.

## D.    FACTS COMMONLY NOTED

17.  From **Thailand's perspective**, certain facts leading to and accompanying the conclusion and implementation of the bilateral investment treaty between Thailand and the Republic of Germany are notable as an aid to a deeper understanding of the object and purpose of the treaty in the context of economic cooperation in the promotion and reciprocal protection of investments of the respective nationals and companies of the Parties in each other's territories.

18.  **Relations between Thailand and Germany in the Twentieth Century:**

The First World War witnessed Thailand's participation in the War on the side of the Allies.  Thailand emerged victorious, having sent two expeditionary forces to Europe to relieve France with logistical supplies and transport vehicles.  Thailand was signatory to the Treaty of Versailles at the end of the War with the result that Germany had to renounce extraterritorial rights for German nationals in Thailand.  As such, Germany was the third country after the United States and Japan to abandon exterritorial rights over their respective nationals in Thailand.  Other European nations did not give up their anomalous positions until after prolonged negotiations and fulfillment of certain legislative conditions by Thailand.

19.  After Japan's invasion of Thailand on 8 December 1941, Thailand became an ally of Japan and consequently of Germany.  Japan mediated the dispute between Thailand and France before the Japanese invasion.  The Second World War ended with uncertainties for Thailand, thanks to the Thai resistance movements in the United States and the United Kingdom as well as the underground movements in the Kingdom.  The United States mediated the dispute between Thailand and France resulting in the Washington Accord of 1947, establishing a Conciliation Commission to conciliate the border dispute between Thailand and France, which ended in the status quo ante World War II.  Thailand in the meantime was able to secure her admission to the United Nations in 1946. This was attributable, in no small measure, to the efforts on the part of the United States and the preliminary steps taken by the Free Thai Movement which liberated Thailand when the Allied High Command entered to accept the surrender of the Japanese forces in the Kingdom.

20. Japan and Germany were both declared to be enemies of the United Nations. Germany was divided and Japan remained outside the UN until after the Bandung Joint-Communiqué of 1955. By that time, Japan had concluded the Treaty of Peace with the United States and Germany had recovered from the ravages of the War. By 1960, Japan had not yet settled the dispute with Thailand regarding the repayment of Japanese war-time loan, which subsequently was settled by the conclusion of the Special Yen Agreement, following the official visit of Prime Minister Ikeda to Thailand. On the other hand, the Federal Republic of Germany joined forces with the North Atlantic Collective Defense Treaty Organization with the United States, France and the United Kingdom, Thailand hosted the Headquarters of the South-East Asia Treaty Organization, NATO's counterpart, in South-East Asia, also sharing the same partnership in collective defense with the United States, France and the United Kingdom. The stage was thus set for a new era of closer relations and cooperation between Thailand and Germany.

21. By 1960, Thailand had a thriving economy with long-term economic planning and necessary mechanisms put in place to carry out the task of national economic development, including *inter alia* legislation to encourage foreign investments and the establishment of a Board of Investment to grant privileges and incentives to certain identified categories of industrial projects to advance her national economic development plan. Disenchanted with the earlier series of FCN Treaties which carried inherent vestiges of extraterritorial rights and frontier rectification provisions in the FCN Treaties with Western Colonial Powers, Thailand was planning to overhaul these outmoded treaties, including the investment guarantee exchange of letters with the United States. It was indeed opportune that in 1961 Germany made a timely overture by sending a team with two sub-committees, one to negotiate a bilateral treaty of promotion and reciprocal protection of investments and the other to propose projects of technical assistance and economic cooperation with Thailand. This was a welcomed gesture and concrete agreements were reached on the bilateral investment protection treaty as well as the acceptance of several of the technical cooperation projects offered by the German counterpart.

## I.    INVESTMENTS WITHIN THE TERMS OF THE 1961 TREATY

## E.    THE OBJECT AND PURPOSE OF THE TREATY

22. **The Title**
As expressly specified in the Treaty itself which is fully entitled: "**Treaty between the Kingdom of Thailand and the Federal Republic of Germany concerning the Promotion and Reciprocal Protection of Investments**", there can be no uncertainty about the object and purpose of the Treaty, namely to promote and to protect the investments of nationals and companies of each contracting State in the territory of the other.

8

23.    **Preamble**

The three paragraphs in the Preamble describe the desire, intention and recognition of the Kingdom of Thailand and the Federal Republic of Germany in the following terms:

"DESIRING to intensify economic cooperation between both States,

"INTENDING to create favorable conditions for investments by nationals or companies of each State in the territory of the other State, and

"RECOGNIZING that a contractual protection of such investments is apt to stimulate private initiative and to increase the prosperity of both States,"

HAVE AGREED AS FOLLOWS:......

It is in this context that the provisions of the bilateral treaty of 1961 should be read, interpreted and understood accordingly. .

## F.    STATUS OF THE INVESTMENTS AT ISSUE

24.    Several questions have been raised by the Respondents regarding the status of the investments held by the Claimant, which in my view is beyond suspicion. It is to be noted that "investment" for the purpose of the Treaty of 1961 may take many different forms and contain several components or elements. In the practice of international biddings, for instance, it is customary to incur expenses in the exploratory pre-investment or pre-admission stage of foreign direct investment. Only the successful bidder will be awarded the contract and his post-contractual transfer of capital will henceforth be regarded as actual foreign investment after being duly admitted, all expenses incurred in the pre-admission or preliminary bidding stage are considered to be merely "pre-investment" expenses. However, for accounting purposes, all pre-investment expenses for a successful bid which led to the conclusion of a construction contract or engineering contract or any concession contract, are invariably included as part and parcel of foreign direct investment. In general and in most other cases, the definition of "investment" is comprehensively contained in the 1961 Treaty.   Article 8 (1) defines "investment" as "comprising **every kind of asset**, and **more particularly, though not exclusively,**

  **a)**  movable and immovable property as well as any other rights in rem, such as mortgages, liens, pledges, usufructs and similar rights,

  **b)**  **shares** or other kinds of interest in companies,

  **c)**  rights of action for money or for any performance having an economic value,

  **d)**  copyrights, patents, trade-marks, trade-names and good wills

  **e)**  **business concession** under public law."

This definition more than fully covers the entire investments made by the Claimant in Thailand from the very outset, beginning with a 49/51 joint venture with a local partner to form a special entity duly designated and pre-ordained by the Department of Highways and the Ministry of Communications to carry out the DMT project, a project conceived, planned and sponsored by the national Government of the Kingdom of Thailand. As will be seen in paragraph 57 below, the Ministry of Foreign Affairs reaffirmed in a Note to the German Embassy dated 28 October 2003, that among other things, foreign investments made in connection with a Government concession contract under public law requires no additional approval and as such this category of investment does not need to apply for a second approval. In any event, the Treaty makes no mention of "direct" or "indirect" investment, nor of any required percentage of share-holding in the case of investment in the form of "**shares**" listed in subparagraph b)

25.     Furthermore, Article 1 (1) provides that the Contracting States, i.e. Thailand and Germany will each "endeavor to admit in its territory, in accordance with its legislation, the investment of capital by nationals and companies of the other Contracting Party." In this case, the admission into Thai territory of investment of capital by nationals or companies of Germany, namely the Claimant, Walter Bau AG, the entity with which subsequently was merged the total business of Dyckerhoff & Widmann, in a merger and acquisition in accordance with the prevailing law of incorporation covering merger and acquisition in Germany, both being German companies in accordance with **Article 8 (3) within the meaning of the Basic Law of the Federal Republic of Germany.** Acquisition of shares by merger was clearly permitted and in effect contemplated by the provisions of **Article 8.** It was as such indubitably a German investment of capital in the form of shares in a joint venture company composed *ab initio* of Dyckerhoff & Widmann as a foreign investor and Delta Engineering, a local Thai company together to hold 49/51 shares in a newly created Thai special purpose company, named Don Muang Tollway Company (DMT) to take over the Don Muang Tollway project. DMT was granted a concession agreement by the Department of Highway, signed by the Department Director and the Minister of Communications in August 1989.

26.     The Respondent has alleged in this connection that the additional requirement as to the proportion or percentage of shares owned by the Claimant in the DMT has not been met to be qualified as coming within the meaning of "investment" as defined in the 1961 Treaty. This Treaty of 1961, as amended and reinforced by the successive Treaty of 2002, is admitted by both Claimant and Respondent to contain all the applicable and prevailing rules governing the case under examination. The Respondent has further asserted that to qualify as a "foreign direct investment" (FDI) under the 1961 Treaty, the Claimant's shares must exceed the threshold of 10 per cent, and that anything short of 10 per cent does not count as "direct" investment but constitutes "indirect" investment, and impliedly not covered by the 1961 Treaty protection. In my considered opinion, in the case under review, it is generally uncontested that in any event in earlier

years from 1989 the investments by the Claimant in Thailand in the form of share-holding owned by German nationals or companies were most of the time in substantial proportion, beginning with 49 per cent of the total shares. As I have been informed, the original shareholding in DMT was 49 per cent Dyckerhoff & Widmann AG and 51 per cent Delta Engineering Construction Company Limited. Investors were sought and a shareholder Agreement signed just before the Concession Agreement was entered into, following which Dyckerhoff's shareholding was reduced to 27 per cent and Delta to 25 per cent. Under the Concession Agreement, DMT undertook that Dyckerhoff's and Delta's shareholding would together be at least 30 per cent. By financial closing in 1990 Dyckerdoff's holding was 21 per cent. By 1994, Dyckerdoff transferred 3 per cent of its shareholding to another "Promoter", reducing its share to 18 per cent. It is reduced proportionally to its current level of 9.87 per cent after the Government's participation upon MoA2 and the Share Purchase Agreement in 1996-97.

27.    Furthermore, the Respondent's allegation and assertion are clearly unfounded, as regards the allegation of additional requirement as much as the assertion that 10 per cent minimum share-holding is required to constitute "direct investment". Both the allegation and the assertion on behalf of the Respondent in this connection must be rejected for the following reasons:

1) The term "investment" as used and defined in the 1961 Treaty does not exclude indirect investment. It makes no mention of any distinction whatsoever between direct and not so direct or indirect investment.

2) In fact, the difference between direct and indirect investment may be and has been used in an entirely different context and connection. The adjective "direct" may refer to the initial import of capital from outside the territory. Re-investment of the earnings or returns from the initial investment or "plough back" of the profits so derived may still be regarded in general as "direct" investment. The characterization of investment as "foreign" is used to denote actual transfer of capital from abroad to make the investment as distinguished from local, domestic or colonial investment. Colonial investments may eventually become foreign investments upon attainment of independence by the non self-governing or former colonial territories. Investments made from local sources within the host country are not necessarily regarded as foreign direct investments, nor indeed are investments made by proxy or through an undisclosed agent. In any scenario, an investment remains an investment, entitled to protection under the Treaty and under international law, regardless of the amount or percentage of shares in a company.

3) From the record of the Minutes (Revised) of the Meetings of the Thai CA Committee, in Document QQ, 1st meeting dated 28 August, 2002, pages 8, 9 and 10, a lively discussion took place between the Chair and Members of the

Committee. In particular, references were made by representatives of the BOI, of the Bank of Thailand and of the Ministry of Finance to the IMF practice of accepting a benchmark of ten per cent share-holding as a cleavage between "direct investment" and "**portfolio investment**" which is tested by a different set of criteria pertaining to the differences between a short-term investment and a minimum one year term of port folio investment, taking into account the commercial risks associated with investment in the stock market. The risks involved in the speculative character of a volatile stock market are not insurable by way of Treaty protection. Considerations applicable to short-term investments in financial portfolio and investment speculation in stock exchange and international stock market belong to the financial world, way out of the present context. In any case, Dr. Kraichitti, the Chair, was prepared to recognize as direct investment even investment in the money market port folio as long as it passes the ten per cent benchmark. It was the consensus of the Meeting nonetheless that in any event the investments made in Thai Government projects must automatically be taken for granted as already approved, especially in cases where there had been Government solicitation for foreign direct investments in such a Government sponsored project, the Chair citing the case of German investment in the BCEL Expressway as an example. The current dispute relates precisely to such a Thai Government project. The same considerations are applicable with particular regard to the measures of protection required of every host State by international law, especially as reconfirmed in the present case by additional specific Treaty obligation freely undertaken by States, and to which foreign nationals and companies are entitled and may expect to be granted. It should also be recalled that the threshold of 10 per cent or majority shareholders as adopted by the OECD or the Balance of Payments Manual: Fifth Edition (BPM5) is only relevant as one of the factors among many different criteria used to ascertain the existence of active management or effective control of a company or of its assets in determining priorities to be accorded to the competing claims of a right of action based upon nationality. By way of illustration, in the *Barcelona Traction Case*, Belgium, as country of the nationality of more than 80 per cent of its shareholders appeared to be no match against Canada, country of the place of incorporation as well as the place of effective management of the company. As such, considerations other than the percentage of share-holding appear to be more decisive, such as the place or the law of the place of incorporation or the place of effective management or headquarters or principal office of the Directors or the combination of two or more thereof may be more determinative of nationality of claims. Applying the test of effective management or direction and control of the DMT by Dywidag or Dyckerhoff & Widermann (Germany) and Delta Engineering (Thailand), which can also be seen as representing a truly substantial percentage of shareholding throughout the early part of the life span of the DMT but only to be reduced by subsequent transformation of the DMT itself. More importantly, the Claimant also operated as leader of the Promoter Group, with two representatives on the Board of Directors, the

12

General Manager and the Construction Manager at the initial contraction phase. As such, the investments made by the Claimant are clearly and unmistakably investments within the meaning of the 1961 bilateral Treaty.

4)   As indicated in paragraph 26 above, the Claimant originally owned as much as 49 per cent of the shares in the DMT from the inception of the project. The 9.87 per cent share-holding, cited by the Respondent, was only the position since the Government's participation in the subsequent Northern Extension. In point of fact and of law, the integrity of the status of the capital imported into Thailand from Germany which was **ab intitio** distinctly recognized as protected investment remains unimpaired by any subsequent structural transformation of the DMT. This is explicitly and unequivocally stated in the last unnumbered sub-paragraph of **Article 8 (1) of the 1961 Treaty, which reads:**

> **"Any alteration of the form in which the assets are invested shall not affect their classification as investment".**

Once vested or acquired, as in the case of the Claimant's lawful investment in Thailand, by virtue of the 1961 Treaty, such an acquired or vested right cannot be suspended or confiscated or otherwise unlawfully "taken" without payment of appropriate compensation under customary international law as confirmed time and time again by Treaty provisions. This, in my considered OPINION, is the true meaning of the term "investment" as intended and understood by the Parties to the Treaty to ensure the mutual protection of their respective investment as an additional Treaty obligation undertaken and firmly guaranteed by the Parties to the 1961 Treaty to give full faith and credit to the object and purpose of the Treaty.

## II.   ADMISSION OF INVESTMENTS IN "APPROVED PROJECTS"

## G.   ADMISSION OF INVESTMENTS AND APPROVAL OF PROJECTS

28.   The next series of questions to be considered relate to

(1) the proof of **admission** of direct foreign investment in the case under review and

(2) the necessity of **approval** of such investment for the specific purpose of a particular treaty under reference, namely the bilateral investment protection treaty of 1961 between Thailand and Germany.

29..   It should be recalled that the primary concern expressed by the Thai side during the negotiations of the 1961 Treaty was essentially about the need for recognition and acceptance or acknowledgement of the legitimacy of the German investment under contemplation. In the first place, it is required that the import of German capital investment into Thailand must be legitimate, lawful, admissible and accepted by the host country, Thailand, in order to satisfy the initial requirement of **admission** of the investment in question for the purpose of protection under the existing treaty régime of Thailand for investments of German nationals or

13

companies.  The first question asked is whether the intended investment of capital by a German national or company has been duly admitted or rejected with or without any explanation or justification under Thai law or regulation by the appropriate authority such as the Bank of Thailand with the power and discretion to refuse admission of foreign direct investment of capital of suspicious or dubious origin.  In the case under review, the admission of German capital investment has invariably been transparent and legitimate, consistent with the laws and regulations of Thailand, the recipient State.

30.     Thailand, as the host country, has been constantly aware of the need to assert its sovereign authority to admit or reject friendly foreign direct investments in the various industrial projects that from time to time Thailand may feel the need to promote or encourage in gradual and progressive fulfillment of its national economic development plan.  It is Thailand's prerogative as host State to pick and choose the industrial projects of preference to attain national goals.  That is why it was necessary to specify in paragraph (1) to Article 1, especially sub-paragraph (b) of the Protocol to the 1961 Treaty that "investment" for the purpose of the Treaty, from Thailand's perspective, refers to "investments made in projects classified in the **certificate of admission** by the **appropriate authority** of the Kingdom of Thailand in accordance with the prevailing legislation and administrative practice as an "**approved project**".

31.     It will be seen in paragraph 41 below, whether or not and to what extent there is in actual practice a difference to be discerned between **admission of investment** of foreign capitals and **approval of the project** in which foreign direct investment is made in each individual case.  Clearly *ratione temporis*, the needs or requirements of the developing host country such as Thailand have to change and continue to grow and to evolve with the progress of time, as conditioned by the increasing potentials and capacity of the host State to sustain its national economic development.  The prevailing rules and determining criteria are not only temporal, i.e., changing with the march of time, but are also inter-temporal varying with the prevailing circumstances, conditions and other relevant factors at a particular period of time..

32.     By way of illustration, in the decade that followed the 1961 bilateral investment treaty between Thailand and Germany, Thailand's principal concern was confined to the attraction of foreign direct investments in certain categories of industrial projects which tended to be export oriented in order to earn hard currencies to finance other national economic development projects according to the periodic five or six years plan.  No wonder the language of the Protocol to the 1961 Treaty specifically refers to the certificate of admission, later to be more popularly known as the CA in which the project in question is **classified by the "appropriate authority"** of the Kingdom of Thailand in accordance with its **legislation** and **administrative practice** as an "**approved project**".

14

33. Thus it was the project, indeed the industrial project that must be approved as foreign direct investment in question to be qualified for protection under the 1961 Treaty régime. A Certificate of Admission was merely evidentiary of such approval, not constitutive of any substantive approval. In these circumstances, in my opinion it is crystal clear that "approval of the project" as classified in the Certificate of Admission is a testimony of the admission of the investment made in the project already approved as such. Accordingly, it can be taken for granted that such admission with a proper certificate inevitably implies a previous approval of the foreign direct investment. The approval of the investment is presupposed or subsumed by its classification as an **approved project** verified in the CA. in accordance with the prevailing legislation and administrative practice of the time, and invariably falling within the designation of a specified category of the industries receiving preferential and promotional treatment from time to time and for a limited duration, hence the temporal or inter-temporal character of the preferred treatment.

34. The promotion of a variety of categories of **industrial projects** under the series of Industrial Investment Promotion Acts lies within the province and functions of the Board of Investment intimately connected with the Ministry of Industry. In Thailand, the promotion of industrial projects is a question of policy which has undergone progressive modifications to reflect the pressing needs of the national economic development of the country at any material time. It should be recalled that in the early years of the decade beginning in 1960, Germany was the first country that proposed to conclude a bilateral investment protection treaty with Thailand and proceeded successfully to negotiate and conclude the first such bilateral Treaty in 1961, which entered into force upon ratification in 1964. The historic significance of the Thai-German bilateral Treaty negotiations could never be exaggerated. Readers of the internal memoranda within the Thai Ministry of Foreign Affairs, which have been offered as part of the *Travaux Préparatoires* of the 1961 negotiations, Document SS, will be reminded that in the preliminary preparation for the negotiations, both the Thai and the German Sides had several occasions to request postponement of the negotiations scheduled dates. On 24 June 1960, when the German Ambassador made a call on H.E. Dr. Bun Charoenchai, Minister of Industry acting for the Minister of Foreign Affairs in the latter's absence at the United Nations during the early part of the sixteenth regular annual session of the General Assembly in 1961, the Acting Foreign Minister who was also Minister of Industry, a lawyer by training and former Thai Ambassador to India, took occasion to remind the German Ambassador of the special importance that Thailand attached to this first round of negotiations in a series of bilateral investment treaties ever concluded by Thailand. It was the very first in this category and meticulous care had to be taken because of the Most-Favored-Nations Clause likely to be incorporated in subsequent bilateral treaties with other third countries. This remark was indeed prophetic. It was in the ensuing decade that Thailand started to negotiate a new series of Bilateral Treaties of Amity and Economic Relations after terminating earlier series of FCN Treaties with foreign powers. The first of a kind was concluded with the United States of America in

15

1966, which contained provisions envisaging establishment of business activities in the Kingdom.  By virtue of the most-favored-nation clause, other bilateral treaties also entailed similar recognition of the need for foreign direct investments in new fields other than projects in different industrial sectors promoted by legislation from time to time. This new trend related to the establishment and management of private business enterprises through DFI or joint venture investment of capitals and technology.  Thus a new practice has emerged in terms of an additional appropriate authority of the Royal Thai Government to lend approval to foreign investments in the formation and management of business enterprises permitted by law, or not prohibited nor restricted by legislation, nor otherwise reserved for Thai nationals, either exclusively or proportionately, either in whole or in part, with or without restrictive conditions or covenants. These businesses included retail trade, coastal trade, air services and maritime or inland or fluvial transport and navigation.   It was apparent from the *Travaux Préparatoires* of the 2002, in a Memorandum of 15 August 2002, Document QQ, recalling the origin and background as well as the reasons for the establishment of the CA National Committee dating back to 1991, reviewing the reasons for and against such a CA, including the relative necessity, or comparative utility of the need, for such "approval".  This reluctance or hesitation on the part of competent agencies of the Thai Government, as reflected in the Non Paper Document QQ, a one-page executive summary, dated 27 may 2004, to a large extent accounted for the outcome of the guideline adopted by the Committee and communicated to the German Embassy in October 2003.  The guideline plainly reflecting the existing practice was published in the form of an Announcement of the Committee to the effect that three categories of investments would not require any approval from the Committee, either because the investment was made in a business already licensed and/or registered, or in a project already admitted as an "approved project" or in a concession agreement or State contract, initiated and sponsored by the Thai Government itself or one of its Ministries or Departments which  in practice has been pre-approved by the Government at national level.  The three exceptions listed in the guideline merely reflected the immediate past administrative practice of the Kingdom of Thailand.

35. It is to be observed that under the recent Foreign Business Act B.E.2542 (A.D.1999), it is for the Ministry of Commerce to issue license or grant approval of a business enterprise to be set up and registered accordingly. On the other hand, the various categories of industrial projects continue to require approval by the Board of Investment. The Ministry of Commerce and the Board of Investment or the Ministry of Industry each in turn have had their share in serving as the appropriate authority of the Royal Thai Government in accordance with national legislation and administrative practice at the time for the purpose of approving foreign investment in industrial or business projects.  In addition, Government projects require no subsequent secondary approval by the appropriate subordinate authority.  These include all projects of national development in the creation of essential infra structures, planned and initiated or sponsored and administered by the Royal Thai Government as such.  Government projects may be operated

16

directly by the competent agencies such as the Port Authority of Thailand or the Airport Authority or the Highway Department. They may also be implemented by way of concession agreements conferring upon or assigning to a foreign national or a joint venture company, the task of management and operation of the public utilities, such as gas, water supply, electricity or a public transport system, such as a bridge or a toll way, as in the case under review.

36.   It goes without saying that, in my considered opinion, all **Thai Government Projects** for public purposes and public works, having of necessity been more than approved or even pre-approved and conceived or initiated by the Thai Government itself in accordance with its national legislation and constitutional requirements, do not require any additional or supplementary approval or endorsement by its subordinate agency or subdivision of State of any kind. It is amply apparent in the circumstances that a Certificate of Approval for protection (CAP) is totally redundant, having no place whatsoever in the implementation of all projects espoused by the Royal Thai Government. The Treaty régime under consideration operates for the benefit of foreign private industrial projects or in later years also foreign private business enterprises, which would still need the approval of the appropriate authority, namely the Board of Investment or the Ministry of Commerce, as the case may be. However, in the case of a **Government Project** such as the Don Muang Tollway or DMT Project, *ratione cessante*, there is no more *raison d'être* for the Claimant to seek any additional approval from any more authentic authority than the Royal Thai Government *eo nomine* Nor indeed is it tenable for the Respondent to expect, much less to insist, that the Claimant should seek additional approval of the project, proposed, promoted and advanced by the Royal Thai Government itself.. This project was indeed advertised to solicit foreign direct investment to participate in the implementation of Thailand's national development plan. It is preferable in the case of the Don Muang Tollway project under consideration to apply the test that is generally acceptable in international law. The project is clearly attributable to the Kingdom of Thailand and to no other entity outside the Kingdom. The decisive test is one of attributability, independent of any niceties in the domestic legislation or in the variable local or administrative practices of any given bureaucracy. This Government project is without restrictions or qualifications open to participation by foreign investors with sufficient confidence in the rationality, reliability and dependability of the Government and people of Thailand. No further insistence should be made on the alleged requirement of extraneous additional approval of investments made by the Claimant, German investors, in response to an open invitation by the Thai Government, and with an implicit faith in Thailand's respect for the Rule of International Law above all unilateral domestic differences.

37.   On the other hand, it should be observed at this point that **projects of economic and technical cooperation proposed by a foreign Government**, such as the German Government in 1961, would certainly require consideration and eventual concurrence or **acceptance** by the Government of Thailand as the host State

ultimately to administer and operate the projects. As may be recalled in this connection that, as it happened in actual reality, it was the same Department of Treaties and Legal Affairs of the Ministry of Foreign Affairs led by the Director General M.C. Plerng Nopadol Rabibhadhana that negotiated the BIT in 1961 with a delegation from the Federal Government in Bonn under the leadership of Dr. Kurt Daniel and concurrently in the same year, negotiated and signed on the same day, 13th December 1961, another joint Thai-German Protocol on:

    i.   Technical Assistance;
    ii.  Assistance in the Financial Field; and
    iii. Trade Questions.

38. It should be further recalled that Prince Plerng on that very same day signed and exchanged Notes with Dr. Kurt Daniel on the arrangements regarding the implementation of the agreed Technical Assistance projects. The main BIT and its Protocol, negotiated separately by the Joint Thai-German Legal Sub-Committee, were both signed by Foreign Minister Dr. Thanat Khoman and Ambassador Dr. Hans Bidder. Dr. Kurt Daniel was Chairman of the German Delegation to negotiate on the projects of Technical Assistance and Cooperation with Thailand offered by the German Government and Trade Questions between Thailand and Germany, and signed all three documents and a number of other Notes exchanged with the Thai Government, as Chairman of the German Delegation as a whole. The German Delegation also comprised several separate but not unconnected subcommittees, including the legal subcommittee to negotiate the BIT and its Protocol. Reference to this simultaneous signing of two different sets of documents is intended as a reminder that while the 1961 BIT was concerned with the need for the Certificate of Admission to specify the category of investment made in an "approved project", the second set of Bilateral Agreements related to the **acceptance by Thailand of German offer of technical and financial assistance projects**. Extra care should be taken lest private German investments in "approved projects" in Thailand be confused with the technical and financial assistance projects offered by the German Government and after negotiations **accepted by Thailand** as an "agreed or accepted Government assistance project". Again this requirement of Government approval or agreement for foreign Government assistance projects is to be contrasted with national development projects conceived, planned and proposed by the Thai Government itself, which require no further agreement or approval by any agency when open to participation to the public and more particularly in the case under review when foreign direct investment has been or is being solicited.

39. For the Technical Assistance and Cooperation projects proposed by Germany in 1961, it may be recalled, Thailand actually **accepted five projects** at that time, four out of ten technical assistance projects and one out of two financial or loan projects and retained **eight more** for future consideration, but did not accept the remaining projects of Technical Assistance. It should be remembered that Thailand used the same negotiating team throughout, led by the Ministry of

Foreign Affairs under the chairmanship of Prince Plerng of the Department of Treaties and Legal Affairs which incidentally also served the National Committee to Review Treaties and Conventions, with myself as member and secretary. This was an isolated instance of the Ministry of Foreign Affairs engaging in direct negotiations on the acceptance of various types of projects offered as assistance by the Federal Republic of Germany. The question of acceptability of the projects under parallel and concurrent negotiations in each case must be kept apart to avoid confusion of thought on the relative need for approval. The text of the documents under reference can be found in Volume VII: 1958-1961, pages 315-342 of the Treaty Series, compiled and published by the Treaties and Legal Affairs Department, Ministry of Foreign Affairs, Bangkok, June 1984

## H.   EVOLVING APPROVAL RÉGIME

### 40. Approval of projects for Foreign Investments

It should be noted at this point that the "approval régime" for purposes of foreign direct investments in Thailand has undergone some transformation in many respects including the process of approval and the appropriate authority for the registration or record-keeping of foreign direct investments. To begin with, **Article 1 (1) of the 1961 Treaty** refers to "the **investment of capital** by nationals and companies of the other Contracting Party" in regard to an endeavor to **admit in its territory,** to promote and to give sympathetic consideration for the **granting of the relevant permit required. Article 1 (2)** refers to the granting of **national treatment to investments owned by, under the management or effective control of,** nationals or companies of each Contracting Party in the territory of the other Contracting Party.

41.    On the other hand, the **Protocol of 1961, paragraph (1) b) to Article 1** refers exclusively to German "investments made in projects classified in the certificate of admission by the appropriate authority of the Kingdom of Thailand in accordance with its legislation and administrative practice as an **approved project".**    Thus, the term **admission** or **granting of a permit** refers to the transfer or movement of capital to be invested in Thailand, hence the phrase **admission of investments,** while the term **approval** is used with reference to **projects** for foreign investments in the private sector, and **acceptance** more accurately in the case of **foreign Government projects,** such as a technical assistance or economic cooperation project in the public sector.    In no circumstances should any of the above projects in the private sector available or even promoted for private foreign direct investments be confused with Thailand's Government projects forming part of national economic development plan for which no such permit or admission or license can be additionally required, let alone endorsement or **approval by any authority or agency of the Thai Government.** By way of illustration, no approval is needed for the purchase of Thai Government bonds, should a German national or company wish to purchase

as a long-term secure investment. Any contention that a treaty provision purports to exclude from protection all foreign investments in the purchase of bonds floated by the Government of Thailand would be exposed to a *reductio ad absurdum*. It will be seen whether the language of **Article 1, paragraph 1: Definitions** in effect introduces any alteration in the meaning of the term "investments:" for the purpose of the successive Treaty of 2002.

42.     **Issuance of Certificates of Admission (CA)**

I had occasion to view the copies of the eight Certificates of Admission issued by the Ministry of Foreign Affairs to German Applicants over the period of three decades spanning between 1972 and 2003. It would appear that none had been issued before 1972 although the Treaty entered into force since June 1964. There seem to have been but very few instances of such certificates and too far apart in between. They were in 1972, 1981, 1982, 1984, 1988, 1991 and the last two in 2003. Many observations have dawned on me at first reading:

(1)     It came as no surprise that there was no such CA before 1971, as recalled in the *Travaux Préparatoires*, Document QQ, last memo from the NESD Board, explaining the need for CA in a report to the Cabinet dated 11 October, 1972. Besides, I should have recalled the occasion if there was any CA issued before 1971, since I personally directed the Economic Department from 1967 to 1970, not that there were no German investments in Thailand prior to 1972. German investments were on the rise as evidenced by statistics supplied by the Bank of Thailand and collected by UNCTAD in its World Investment Directory published in 2000, Volume VII-Part 2: Asia and the Pacific, containing statistics of FDI in Thailand for 1987-1997, at page 587, showing a significant amount of investments made by German nationals and companies in Thailand, ranking fifth after Japan, USA, UK and the Netherlands..

(2)     It is curious that the first four certificates were issued in running numbers although No. 1 and No. 4 were actually four years apart, one from the next, No.4 was first issued in 1984 and the same number was repeated in 1988. By 1991 the issuing authority ran out of numbers and the Certificate of Admission for the first time was unnumbered in 1991, Nos. 7 and 8 were issued in 2003, a gap of twelve years after 1991.

(3)     It is to be noted that the first two Certificates cited earlier approval in the form of license granted by the Ministry of Industry and the third by the Ministry of Finance. The fourth, fifth and sixth related to the financing of local industrial business in the form of loan or acquisition of shares in the local companies without requiring or inquiring about the relative proportion of share-holding. No mention was made in the last five certificates of any earlier approval by the appropriate authority in the form of license or other types of approval, except for registration as a limited company under Thai law. Approval may have been taken for granted.

Otherwise the Economic Department would have been functioning in the place of the appropriate authority of other Ministries, Industry or Finance. (4)   This uneasiness may have accounted for the need to establish a central body to issue and convey to the foreign direct investors the confirmation of the applicability and availability of treaty protection based on previous approval by another authority competent in the field, whether industry, or commerce or finance or otherwise.  The Ministry of Foreign Affairs would serve as the coordinator to maintain uniformity in Government practice by reconfirming for the specific purpose of a particular treaty or group of treaties, including regional agreements such as the 1987 ASEAN Agreement.  In other words, the Ministry of Foreign Affairs was prompted by a desire to streamline practical procedures for identifying foreign investments entitled to protection under the Treaties, without itself acting as an approving authority.  It appears from the record in a Non-Paper dated 27 May 2004   that only approximately 20 Certificates of Admission were issued between 1972 and 2004, and only to companies from Germany, the Netherlands and Taiwan, in spite of the fact that by 2004 Thailand already concluded BIT with 35 countries and 39 in all to date.   This also includes the ASEAN Agreement of 1987.  The paucity of the CA is some indication of the relative use or non-use of the Certificates in question.  The retail trade in department stores and super markets or wholesale markets, such as the Dutch investments in Macro, the French in Carrafour and the British in Tesco Lotus in all parts of the Realm, entailed for each site some seal of approval by registration or license issued by the appropriate agency of the Ministry of Commerce.

43. It may be recalled, in this particular connection, that the Ministry of Foreign Affairs through the Department of Treaties and Legal Affairs negotiated with the German Delegation the draft 1961 Investment Protection Treaty and the Protocol to that Treaty as well as other Agreements on Technical Assistance, Assistance in the Financial Field and Trade Questions.  At The treaty-making stage and in the treaty negotiations, it has been the practice of the Thai Government to let the Ministry of Foreign Affairs play the leading role until the international agreement is concluded and subsequently enters into force upon signature or ratification as necessary.  But once a treaty is in force, the actual implementation is assigned, delegated or relegated to the competent agency or appropriate authority for implementation and execution in accordance with the terms of the Treaty.  In actual practice, it is for the Bank of Thailand or the Ministry of Finance, or the Office of the Board of Investment (OBOI) and the Ministry of Industry or Ministry of Commerce, each in turn and in accordance with its competence, to have a fair share in the approval process of foreign direct investments in various forms and in the different classes or categories of business or industrial projects open and available for foreign direct investments with varying degrees of privileges and promotional incentives at different periods of time.  For instance, it is for the Bank of Thailand to allow the transfer or transmittal of capital or for the

21

Ministry of Industry or Commerce or the OBOI to license and register the establishment of a factory or a business enterprise or to authorize an industrial project. The distribution of power to approve a transaction or a project is designed to ensure efficient reception and management of foreign direct investments. This practice is confirmed by the plain reading of the very terms of Article1 (1) of the Protocol to Article 1 of the 1961 BIT.

## III.   COMPREHENSIVE PROTECTION UNDER THE 2002 TREATY

44.   The last series of questions considered in this OPINION relates to the extent, scope and coverage of available measures of protection under the successive 2002 Treaty between the Federal Republic of Germany and the Kingdom of Thailand concerning the Encouragement and Reciprocal Protection of Investments.

### I.   OBJECT AND PURPOSE OF THE TREATY OF 2002

45. It appears that the Treaty of 2002 was primarily designed to update the earlier Treaty of 1961, having been in operation for nearly four decades since its entry into force in 1964. With very slight verbal modifications, the Title and the Preamble, in all its three paragraphs, reproduce almost *verbatim* the wording of its predecessor. The word "encouragement" is used in the place of "promotion", and the phrase "apt to stimulate" is replaced by "conducive to stimulate". The definition of the term "investments" in Article 1 repeats all the components of investments contained in **Article 8** of the predecessor treaty. Accordingly, there has been no change in the intention, motivation or desire of the two Contracting State Parties to both Treaties, continuing to pursue the same object and purpose of the original treaty. Nor has there been any indication that there are further restrictions on the scope, extent or coverage of the measures of protection under the new Treaty. Much less can it be construed as an attempt to curtail or otherwise to impair the rights of German nationals and companies already acquired and protected by the earlier Treaty. If anything, the later Treaty serves to reaffirm and reinforce the reciprocal commitments of the two Governments in the context of the avowed assurance of the availability of improved measures of protection in respect of investments made by nationals and companies of the other Contracting Party.

## J.   NEW FEATURES IN THE 2002 TREATY RÉGIME

46.   In their relentless effort to continue to strengthen the existing Treaty regime which offered firmer assurances than otherwise obtainable under existing customary international law which at the dawn of the twenty-first century may still be characterized as unsettled on many crucial points regarding international development law or the law of international investments in the light of inconsistent resolutions of the General Assembly of the United Nations, the Kingdom of Thailand and the Federal Republic of Germany have found it

expedient to sit down at a conference table to explore the ways and means of improving "transparency" in the rule of international law mutually acceptable by both countries, not unmindful of the current circumstances of economic interdependency and the ever increasing need for foreign direct investments. In my considered opinion, a proper balance has been struck and is currently being maintained in the extended and newly reinforced régime to encourage and reciprocally to provide more readily available mechanisms and methods of friendly negotiations and more relaxed and flexible means of settlement of differences directly between the parties to the dispute without having unnecessarily to invoke the traditional method of subrogation by the home State or to revert to the practice of the so-called diplomatic intervention to protect its citizens abroad. After all, the host State is more than ready and willing to provide the facilities to promote the resolution or settlement of any conflict. The availability and transparency of the methods of dispute settlement is a factor which is conducive to stimulate private foreign investments. Each country has been fully aware that it is capital importing as well as capital exporting at the same time. An appropriate balance could thus be achieved and maintained between Thailand and Germany, as it has been in this particular respect for almost half a century.

47.    As amply demonstrated by the record of the communications between Thailand and Germany and the minutes of the meetings and internal deliberations of the Thai CA Committee headed by Dr. K. Kraichitti, then Deputy-Director General of the Department of Economic Affairs, several concerns were expressed by both Sides. For the Federal Republic of Germany, it was felt that the time had come to revise and update the nature and extent of the measures of protection offered by the existing bilateral treaty régime which had been in force since 1964. On the part of the Kingdom of Thailand, there was an emerging need for more foreign direct investments with more relaxed control and restrictions since the financial crisis of 1977, and a sense of urgency in an effort to restore the general confidence of foreign investors to overcome the Asian financial crisis of the time. Thailand planned for a quick recovery and early repayment of the USD 17 billion loan from the IMF almost without condition. It is in this light that the new 2002 Bilateral Treaty should be viewed and understood. It is noted in this context that Article 10 of the new Treaty provides in detail practical working procedures for the settlement of disputes between a Contracting Party and an Investor, and thanks to the far-sighted wisdom of both Thailand and Germany, parties to the present dispute are accorded an opportunity to be heard before a mutually acceptable and properly constituted arbitral forum, presided by a neutral arbitrator duly appointed in accordance with the provisions of the 2002 Treaty. In the present case, the Claimant was thereby enabled to institute proceedings directly against the Respondent without having to go through the diplomatic channels for traditional measures of protection of yesteryear.

48. On the other hand, the balance struck and maintained by the 1961 Treaty has been recognized and preserved in the 2002 Treaty. The ultimate decision in the

23

admission and the granting of approval of investment projects or the permission required for the establishment of a business enterprise by the Host State is retained intact.  The principle of transparency as well as that of "good faith" dictates that all the requirements to be met by both the investor and the host country must be met **"consistent with the latter's laws and regulations"**.  This is borne out by the wording of **Article 8: Scope of Application,** forming part of the subject to be addressed immediately below..

## K.   SCOPE OF APPLICATION AND COVERAGE OF TREATY PROTECTION

49. Under International Law, the canon of construction and interpretation of Treaties is almost exhaustively contained in the Vienna Convention on the Law of Treaties of 1969, in particular for successive treaties in Article 30 and in general in Articles 31, 32 and 33 for multilingual treaties. Although Thailand has not ratified this particular Vienna Convention, most of its fundamental provisions represent current general international law.   Accordingly, the views expressed in this OPINION on the interpretation of the pair of successive Treaties between Thailand and Germany under review will follow essentially the basic principles of interpretation contained in the Vienna Convention.  For the particular questions under review, **Article 2: Admission, Protection and Treatment of Investments,** in particular **paragraph 2** is directly on the point at issue. It runs:

> "(2) The Treaty shall apply **only to investments that have been specifically approved in writing by the competent authority, if so required by the laws and regulations of that Contracting Party".**

50. Thus, this provision, if read without the proviso, can be seen as a restriction on the application of the 2002 Treaty solely to "investments that have been specifically approved in writing by the competent authority," and not to other investments not "approved in writing by the competent authority". Such a construction would be incomplete since the entire proposition is contingent upon the satisfaction of the condition "if **so required by the laws and regulations of that Contracting Party".**  Further enquiry is needed to verify the requirement by the laws and regulations of the host State.   Based on the paucity of the Certificates of Admission containing approval issued by the Ministry of Foreign Affairs between 1972 and 2003, it appears that the first decade between 1972 and 1982 witnessed only three such certificates, each of which did nothing more than reconfirm the approval already given by another appropriate authority, while the last four certificates between 1984 and 2003 were silent on prior approval being given by an appropriate authority or else being taken for granted by the Ministry of Foreign Affairs, not being in the position to find any Thai law or regulation requiring such approval, consistent with the terms of **Article 2 (2)** of the 2002 Treaty...

.51.     As such, **Article 2 (2)** may be considered to be sufficiently well balanced even without reference to the express provision of **Article 8.** In any event, following on the heel of **Article 1: Definitions** any reasonable interpretation of **Article 2** must take into account the definitional provision of the various components of "**investments,**" which necessarily include "**shares**" in b) and **business concession under public law in e).** Under the general rule of interpretation of treaties, **Article 31 of the Vienna Convention** is directly on point. It reads in part:

> "1.    **A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."**

It should be recalled that the definition of investment in **Article 1** and the list of **every kind of asset enumerated therein** is not meant to be exhaustive, leaving room for other types of assets as yet not specifically classified.

52.     **Article 2 (2)** cannot as such be read out of context, or without regard for the entire text of the Treaty. Without resorting to supplementary means under **Article 32** reference still has to be made to **Article 8 of the same 2002 Treaty,** which affords the check and balance for the total structure of the 2002 Treaty. It defines the **Scope of Application** in these terms:

> "**This Treaty shall also apply to approved investments made prior to its entry into force by investors of either Contracting Party in the territory of the other Contracting Part consistent with the latter's laws and regulations."**

53. **Article 8** provides the necessary link to ensure the uninterrupted application of the enhanced protection guaranteed by the later Treaty. A normal reading of the final clauses of both Treaties reveals the existence of a well-conceived coherent system being put in place. Thus **Article 14 (3) of the 1961 Treaty** serves to ensure the protection afforded by **Articles 1 to 13 of the Treaty** for all investments made prior to the termination of the Treaty to remain effective for another ten years after termination of the Treaty. The 2002 Treaty entered into force on 14 October 2004, thereby terminating on that date the 1961 Treaty, whereas the investments made prior to that date, naturally under the 1961 Treaty **shall continue to be effective for a further period of ten years,** i.e. until 14 October 2014. As such, investments made in Thailand by German nationals and companies prior to 14 October 2004 will continue to be protected by the provisions of Articles 1 to 13 of the 1961 Treaty until 14 October 2014 and at the same time will continue to receive the concurrent protection available under the 2002 Treaty from the date of the latter's entry into force until terminated. For these reasons, investment made by the Claimant continues to receive concurrent double coverage of protection of both the 1961 and the 2002 Treaties from 14 October 2004 until 14 October 2014, exactly ten years of the entire period of concurrent operation of both Bilateral Treaties. If the 2002 Treaty were to be terminated after entry into force for ten years, that is to say on 14 October 2014 after giving twelve months notice of termination, then investments made before termination date under the 2002 Treaty would continue to be effective for another

fifteen years from the date of effective termination.. *Ratione temporis*, in any event, the present dispute is safely and amply covered by virtue of the provisions of the 1961 Treaty as well as those of the 2002 Treaty.

54. It should also be added that this proposition is endorsed by the final clause of the **2002 Treaty**, of which Article 11 (2) stipulates that **This Treaty shall remain in force for a period of ten years and shall be extended thereafter for an unlimited period unless denounced in writing through diplomatic channels by either Contracting Party twelve months before the expiration.** Accordingly, the 2002 Treaty cannot be denounced before 14 October 2014. Thus the protection granted under the 1961 Treaty will remain effective until that date, thereby securing the standing of the Claimant in respect of the validity of its claims and the applicability and availability of the continuing protection offered and reconfirmed by both Treaties 1961 as much as 2002. There appears to be no discrepancy on these points in the three different languages of the Treaties, English, Thai and German, each text containing in effect identical provisions. There is no necessity to invoke Article 33 of the Vienna Convention of 1969.

## L.    VIABILITY AND VALIDITY OF ARTICLE 8 OF THE 2002 TREATY

55. **The Scope of Application** as specifically circumscribed in **article 8, representing a balanced approach,** may and has in fact given rise to at least two questions.    The first question relates to the use of the term "**approved investments**" which in the light of the clarification given in Section G. **paragraphs 28 to 39 above** refers to "investments made in projects classified in the **certificate of admission** by the **appropriate authority of the Kingdom of Thailand** in accordance with its legislation and administrative practice as an "**approved project**".    In short, the phrase "**approved investments**" for all practical purposes means "investments made in Thailand in projects classified by the appropriate authority of the Kingdom of Thailand in accordance with its regulations and administrative practice as an "**approved projects**".    In point of fact, the shorter term "approved investments" after four decades of repeated usage has come to be adopted in the 2002 Treaty, as a more convenient substitute for the longer phraseology and verbiage used in the 1961 Protocol.  Both terms continue to be used interchangeably, but retaining one and the same meaning, namely "investments made in an approved project".

56. The second question at issue relates more precisely to the phrase "**consistent with the latter's laws and regulations**" in connection with the "**approved investments made prior to its entry into force.**" This phrase only refers to "**investments made prior to 14 October 2004**".    This can only mean "**investments made in projects classified in the CA as an "approved project**". Thus the term "**approved investment**" used in the 2002 Treaty merely operates as a *renvoi* back to the 1961 Treaty and Protocol, and could not stand on its own without invoking the true meaning with exclusive reference to "**approved**

project". The two terms are intended to signify one and the same notion, namely "**approval of the project**".

57. For these reasons, the expression "approval of the investment" in the 2002 Treaty is meaningless without a *renvoi* back to the 1961 Treaty régime. Any serious attempt to clarify the true meaning of this phrase cannot avoid a reasoned appreciation of the legal effect of the **Announcement of the Committee** appointed by the Council of Ministers, composed of representatives of the competent Ministries concerned and headed by the Ministry of Foreign Affairs. The Announcement was adopted on 19 August 2003, as a new guideline for the issuance of CA (Certificate of Admission) with its name changed to CAP (Certificate of Approval for Protection). It was officially communicated by the Ministry of Foreign Affairs to the German Embassy in a Note **No. MFA (1704/2278) dated 28 October 2003**. The Embassy was further notified that the new investments made in the future shall be entitled to full protection without the necessity to apply for the approval from the CAP Committee through the Ministry if they fall under the following categories:

1). **Investment that is granted the license approved by the Minister of Commerce or the Director-General of the Department of Business Development according to the Foreign Business Act B.E. 2542;**

2). **Investment that is granted the Certificate of Promotion from the Board of Investment;**

3). **Investment under Government concessions.**

Two separate issues are inherently intertwined in any quest to find a viable answer to this enigma. First, it is useful and necessary to verify the legal status of this **Announcement**, specifically whether or not it constitutes in Thai practice a law or a regulation as stipulated in **Article 8 of the 2002 Treaty**. In the second place, regardless of the standing or legal status of this **Announcement**, it is nevertheless relevant to ascertain the final outcome of the exercise of authority pursuant to the **Announcement which must be read as a whole** to be able to determine whether in actual practice it serves to fortify or in any way to preclude or preempt the jurisdiction of the present Arbitral Tribunal. In my considered opinion, the **Announcement** in no uncertain terms expressly eliminated any possibility of an application to be made to the Committee for re-approval of all Government concession contracts, including especially the Don Muang Tollway Concession currently *sub judice* the present Tribunal. The Committee has no part to play in the approval of a Thai Government project such as the DMT.

58. **Legal Effect of a Resolution of the Council of Ministers (Cabinet)**

The first issue that appears relevant and need to be answered forthwith is the status or legal effect of a resolution adopted by the Council of Ministers at its

regular weekly session. Contrary to popular belief, under Thai law and practice, Cabinet resolutions do not have the force of law, although they are binding on the part of Government agencies concerned unless and until overruled or modified by subsequent resolutions adopted at the next Cabinet meeting or otherwise annulled or revoked by a succeeding Council of Ministers. As such, resolutions of the Cabinet do not have the force of law in Thailand and consequently are not covered by the phrase **"consistent with the laws and regulations"** of the Contracting Party. It is to be noted that the treaties concluded by Thailand, bilateral and multilateral, contain frequent references to Thai national legislation, which invariably includes all Thai laws and regulations but not Cabinet resolutions. Under Thai legislative practice, all Acts of Parliament, Royal decrees, Ministerial regulations or decrees, as subordinate or delegated legislation, may have the force of law, and as such are binding generally. They will be given legal effect due to them by the Courts of law. However, decisions of the Cabinet or Resolutions adopted by the Council of Ministers, not being recognized as a juristic person under Thai internal law, civil and commercial, nor authorized as a legislative body under Thai administrative law, although highly regarded as policy directives for all branches of the administrative and government bodies, are not binding on the people, nor on the Thai judiciary which may feel free not to give effect to them in the absence of subsequent legislative enactments or prior general enabling Act of the House of Representatives. Thus, the Supreme *Dika* Court of Thailand, in *Phya Preeda Narubate v. H.M. Government (1947)*, Decision Nuimber 724/2490, rejected the claim against the Thai Government, not for immunity from jurisdiction, but for the absence of legal personality on the part of the Thai Government under internal civil law. This decision was cited in an article I published in the Netherlands Yearbook of International Law, Volume X, 1979, pp.143-151 on *"Immunity from Attachment and Execution of the Property of Foreign States : Thai Practice"*.

59. The **Announcement of the CAP Committee** in question refers to two Cabinet decisions on 1 July and 19 August 2003. It was dated 22 October 2003, after the signing of the 2002 Treaty between Thailand and Germany, but before its ratification in October 2004. It is in fact traceable back to a much earlier letter, dated 24 June 1991, addressed to the Council of Ministers, proposing the establishment of a new Permanent Committee. This was adopted by a cabinet Resolution of 12 July 1991. The Committee was appointed for the purpose of approving projects under the Investment Treaties between Thailand and other countries. In 1994 the name of this Committee was changed to **"Committee on the Approval of Investments between Thailand and Other Countries"**. The certificate issued was also subsequently changed from **"Certificate of Admission" (CA)** to **"Certificate of Approval for Protection" (CAP)**. It is to be recalled in this connection that three types of foreign investments **"shall be granted protection" under the relevant BIT without the need for further specific approval.** These exceptions include **all investments specified in the** guideline set out *in extenso* in **paragraph 57 above.** .

28

60.    For all practical purposes, the **Announcement**, in its own words, as communicated to the German Embassy, in a Note dated 28 October 2003, restated the practice of the CAP Committee issuing Certificates of Approval under the Treaty of 1961, by the Ministry of Foreign Affairs, heading the new Committee. Under the guideline set out in the **Announcement**, three inherent exceptions are recognized, of which at least two are eminently applicable to the investments made by the Claimant in Thailand. First of all, the Claimant's investments were made in the merger with Dyckerhoff & Widmann and the acquisition of substantial German shares in the DMT which was granted a Certificate of Promotion by the Office of the BOI.  Secondly, the Claimant has been prominently recognized as a leading partner in the DMT, a Thai joint venture, specifically to secure a Government Concession, which was successfully awarded to DMT with specific mention by name and in full recognition of the pivotal role of the Claimant as an indispensable operation and management partner in the Thai-German joint-venture enterprise, the DMT  Furthermore, the construction was designed and engineered by the Claimant, as well as managed and directed by its personnel, and ultimately it was fully completed in accordance with the Concession Agreement. The Ministry of Foreign Affairs cannot be heard at this late hour to proclaim a proposition of law contrary to the contents of its own diplomatic Note dated 28 October, 2003, cited repeatedly earlier in this OPINION.   Under international law, the Respondent is precluded from denying the validity or veracity of the existing administrative practices of the Thai Government as lucidly categorized in the **Announcement** officially conveyed to the German Embassy through diplomatic channels.

## M.    NON PERFORMANCE OF CONTRACT OR BREACH OF TREATY

61.    One last question to be addressed in this OPINION concerns the connection or relation, if any, between a breach of a State Contract and a violation of a Treaty obligation.  Admittedly, the concession contract at issue is a State contract or a Government contract between the State through the Department of Highways on the one part and the DMT on the other. A breach of contract by a State as a party to a concession agreement is not necessarily an internationally wrongful act in the eyes of international law.  Nor indeed does it necessarily constitute a breach of a Treaty obligation entered into between two Contracting States in a distinct and separate transaction unconnected with any State contract with a private concessionaire. However, a State is not excluded from the possibility of violating its treaty obligation whereby it undertakes to provide constant protection to the investments lawfully made in its territory by nationals and companies of the other Contracting Party. In various instances, a State may also be considered to have violated customary rules of International Law by expropriation or nationalization of foreign-owned industries without paying appropriate compensation, required of it by

International Law, and which in addition to constituting failure to abide by the terms of the concession contract, also violates its own bilateral treaty obligation.  A state can also undertake in a State contract not to expropriate or nationalize without paying compensation.  Different obligations may be violated by one and the same act attributable to the State which constitutes a breach of contract, and at the same time failure to comply with the minimum standard of treatment of aliens under International Law, as restated and confirmed in bilateral or multilateral Treaty commitments.  Once understood, it is clear that one act attributable to the State may entail two or more different breaches, one as a violation of an international obligation towards another State, such as .a breach of an Investment Protection Treaty, and indeed another as failure to perform a contractual obligation under its own contract law or administrative law.  A breach of promise in a concession contract can entail a violation of the norm *Pacta sunt servanda* under the law of Treaties. Both promises must be kept whether under national law of contract or administrative law or pursuant to the Law of Treaties, just as parallel or repeated commitments made contractually under the internal civil law must be honored.  Its breach could also at the same time engage the State responsibility for failure to perform a Treaty obligation by the very same action or omission on the part of the State.

## JUSTICE MUST ALSO APPEAR TO BE DONE

62.  True it is in all cases of dispute settlement that justice must not only be done, but must also appear to be done.  The ultimate interest of the Kingdom of Thailand and the public interest of the Thai people would be best served if the present dispute could be faced fair and squarely and seriously considered and settled by the means chosen by the parties rather than be shunned and avoided. Justice should not be denied for want of a better chosen or more competent forum, especially after careful considerations by the Parties to the 1961 Treaty, hand-picking the method and process of dispute settlement from among the available means of their choice.  There is wisdom in resolving the existing conflict rather than postponing the chance of tackling it by keeping it floating or dangling in the air.  Thailand and Germany should be afforded a much needed opportunity to have their rights and obligations under the Treaty clarified by an independent forum once and for all.  Final settlement of this burning issue could enhance further continuing friendly and mutually fruitful cooperation between the two Nations, with renewed assurances of a reasonable expectation of an agreed measure of protection for the reciprocal treatment of the investments made by their respective nationals and companies in the territory of the other Contracting Party.  The Thai side could rest assured that the claims of German investors in the case at bar are legitimate, and that their grievances are real and should be heard.  Their claims are not frivolous, nor are they in any sense vexatious.  Far from being malicious, the German claims have been made in all honesty and in the best of good faith. . They clearly deserve to be settled on their merits.

## IV.   CONCLUSION

63.   The preceding considerations of the three main questions and related issues addressed in this OPINION warrant the following conclusions.

(1)  The investments made by the Claimant in Thailand are investments in projects consistent with Thai laws and regulations within the meaning and purview of the 1961 bilateral Treaty between Thailand and Germany on the Promotion and Reciprocal Protection of Investments.

(2)  The investments made by the Claimant in Thailand have been made in an "approved project" in the language of the 1961 Treaty, otherwise subsequently known for short as "approved investment" under the 2002 Treaty, by acquiring significant amount of shares in a joint-venture company with a Certificate of Promotion, and further strengthened by active participation and management of the joint-venture to obtain concession contract from the Department of Highways of the Ministry of Communications of Thailand consistent with the relevant laws and regulations of the Kingdom.

(3)  The investments made by the Claimant in Thailand are fully entitled to the protection guaranteed by the Kingdom of Thailand in the two successive and concurrently applicable Investment Protection Treaties of 1961 and 2002.

For the foregoing reasons, in my considered opinion, the Arbitral Tribunal is well and truly and fully competent with plenipotentiary jurisdiction to hear and determine the merits of the case before it.

Sompong SUCHARITKUL
San Francisco, 11th November 2006

31